**2014-1731**

———————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

———————————

**INNOVENTION TOYS, LLC,**

*Plaintiff-Appellee,*

**v.**

**MGA ENTERTAINMENT, INC.,
WAL-MART STORES, INC., AND TOYS "R" US, INC.**

*Defendants-Appellants.*

———————————

**Appeal from the United States District Court for the
Eastern District of Louisiana, in case no. 2:07-cv-06510,
Judge Susie Morgan.**

———————————

**BRIEF FOR DEFENDANTS-APPELLANTS
MGA ENTERTAINMENT, INC.,
WAL-MART STORES, INC., AND TOYS "R" US, INC.**

———————————

Donald R. Dunner
Allen M. Sokal
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001
(202) 408-4000

*Attorneys for Defendants-Appellants
MGA Entertainment, Inc., Wal-Mart
Stores, Inc., and Toys "R" Us, Inc.*

October 21, 2014

## Certificate of Interest

Counsel for MGA Entertainment, Inc., Toys "R" Us, Inc., and Wal-Mart Stores, Inc. certifies the following (use "None" if applicable; use extra sheets if necessary):

The full name of every party or amicus represented by me is:

>MGA Entertainment, Inc.
>Toys "R" Us, Inc.
>Wal-Mart Stores, Inc.

1.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

>MGA Entertainment, Inc.
>Toys "R" Us, Inc.
>Wal-Mart Stores, Inc.

2.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

>MGA Entertainment, Inc.:  None
>Wal-Mart Stores, Inc.:  None
>Toys "R" Us, Inc.:  No parent company; Vornado Realty Trust, Inc., a Publicly owned real estate investment trust, owns 10% or more of the Stock of Toys "R" Us, Inc.

3.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or are expected to appear in this court are:

**Finnegan, Henderson Farabow, Garrett & Dunner, LLP.**
Donald R. Dunner, Allen M. Sokal

**Greenberg Traurig, LLP.**
Kevin J. O'Shea, Mark R. Gal, Matthew J. Levinstein, Michael A. Nicodema

**Liskow & Lewis**
S. Gene Fendler, George Denegre, Jr.

**M. Breaux Intellectual Property Law, LLC**
Marie Breaux

**Milling Benson Woodward, LLP**
James K. Irvin, Juan Joseph Lizarraga

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF RELATED CASES ................................................. iv

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES...........................................................2

I.    STATEMENT OF THE FACTS ...................................................8

      A.    The '242 Patent ................................................................8

            1.    The  Claims .............................................................8

            2.    The Level of Ordinary Skill ....................................9

      B.    The Prior Art ...................................................................10

      C.    This Court's Previous Opinion .......................................12

      D.    Provisional Rights  .........................................................15

            1.    The Scope of the Patent Claims Versus the Published
                  Application Claims ................................................15

            2.    The Summary Judgment Opinion on Provisional Rights
                  Damages..................................................................17

      E.    The Trial ..........................................................................19

            1.    Testimony About the Prior Art and Obviousness....................19

            2.    Testimony About Beveling/Kinematic Mounts,
                  Displacement Errors, Optical Quality, and Level of
                  Ordinary Skill........................................................22

            3.    Testimony About Commercial Success and Industry
                  Acclaim ..................................................................27

            4.    Testimony About Copying........................................28

        5.      Testimony About Willful Infringement ....................................33

        6.      The Verdict ...............................................................................34

   F.    The Trial Court's Opinion on Willful Infringement ...........................35

   G.   The Trial Court's Opinion  Denying JMOL ......................................45

II.    SUMMARY OF THE ARGUMENT .............................................................45

III.   ARGUMENT ...................................................................................................47

   A.   Standard of Review .............................................................................47

   B.   MGA Is Entitled to JMOL on Obviousness or, Alternatively, a New Trial .............................................................................................48

   C.   The Court Erred in Concluding that Innovention Introduced Substantial Clear and Convincing Evidence of Willful Infringement .........................................................................................57

   D.   The Court Erred in Denying Summary Judgment on Provisional Rights, Because the '242 Patent Claims Are Not Substantially Identical to the Published Claims .......................................................60

CONCLUSION ..............................................................................................................63

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agrizap, Inc. v. Woodstream Corp.*,
    520 F.3d 1337 (Fed. Cir. 2008) ........................................................54

*Arcelormittal France v. AK Steel Corp.*,
    700 F.3d 1314 (Fed. Cir. 2012) ......................................................55

*Asyst Technologies, Inc. v. Emtrak, Inc.*,
    544 F.3d 1310 (Fed. Cir. 2008) ......................................................54

*Cable Electric Products, Inc. v. Genmark, Inc.*,
    770 F.2d 1015 (Fed. Cir. 1985), *overruled on other grounds by*
    *Midwest Indus. v. Karavan Trailers*, 173 F.3d 1356, 1358-59 (Fed.
    Cir. 1999) .......................................................................................56

*Dystar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick
    Co.*,
    464 F.3d 1356 (Fed. Cir. 2006) ......................................................54

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    131 S. Ct. 2060 (2011)....................................................................59

*Goodner v. Hyundai Motor Co.*,
    650 F.3d 1034 (5th Cir. 2011) ........................................................47

*Innovention Toys, LLC v. MGA Entertainment, Inc.*,
    637 F.3d 1314 (Fed. Cir. 2011) ................................................*passim*

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*,
    383 F.3d 1337 (Fed.Cir. 2004) .......................................................58

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)..........................................................50, 53, 54

*Laitram Corp. v. NEC Corp.*,
    163 F.3d 1342 (Fed. Cir. 1998) .........................................17, 60, 61

*LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*,
    275 F.3d 1347 (Fed. Cir. 2001) ..........................................................48

*Media Techs. Licensing, LLC v. Upper Deck Co.*,
    596 F.3d 1334 (Fed. Cir. 2010) ..........................................................55

*Octane Fitness, LLC v. Icon Health & Fitness, Inc.*,
    134 S. Ct. 1749 (2014)................................................................46, 58

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)...........................................................................47

*Ruiz v. A.B. Chance Co.*,
    234 F.3d 654 (Fed. Cir. 2000) .....................................................39, 42

*Safeco Ins. Co. of American v. Burr*,
    551 U.S. 47 (2007).............................................................................58

*In re Seagate Tech, LLC*,
    497 F.3d 1360 (Fed. Cir. 2007) ...................................................35, 58

*Smith v. Transworld Drilling Co.*,
    773 F.2d 610 (5th Cir. 1985) .............................................................48

*In re Tiffen*,
    448 F.2d 791 (CCPA 1971) ...............................................................55

*Tokai Corp. v. Easton Enters., Inc.*,
    632 F.3d 1358 (Fed. Cir. 2011) ...................................................42, 54

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) .........................................................47

*Whitserve, LLC v. Computer Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012) .............................................................58

*Wyers v. Master Lock, Co.*,
    616 F.3d 1231 (Fed. Cir. 2010) .............................................54, 55, 57

*Yarway Corp. v. Eur-Control USA, Inc.*,
    775 F.2d 268 (Fed.Cir. 1985) ............................................................58

iv

**Statutes**

28 U.S.C. §1295(a)(1)..................................................................................1

28 U.S.C. §§1331........................................................................................1

28 U.S.C. §§1338(a) ...................................................................................1

28 U.S.C. §2107 .........................................................................................1

35 U.S.C. §154(d)(2)..................................................................................17

35 U.S.C. §284..................................................................................46, 58

35 U.S.C. §285..........................................................................35, 46, 58

**Other Authorities**

Fed.R.App.P. 4(a) ......................................................................................1

Fed. R. Civ. P. 56(a)..................................................................................48

Federal Rule of Appellate Procedure 32(a)(7)(B) ....................................2

Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) ..............................2

## STATEMENT OF RELATED CASES

An appeal from the same civil action was previously before this Court, *Innovention Toys, LLC V. MGA Entm't, Inc.,* 637 F.3d 1314, Appeal No. 2010-1290 (March 21, 2011), before then Chief Judge Rader, Circuit Judge Lourie, and District Court Judge Ronald M. Whyte, sitting by designation. Counsel is aware of no other case pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

The United States District Court for the Eastern District of Louisiana had jurisdiction over this case under 28 U.S.C. §§1331 and 1338(a).

This Court has exclusive jurisdiction over this appeal.     28 U.S.C. §1295(a)(1).

The Notice of Appeal from the Final Judgment entered May 7, 2014, and the subsequent denial of JMOL was timely filed under 28 U.S.C. §2107 and Fed.R.App.P. 4(a) on August 5, 2014.

## STATEMENT OF THE ISSUES

1.    Did the court err in denying JMOL of obviousness when

(a)    the prior-art Laser Chess articles disclose all claim limitations in a computer game rather than a physical game as claimed, while the prior-art Swift patent discloses most claim limitations and implementing its physical laser game as a computer game, and this Court ruled that the Swift/Laser Chess prior art and Innovention's patent all address the same problem,

(b)    the verdict of nonobviousness relied on finding a level of skill requiring no laser/optics experience even though (1) all asserted claims, the field of the invention, and all of MGA's prior art address chess-like laser games that divert laser beams with user-placed mirrors, (2) Innovention's expert admitted creating the claimed game requires significant skill in lasers/optics, and (3) this Court recognized the necessity for understanding geometrical optics,

(c)    Innovention's expert testified that one skilled in the art (in his opinion having no laser/optics experience) couldn't have combined the prior-art teachings solely because one must have laser/optics experience to overcome certain engineering barriers even though Innovention's patent neither claims nor discloses them or how to overcome them,

(d)    combining the prior-art teachings to make the claimed physical game yields only predictable results, and Innovention's expert effectively admitted

the claimed subject matter would have been obvious to one having laser/optics experience, and

(e)     Innovention's evidence of commercial success and industry acclaim, and even operability, was attributable to a critical feature of its commercial product that Innovention's patent neither claims nor discloses, and, as a matter of law, evidence of secondary considerations couldn't overcome MGA's strong prima facie case of obviousness?

2.     Did the court err in denying JMOL of no willful infringement when

(a)     MGA had an objectively reasonable obviousness defense (see issue 1, *supra*),

(b)     the court construed the claims to require physical game pieces and reasoned that MGA's expert admitted that neither the prior-art Laser Chess articles nor Swift discloses "game pieces," but he admitted only that (1) the Laser Chess articles disclose electronic, not "physical," game pieces, and (2) Swift discloses fixed, not "movable," *key* game pieces,

(d)     the court implicitly held unreasonable MGA's position that the level of ordinary skill included substantial experience with optics and lasers, despite strong evidence supporting MGA's position (see issue 1(b), *supra*),

(e)     the court held substantial evidence of commercial success and industry acclaim existed, despite the futility of that evidence (see issue 1 (e ), *supra*), and

(f)     the court relied on MGA's knowledge of Innovention's published claims, even though Innovention amended those claims after a rejection without MGA's knowledge?

3.     Did the district court err in denying summary judgment of no provisional rights damages when

(a)     provisional rights damages are available only if the patent claims are "substantially identical" to the published claims,

(b)     no published claim required *movable* key pieces,

(c)     the examiner rejected most published claims because Swift discloses fixed key pieces, and

(d)     the applicant overcame the rejection by amending all claims requiring key pieces to require "movable" key pieces?

## PRELIMINARY STATEMENT

The court erred in denying MGA's motion for JMOL of invalidity of Innovention's '242 patent for obviousness. The asserted claims claim a chess-like board game, each player having playing or game pieces with mirrored surfaces and a key piece (resembling the king in chess) with no mirrored surface. Each player

4

has a laser source and takes turns positioning pieces to deflect laser beams away from the player's key piece and into the opponent's. The prior-art Laser Chess articles disclose everything claimed except they disclose a computer, not physical, game. Swift discloses a physical game including everything claimed by most asserted claims except that its key pieces are not movable, and it also discloses that one can alternatively implement its game on a computer. One can hardly imagine a stronger case of obviousness, i.e. making Swift's key pieces movable (as in the Laser Chess articles or chess, which render obvious also the few additional features missing from Swift in some claims) or a physical version of the Laser Chess computer version (in view of Swift).

Remarkably, the court granted summary judgment of *non*obviousness, ruling that the Laser Chess articles were non-analogous prior art. This Court vacated that judgment, explaining that game elements from any strategy game, electronic or physical, would have commended themselves to an inventor addressing a problem of game design.  On remand, the then district court judge (the case was transferred to another judge before trial) questioned whether obviousness remained in doubt given this Court's opinion.

At trial, however, Innovention's expert, ignoring overwhelming contrary evidence, testified that one of ordinary skill would have no experience with lasers/optics and therefore couldn't design a critical kinematic mount necessary for

operability and for combining the prior-art teachings, even though the '242 patent neither claims nor discloses a kinematic mount. And Innovention presented evidence of its product's commercial success and industry acclaim, even though that product has the critical but unclaimed and undisclosed kinematic mount necessary for both the product's success and operability. The jury found not just commercial success and industry acclaim, but also secondary considerations for which Innovention presented no evidence, and found the patent not invalid and willfully infringed. Although Innovention and its expert clearly misled the jury with irrelevant evidence and improper opinions, the court denied MGA's motion for JMOL of obviousness or a new trial.

The court also held as a matter of law that MGA willfully infringed, i.e. that MGA's obviousness defense was objectively unreasonable. Several clear errors undermine that ruling. The court inexplicably reasoned that the prior art doesn't disclose game pieces based on MGA's expert's alleged admissions, even though he testified to the contrary and admitted only that the Laser Chess articles don't disclose "physical" game pieces and that Swift doesn't disclose "movable" *key* pieces. And the court implicitly held unreasonable MGA's position that the level of skill in the art included substantial knowledge of optics and lasers despite overwhelming evidence supporting that position. That error undermined the court's nonobviousness as well as its willfulness holding, because Innovention's

expert testified that one experienced with lasers and optics would have found solving the kinematic mount problem trivially obvious. And the court not only adopted the jury's findings of commercial success and industry acclaim despite the silence of the '242 patent regarding the commercial product's critical kinematic mount, but overlooked that even relevant evidence of secondary considerations doesn't render a strong prima facie case of obviousness unreasonable. Finally, the court reasoned that MGA knew the scope of the patent claims upon issuance because MGA knew the scope of the *published* claims, but Innovention amended those claims to overcome a prior-art rejection and MGA indisputably first learned the scope of the *issued* claims when sued.

The court also erred in denying MGA's motion for summary judgment of no provisional rights damages. As required by statute for provisional rights damages, the court held the patent claims substantially identical to Innovention's published claims. But the examiner rejected the published claims, none requiring *movable* key pieces, in view of Swift, which disclosed fixed key pieces. The examiner allowed the claims after Innovention amended them to require movable key pieces. The court erroneously reasoned that Innovention amended the claims to make them more definite.

## I.    STATEMENT OF THE FACTS

### A.    The '242 Patent

#### 1.    The Claims

The '242 patent issued September 4, 2007.  A220.  Innovention sued MGA on October 5, 2007, for infringing claims 31-33, 39-41, 43, 44, 48-50, 53, and 54. The asserted claims require a board game with movable playing (or game) pieces having mirrored surfaces, movable key playing pieces without mirrored surfaces, and a laser source, the players taking turns moving playing pieces to deflect laser beams to illuminate the opponent's key playing piece and end the game.  Claims 31 to a board game and 39 to a method of playing it are representative and adequately describe the invention:

> 31.    A board game for two opposing players or teams of players comprising:
>
> a game board, movable playing pieces having at least one mirrored surface, movable key playing pieces having no mirrored surfaces, and a laser source,
>
> wherein alternate turns are taken to move playing pieces for the purpose of deflecting laser beams, so as to illuminate the key playing piece of the opponent.
>
> 39.    A method of playing a game by opposed players; said game comprising two sets of distinguishable playing pieces, each set having movable pieces with no mirrored surfaces, of which one is a key piece, and pieces with at least one mirrored surface, a game board consisting of a first end, a second end, and a plurality of rows and columns, intersecting to form a plurality of spaces, the method comprising the steps of:

8

> placing each player's set of playing pieces on the game in a pre-determined starting configuration; and
>
> alternating turns, each turn comprising moving, either a translation or a rotation, a piece followed by activation of a laser, said alternating moves continuing until one player illuminates the opposing player's key piece;
>
> wherein moving a piece consists of a movement one space in a horizontal, vertical, or diagonal direction to an unoccupied adjacent space.

A242-43.

Other asserted claims add additional limitations, but neither Innovention nor the court relied on them as distinguishing over the prior art.

## 2.    The Level of Ordinary Skill

The '242 patent's disclosure and claims are relevant to determining the level of ordinary skill. Specifically, the patent describes the field of the invention as follows:

> The present invention relates to board type games played on a game board or surface, preferably a substantially orthogonally gridded, planar surface, and *more particularly to a game which selectively diverts a beam (e.g. laser beam) by user-placed mirrored game pieces* that are moved laterally or rotated during play.

A237, col. 1, lines 21-28 (emphasis added). Swift, which the '242 patent describes in some detail, has a similar field of the invention with some identical phrases: "This invention relates generally to board type games and more particularly to a laser game which selectively diverts laser beams by user-placed mirrors." A5085,

9

col. 1, lines 5-8.  Swift, like the '242 patent, discloses only board games that employ lasers and deflecting mirrors.  All of the '242 patent claims recite lasers deflected by mirrors.  Swift, unlike the '242 patent, describes in detail the necessity of precisely positioning the deflecting mirrors.  See the description of Swift below.

### B.    The Prior Art

At trial MGA relied on Swift and the two Laser Chess articles.

Swift, A5075-93, discloses all limitations of '242 patent claim 31 except "movable" key pieces.[1]    Swift expressly discloses a "board game."  See, e.g., A5075, title, abstract, A5085, col. 1, lines 3-8.  The board includes x-shaped slots into which players "alternate turns" inserting deflecting mirror pieces ("movable playing pieces having at least one mirrored surface") to direct their own laser beams toward the opponent's scoring module ("key piece") or prevent their opponent's laser beams from reaching their own key piece ("[A]lternate turns are taken to move playing pieces for the purpose of deflecting laser beams, so as to illuminate the key playing piece of the opponent").  See, e.g. A5075, abstract.  The key pieces are permanently mounted on the board, while the players can place the mirror pieces in different squares.  See, e.g., A5085, col. 2, lines 54-56.

---

[1] Claim 39 includes that and other differences, namely the starting configuration and how players may move the pieces.

Indeed, comparing the '242 patent and Swift demonstrates that the '242 patent draftsman copied portions of Swift's disclosure. Compare the descriptions of the fields of the invention, *supra*, and the descriptions of prior-art Patent No. 3,516,671 in both. A237 , col. 1, lines 38-50; A5085, col. 1, lines 15-30.

But a strong emphasis in Swift, completely lacking in the '242 patent, is on needing to precisely position the deflecting mirrors. Swift discloses in detail how to prepare the x-shaped slots and mirror pieces to achieve that "critical" precision, including mirror thickness, materials, etc. See, e.g., A5085, col. 1, lines 40-45; col. 2, lines 24-28 and A5080, Figures 8 and 9; A5086, col. 3, lines 13-23; col. 3, line 67-col. 4, line 1; A5086-87, col. 4, line 27-col. 6, line 68.

Swift bridges the line between physical and computer games (the court construed the '242 patent claims as limited to a physical game) by disclosing, "Although the preferred embodiment is played by two players, obvious modifications of the game allow for ... a single player playing against a computer." A5085, col. 2, lines 47-51.

Under Swift's rules, however, the starting configuration places only the key pieces on the board, while claim 39 requires initially placing all pieces, and the players alternate inserting mirror assemblies into x-slots, where they remain until play ends. A5089, col. 9, lines 47-65. In those respects, Innovention argued, Swift

differs from the '242 patent claims. But as will be seen, such differences are remedied by the Laser Chess articles and conventional chess.

The Laser Chess, A5308-13, and Advanced Laser Chess, A5314-20, articles disclose all '242 patent claim features in a computer, not physical, game. For example, they disclose a two-player strategy game patterned after traditional chess with the goal of manipulating a laser-firing piece and mirrored objects to eliminate the opponent's king ("key piece"), in which (1) when a laser beam strikes a mirror, it bounces off without harming the piece, but destroys any piece that it hits on a nonreflective surface, (2) the mirrored and key pieces can move from square to square and the reflective pieces can rotate in place to direct laser beams, (3) the game ends when a laser beam hits a key piece, and (4) the players alternate moving pieces and firing lasers. The Laser Chess articles disclose also starting configurations on chess-like boards.

### C.    This Court's Previous Opinion

MGA previously appealed from a summary judgment that it infringed and the '242 patent was not invalid. 637 F.3d 1314 (Fed.Cir. 2011). This Court's opinion vacating the validity judgment and affirming infringement is relevant to the instant obviousness issue.

First, the Court held as a matter of law that the Laser Chess articles are analogous art. The Court noted that the district court found that the Laser Chess

references each disclose "an electronic version of the '242 patent." 637 F.3d at 1321. The Court further stated that a reference disclosing an "electronic" laser-based strategy game "would . . . have been reasonably pertinent to the problem facing an inventor of a new, *physical*, laser-based strategy game . . . as a matter of law." *Id*. at 1322, 1323.

The Court reinforced that conclusion by comparing the disclosures of the '242 patent and the Laser Chess references, noting that both disclose various game pieces, rules for players' turns, and the objective of eliminating an opponent's key piece. *Id*. at 1322. The Court concluded that the patent and references relate to the same goal, namely designing a winnable, entertaining strategy game:

> [T]he '242 patent thus deals with the problem of game design, and game elements from any strategy game, regardless of how implemented, "logically would have commended itself to an inventor's attention in considering [this] problem." ... Basic game elements remain the same regardless of the medium in which they are implemented: whether molded in plastic by a mechanical engineer or coded in software by a computer scientist. And, as MGA's evidence shows, inventors of numerous prior art patents contemplated the implementation of their strategy games in both physical and electronic formats.... For example, the Swift patent states that "[a]lthough the preferred embodiment is played by two players, obvious modifications of the game allow for ... a single player playing against a computer."

*Id*. at 1322-23. On remand, District Court Judge Feldman questioned whether obviousness remained an issue or whether the Federal Circuit "has made a finding on obviousness itself."A5324, A5328.[2]

Regarding the level of skill, the Court held that the district court erred in holding it to be that of a layperson. The Court noted that one of the inventors had a Ph.D., the '242 patent reveals that the claimed invention requires an understanding of geometrical optics, and the district court stated that "it seems some knowledge of mechanical engineering or optics is required." *Id*. at 1323-24. The Court concluded, "evidence in the record and [the district court's] apparent factual finding that one of ordinary skill in the art would possess a higher level of skill in the art" meant the district court erred in basing its analysis on what a layperson would have found obvious. *Id.* at 1324.

This Court's affirmance of summary judgment of infringement is relevant to whether Swift's mirrored pieces satisfy the claim requirement for "movable" mirrored pieces.[3] This Court held that MGA's accused products infringe because their key pieces satisfy the claim requirement that they be "movable." The Court

---

[2] Before trial, the case was transferred to Judge Morgan.

[3] As detailed below, Innovention's expert, Dr.Eimerl, testified that Swift does not disclose "game pieces" because, *inter alia*, the district court construed "game piece" as a "mirrored or a non-mirrored structure that can be placed on the game board and moved by the players during the course of game playing" and Swift's mirrored assemblies, once positioned, do not move. A2106. The district court relied on that testimony. A48 n.72.

observed that although MGA argued that its key pieces were not supposed to be moved during game play, the district court reasoned that even if that were so, they "'are capable of movement ….'"  *Id*. at 1320.   This Court further observed Innovention's argument, "the Towers [key pieces] are 'movable' since they are not permanently mounted to the game board as are the key playing pieces (scoring modules) disclosed in the Swift patent."  *Id*. at 1319.

This Court concluded,

> such a construction does not render "movable" superfluous, as MGA asserts, since it distinguishes the '242 patent's key pieces from the mounted scoring modules disclosed in Swift.  Laser Battle's Tower pieces thus meet the "movable" limitation under the district court's consistent construction based on the pieces' undisputed ability to be physically positioned in different squares on the game board.  No reasonable jury could find otherwise.

*Id*. at 1320.  This Court's distinguishing between fixed or mounted key game pieces and those that are not fixed has obvious relevance to whether the mirrored pieces disclosed by Swift, which players position as desired on the board during play, meet the "movable" limitation of the claims.

### D.    Provisional Rights

#### 1.    The Scope of the Patent Claims Versus the Published Application Claims

The '242 patent's prosecution history is relevant to whether the scope of the patent claims differs from that of the published claims, and therefore to provisional

rights damages and, as will be seen, willful infringement.  The court recognized, "it is difficult to conceive of many situations in which the scope of a rejected claim that became allowable when amended is not substantively changed by the amendment."  A97 (citation omitted).  Yet the court denied MGA's motion for summary judgment of no provisional rights damages, holding as a matter of law that the patent claims are "substantially identical" to the published claims even though Innovention amended the published claims to overcome a rejection.  A96.

Although the published application included claims requiring movable game or playing pieces and key game or playing pieces, no claim required *movable key pieces*.  A5025-27.  The examiner rejected all but one asserted published claim in view of Swift and objected to that one claim, claim 39, as depending on a rejected claim, although it was an independent claim.  The examiner noted that Swift disclosed key game pieces, i.e. fixed scoring modules, having all claimed characteristics.  A5140.  To secure allowance of all of the claims, Innovention amended all independent claims requiring key pieces, including claim 39, to require a "movable" key piece.  A5115-25.[4]

---

[4] The Applicants' first sentence of the remarks in the responsive amendment stated, "Claims 1-35, 39-51, and 53-54 are amended to clarify what Applicant regards as the invention …." A5126.  And under the heading "Allowable Subject Matter," the last two sentences before the Conclusion state, "As noted above, claim 39 was amended to provide further clarity. This claim remains allowable."  A5128.  No such statement accompanied the response's argument that requiring "movable" key pieces overcame Swift.

Moreover, in successfully arguing the amended claims avoided anticipation, Innovention asserted, *inter alia*, "Swift also fails to disclose non-mirrored game pieces that are movable," and, in successfully arguing that the amended claims avoided obviousness, Innovention asserted, "Swift also fails to disclose, teach or suggest … non-mirrored game pieces that are movable." A5127-28, A5512-14.[5]

### 2.    The Summary Judgment Opinion on Provisional Rights Damages

The court recognized that the issue raised by MGA's motion for summary judgment of no provisional rights damages was one of law:  "whether the scope of the '242 patent is substantially identical to the scope of the '602 patent application." A96-97.  *See* 35 U.S.C. §154(d)(2).  Because the court found the scope of the patent claims substantially identical to that of the published claims, it denied MGA's motion.  A100.

The court also recognized that "it is difficult to conceive of many situations in which the scope of a rejected claim that became allowable when amended is not substantively changed by the amendment."  A97 (quoting *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347-48 (Fed. Cir. 1998)).  Although, as shown in Section I(A)(3), *supra*, Innovention amended all independent claims reciting key pieces to

---

[5] The key pieces in both the '242 patent and Swift (and the Laser Chess articles) have no mirrored surfaces.

require "movable" key pieces to overcome a prior-art rejection, the court ruled that the patented and published claims were substantially identical because (1) the examiner held published claim 39 patentable even though it did not require "movable" key pieces; (2) "the other [published] claim language (which describes moving game pieces) makes clear that being stationary rather than movable was not an option for the game pieces," e.g. "wherein alternate turns are taken to move playing pieces," or "moving, either in translation or a rotation, a piece . . ., said alternating moves continuing until one player illuminates the opposing player's key piece," and (3) "the record supports [Innovention's] contention that it [amended all independent claims that included "key pieces," including claim 39, to add "movable"] for clarity purposes," i.e. to make the claims more definite, analogous to providing antecedent basis. A98-100.

The court did not compare the issued and published claims. Nor did it explain why claim language requiring movable pieces means *all* pieces, including key pieces, must be movable, rather than just some pieces, such as the mirrored pieces. It did not explain how the indication of allowability of published claim 39 without a requirement for "movable" key pieces showed that the published claims implicitly required movable key pieces, when published claim 39 included other narrow limitations that Innovention eliminated when it amended claim 39 to require movable key pieces. Finally, the court did not reconcile its conclusion that

18

Innovention limited the claims to "movable" key pieces to make the claims more definite, when the examiner rejected the claims in view of Swift and Innovention relied on the new limitation to distinguish from Swift. See Section I(A)(3), *supra*.

### E.    The Trial

The trial testimony is relevant to obviousness, willful infringement, and exceptional case, all depending on the strength of MGA's evidence of obviousness. The jury heard expert opinion on obviousness and testimony about prior art, the differences between the claimed invention and the prior art, the level of ordinary skill, commercial success, industry acclaim, copying, and willful infringement. And the jury heard the inventors testify about how the invention was made.

### 1.    Testimony About the Prior Art and Obviousness

Both parties' experts testified about the prior art and obviousness. MGA's expert, Mr. Samuel Phillips, described how the Laser Chess articles and Swift "disclosed all of the elements of all of the asserted claims." A1869, A1877-1922, A1965-70; see also A5250-307, Phillips's claim charts. He also testified that one of ordinary skill would have had "about three years' experience designing optical systems," including "lasers and mirrors and laser mounts and precision alignment." A1877. And he testified that one of ordinary skill would have been motivated to combine the prior-art teachings to achieve the goals of the '242 patent. A1878.

He acknowledged that the Laser Chess articles describe a computer game, while Swift describes a physical game. A1889. He explained that both descriptions were "equally valuable" for teaching game elements and that "it's a [sic] legitimate to combine these, to treat them all equal." *Id*. (This Court adopted a similar position. *See* Section I(C), *supra*.)

Phillips then walked through all of the asserted claims' limitations and identified where the Laser Chess articles and/or Swift disclosed each. A1887-1922. For example, he began with the first element of claim 31, "a board game for two opposing players or teams." A1890. Using his slides, A5250-307, he explained where the references disclose two-player board games. A1890-92.

Contrary to the court's description, he expressly testified that Swift discloses "movable playing pieces having at least one mirrored surface." "[Y]ou place the mirror assemblies in the X slots, that is the movement. You do not move them after they have been placed but you do move them once." A1893-94. As to movable key playing pieces having no mirrored surfaces, Phillips testified that the Laser Chess articles disclose that limitation, not Swift, because Swift "did not have *movable* key playing pieces." *Id*. (Emphasis added). Phillips concluded, "Everything would have been—the performance would have been completely predictable. There would not have been any undue experimentation." A1922.

But Innovention's expert, Dr.Eimerl, testified that because the Laser Chess articles describe video games, they did not disclose any claim limitation. For example, "just because you call something a mirror does not make it a mirror." A2092. See also A2102-04. He admitted, however, that his testimony "sounds like it's splitting hairs and kind of crazy." A2105. Indeed, Dr.Eimerl pointed to no claim limitation missing from the Laser Chess articles except that they disclose video games, not physical structures. A2159-60, A2162-64.

Dr.Eimerl acknowledged Swift discloses a physical game. He testified, however, that Swift does not disclose a game board, A2105-06, despite Swift's express disclosure to the contrary, see Section I(B), *supra*. And he argued that the court's claim construction for "game piece"[6] required "a mirrored or a non-mirrored structure that can be placed on the game board and moved by the players during the course of game playing." A2106. Reasoning that the mirrored pieces in Swift are "not moved by the players during the course of game playing," Dr.Eimerl concluded, "there are no game pieces in Swift," *id*., even though Innovention had successfully argued that the accused products infringed even if they had key game pieces that remained stationary once placed on the board, *see* Section I(C), *supra*. Dr.Eimerl concluded that Swift discloses virtually nothing that the '242 patent claims:

---

[6] Although some of the patent claims recite "game pieces," all of the asserted claims recite the synonymous term "playing pieces" or just "pieces."

> [I]f there are no game pieces, there's no game board because there is no structure supporting it because they don't exist. So … there is no movable key playing pieces because there are no movable playing pieces. And so there's no pieces actually having no mirrored surfaces in Swift either ....

A2107. See also A2107-08. But see Section I(B), *supra*.

On cross-examination, however, Dr.Eimerl admitted Swift uses the phrase, "board game." A2152. And he admitted Innovention, in response to rejections in view of Swift, never asserted it lacked a game board, game pieces, or movable playing pieces. A2152-53. Dr.Eimerl also admitted the PTO did not have the Laser Chess articles. A2158; see Section I(A), *supra*.

## 2. Testimony About Beveling/Kinematic Mounts, Displacement Errors, Optical Quality, and Level of Ordinary Skill

Innovention's fact and expert witnesses emphasized for nonobviousness and operability numerous requirements, especially a critical beveling feature, or kinematic mount, that Innovention's patent neither describes nor claims. Coinventor Hooper testified at length about the inventors' struggles to achieve proper alignment of mirrored pieces. A1588-613. He emphasized that they had to align the mirrors to an accuracy of 0.1 degree. Otherwise, after two or three bounces, when at least ten were required, the laser beam would drift off target. *See, e.g.*, A1594. After years experimenting, the inventors found the primary solution—beveling the pieces' bases and providing complementary beveling in the

board squares to consistently align the pieces correctly. A1591. Indeed, Hooper testified the alignment means on the accused Laser Battle game, employing a locking methodology, did not work. A1591-92, A1673-74.

Innovention's expert, Dr.Eimerl, described the critical beveling feature as a "kinematic mount," and confirmed it must be reproducible to 0.1 degree for operability. A2118, A2122-23. Dr.Eimerl admitted, however, that Innovention's patent neither refers to nor claims a "kinematic mount." A2145. But Dr.Eimerl claimed the '242 patent nevertheless discloses kinematic mounts, relying solely on Figures 6 and 8 and asserting that the bases of those pieces were "angled in, so that when you place this or one of the pieces on the recesses [in the game board], it kind of just slides down until the sides of the base match the sides of the piece." A2122-23. The patent, however, supports none of that discussion and discloses instead that Figures 6 and 8 illustrate "game pieces…having no mirrored surfaces," A238, col. 3, lines 61-63, 65-67, which do not require precise alignment. Innovention's counsel apparently recognized that, because in closing, unsupported by evidence in the record, he alleged that only other figures (13 and 15) disclose the critical kinematic mount. A2226. Although those figures relate to game pieces having mirrored surfaces, neither the patent's discussion nor any testimony about them said anything about a kinematic mount.



FIG 13

FIG 15

A229-30.

Dr.Eimerl further testified that if a person of ordinary skill attempted to combine the prior-art teachings, he would fail. A2117. He explained that "a person of ordinary skill in the art would not be aware of [numerous requirements] because they're the kind of things that you do not learn until you've had some experience working with lasers and optics .... The three areas where it isn't easy: The first one is something called the kinematic mount ...." A2117-18. He

admitted, however, that "if you had the experience that I had working with lasers and optics in a laboratory, you would know the answer before you even started.... And this problem was solved, oh, for the first time I would say 30 years ago." A2120.

Dr.Eimerl described other requirements that would be beyond the ability of "a person of ordinary skill in the art of making board games," including factors relating to "displacement errors," e.g.

> the mechanical size of the mirrors, … what glue do I use to hold them in, ....  Every single piece that you make has to work exactly the same way, they all have to be reproducible and identical for the game to be successful in the marketplace.

A2123-24.  Another requirement Dr.Eimerl testified would be beyond the ability of one of ordinary skill was "optical quality."

> [F]or the game to work, this mirror has to be exactly flat, it has to be in exactly the right place ....  [Y]ou have to know which materials to use ....  You have to have a design that can be wiped clean without damage, you have to have a design that is tolerant to being frozen out in the cold, or being heated and left out in the sun....  And these are things which the ordinary practitioner of a board game, think of a game like Monopoly, you don't come across these problems in Monopoly.

A2124-25.   Dr.Eimerl did not say where Innovention's patent discloses those requirements.

On the contrary, Dr.Eimerl admitted that the patent says nothing about a 0.1 degree accuracy.  A2145.  And the patent says nothing about what the taper angles, the tolerances, or the materials of construction have to be.  *Id*.  He admitted the patent also says nothing about displacement errors, the thickness of the mirrors, mirror wearing and damage, ruggedness, and optical performance and quality.  A2145-46.  And nothing about materials and design that can be wiped clean without damage or even what the preferred materials are.  A2146-47.

Paradoxically, Dr.Eimerl maintained that one of ordinary skill need have no knowledge of lasers and optics.  A2084-90.  Yet in his deposition he testified that to make or create the claimed game "does require significant levels of skills in optics and lasers."  A2175.  And he admitted that he was "talking about a person who has the ['242] patent in front of him."  A2176-77.  Phillips, on the other hand, testified that one of ordinary skill would have a bachelor's degree in mechanical engineering or equivalent work experience, and also about three years' experience designing optical systems involving lasers, mirrors, laser mounts, and precision alignment.  A1877.

Dr.Eimerl disagreed, but admitted that his slides described the field of the invention as only a strategy board game with a structured board with physical game pieces, without referring to a laser.  A2147-48.  He admitted that the patent actually discloses the field of the invention as:

> The present invention relates to board type games played on a game board or surface, preferably a substantially orthogonally grid planar surface and more particularly a game which selectively diverts a beam, e.g., a laser beam, by a user-placed mirrored game pieces that are moved laterally or rotate during play.

A2149.  When asked to explain, he said,

> They used the term laser beam in that definition. However, they did not assert that in the Field of Invention that they are working in, every invention in the field has a laser.  They just asserted that it may include a laser.   There's more particularly to a game which selectively diverts a beam, a laser beam.

A2149-50.  But when asked to confirm that every '242 patent claim includes a laser, Dr.Eimerl said, "I don't know if it does or not."  A2151.  (All asserted claims do require lasers, and all claims require at least beam-emitting devices.  A241-43.)

Finally, Dr.Eimerl admitted he did not conclude that if Phillips was correct about the definition of a person of ordinary skill in the art, that person would not be motivated to combine the prior-art teachings.  A2170-71.

### 3.     Testimony About Commercial Success and Industry Acclaim

Innovention presented evidence intended to establish commercial success and industry acclaim.  Innovention directed all of that evidence to its commercial products.  Those products employed undisclosed, unclaimed features, including the kinematic mount and other requirements for operability, about which Dr.Eimerl said, "they all have to be reproducible and identical for the game to be

successful in the marketplace." A2123-26. Innovention presented no evidence that without the kinematic mount, it would have achieved commercial success or industry acclaim. As shown above, Innovention's own witnesses testified that without that feature, the game would not succeed or even work.

Innovention presented sales figures for its game from 2005 to 2011. A1164, A1204, A5094. With sales hitting a peak in 2007 and a low point in 2010, Innovention sold about 200,000 units for about $4.3 million.

Innovention's evidence of industry acclaim included a complimentary article in Popular Science magazine, A1183-84, a selection in 2006 as one of five out of sixty-two submissions as a Mensa select winner, A1191-92, a selection by the Toy Industry Association in 2007 as one of five finalists among the submissions for Game of the Year, A1205, and an article in Optics and Photonics news in 2007 about the history of games using light that also mentions the prior-art Laser Chess article, A1214-15. Again, all of that evidence concerns Innovention's games employing the critical but undisclosed, unclaimed kinematic mount.

### 4.    Testimony About Copying

Although the jury found that MGA copied, MGA presented evidence that it independently developed Laser Battle, and learned about Innovention's game only after substantially completing that development. Moreover, the evidence indisputably establishes that the parties' games substantially differ.

Mr. Ami Shapiro designed and developed the accused Laser Battle game. He drew his initial design in December 2004 on the back of a list of new product suggestions on toy registration cards dated December 8-16, 2004. A5034 paragraphs 6-7, A1490-96, A5031-32. Shapiro was inspired by, *inter alia*, the Laser Chess and Advanced Laser Chess articles. A5034 paragraphs 8-9, A1535-36.

Using modeling clay, mirrors, and lasers, Shapiro constructed prototypes of game pieces. A5034 paragraph 9, A1502-03. At the same time, Shapiro and Yuval Caspi, Shapiro's boss, A1467, began developing game rules. In August 2005, Shapiro began working with MGA's Hong Kong team to develop a working, plastic model to assess manufacturability and determine pricing. He e-mailed his first CAD (Computer Aided Design) drawings to Alex Fan in Hong Kong around August 30, 2005. A5034-35 paragraphs 9-12. The continuous activity from that time until June 26, 2006, is demonstrated by a ten-page list of about five hundred e-mails. A5035 paragraph 10, A5039-48, A1508-33.

In late November or early December 2005, Shapiro first learned about Innovention's Deflexion game on the internet. A1468-69, A5033 and 5035 paragraphs 2, 13. At that time, Laser Battle (previously called Laser Strategy) was substantially complete, the remaining issues being pricing, manufacturing,

choosing a child-safe laser, and packaging.  A5035-36, see, e.g., A5330-34, A5000.

Following the usual policy of monitoring competition, Shapiro ordered two copies of Deflexion on December 1, 2005, sending one to Fan.  A1173, A1537-38. Shapiro did not change Laser Battle after inspecting Deflexion.  A1538-39.  See A5000, A5335-451, A5031, A5049-52.  Innovention relied on Exhibit 246, an e-mail from Fan to Shapiro dated December 8, 2005, in which Fan observed a "patent pending" notice on the Deflexion box and asked, "which part did they patent?"  A5030, A1182-83.  But Innovention coinventor Dr. Larson admitted that the notice did not reveal what Innovention's application disclosed or claimed and that that information was confidential until publication on October 12, 2006, after Laser Battle was marketed.  A1255-56, A1259, A1489-90.  Even then, MGA did not know whether a patent would issue and what it might claim.

To support its argument that MGA copied, Innovention relied on Shapiro's resumé, A5452, to argue that Shapiro attended the February 2005 Toy Fair, where Innovention first exhibited Deflexion.  A1168.  But Shapiro's resumé says merely that his toys were exhibited there in 2002, 2003, and 2005.  Moreover, Dr.Larson admitted he attended the 2005 fair and did not see Shapiro or anyone from MGA. A1255.  Indeed, at Shapiro's deposition, Innovention's counsel asked him whether he attended the 2005 fair; Shapiro unequivocally answered no.  Innovention

therefore did not designate that testimony but at trial nevertheless, over MGA's objection, relied on Shapiro's resumé.  A1175-79.

Innovention relied also on similarities between the parties' games.  But Dr.Larson admitted numerous differences, including the means for aligning the mirrored pieces.  Rather than Khet's square kinematic mount, Laser Battle had grooved circular bottoms fitting into round holes in the game board with corresponding grooves to lock the pieces into the board.  A1277-78.  Innovention's Hooper testified that MGA's "locking methodology" is "a different system" and in his experience "didn't work."  A1673-74.

Dr.Larson admitted also that

- Innovention's square-bottomed mirrored pieces could rotate in only multiples of 90 degrees while Laser Battle's could rotate in 22.5 degree increments, A1278-79, A5049-52,

- in Deflexion, Innovention embedded the lasers in the board, preventing them from moving, while in Laser Battle the laser pieces were movable, and Innovention introduced movable laser pieces, in Khet, only after Laser Battle was marketed, A1269-71, A1275-77, A5059,

- Laser Battle included a modular board for assembly into different configurations while Innovention's boards have only one configuration, A1280-81, A5060,

- Innovention's boards have a raised periphery for embedding lasers, a feature Laser Battle never had, A1275-76, A1282-83, A5062,

- Innovention's games include accessory pieces, unlike Laser Battle, A1283-84,

- Only Innovention's games have an Egyptian theme, A1282-84, A5059, and

- the Laser Battle box was significantly smaller than Deflexion's, but after Laser Battle was marketed, Innovention modified the Khet 2 box to be substantially the same size as Laser Battle's, A1282, A5061.

Innovention also compared Khet's rules to Laser Battle's to attempt to show copying. A5063-66. But the rules Innovention selected closely resemble prior-art rules. A1677-79, A5063-66. For example, Innovention's first comparison is the object to "illuminate your opponent's pharaoh by bouncing your laser beam off the mirrored pieces and around the playing field" in Khet, and "to strike your opponent's Tower using your Laser Gun and Mirrors" in Laser Battle. But that is the Laser Chess object. A5310.

On the other hand, comparing Innovention's rules, A5053-58, with Laser Battle's, A5049-52, demonstrates many differences. In Laser Battle, one should not move the Target piece during game play, unlike in Khet; the starting configurations for the two games entirely differ; Laser Battle permits four players simultaneously while Khet permits two; Khet requires the first player to move a silver piece, unlike Laser Battle; and in Khet, no red piece can move into a silver square and no silver piece can move into a red square, while Laser Battle has no such restrictions.

### 5.    Testimony About Willful Infringement

Innovention relied heavily on evidence of copying to support its argument that MGA willfully infringed. The facts regarding alleged copying appear in subsection 4, *supra*. Innovention also asserted that MGA's obviousness defense, including its position on the level of ordinary skill, was unreasonable. The facts concerning those issues appear in subsections 1 and 2, *supra*. Finally, Innovention relied on evidence of commercial success and industry acclaim to reinforce its position that MGA's obviousness defense was unreasonable. The facts regarding those issues appear in subsection 3, *supra*.

Innovention relied also on communications with MGA regarding Innovention's application and patent. Shortly after the PTO published Innovention's application, Innovention sent MGA a letter enclosing the

application.  A5001-27, A1201-03.  The letter said Laser Battle "may be covered by at least one claim," and "if a patent ultimately issues with claims substantially identical to the claims in Innovention's published patent application MGA may, at a minimum, be liable for payment of a reasonable royalty."  A5001.  The letter requested no response, and MGA sent none.  The PTO rejected most of the published claims in view of Swift, which the application described, and issued the patent only after Innovention narrowed the claims to require a "movable" key piece.  See Section I(A)(3), *supra*.

On October 5, 2007, shortly after the patent issued, Innovention filed this suit and sent MGA a letter so advising it.  A1212-13, A5028-29.  This letter accused MGA of infringement, copying, and willful infringement and demanded a response.  A5028-29.  MGA's response, sent after investigating, enclosed the Laser Chess and Advanced Laser Chess articles, which the PTO had not considered.  A1290-92, A1296.

### 6.    The Verdict

The jury ruled for Innovention on every issue.  It found that a person of ordinary skill would have a bachelor's degree in mechanical engineering or equivalent experience, requiring no knowledge of lasers or optics.  A2274-75, A108-19.  It found differences between the combined prior-art teachings and the asserted claims.  A2275, A109.  It found no motivation to combine the prior-art

teachings.    A2275, A110-12.    It found Innovention established commercial success; long-felt need; copying; unexpected and superior results; industry acclaim; and surprise, initial skepticism, or disbelief, even though Innovention submitted evidence to establish only commercial success and industry acclaim. A2275-76, A113.    The jury found all asserted claims nonobvious.    A2276-77, A114-16.   And the jury found MGA had willfully infringed.   A2278, A118.   The jury awarded $167,455 as pre-issuance reasonable royalty damages and $1,405,708 as post-issuance lost profits damages.    A2277-78, A117-18.

### F.    The Trial Court's Opinion on Willful Infringement

After the verdict, MGA moved for judgment of no willful infringement, and Innovention moved for judgment of willful infringement, treble damages, attorneys' fees under 35 U.S.C. §285, taxable and nontaxable costs, prejudgment and post-judgment interest, and an injunction.   The court denied MGA's motion and granted all of Innovention's motions.   A28, A88-90, A5453.

The court recognized that the objective prong of the willfulness test under *In re Seagate Tech, LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007), is a question of law for the court.   A37-38.   The court further recognized that Innovention had the burden of proving "by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent."   A38 (quoting *Seagate* at 1371).   The court noted that the objective

prong "tends not to be met where an accused infringer relies on a reasonable defense to a charge of infringement." A39 (citation omitted). The court concluded, therefore, that it had to determine, as a matter of law, whether MGA's obviousness defense was objectively reasonable. *Id.*

The court further observed that to "willfully infringe a patent, the patent must exist and one must have knowledge of it." A40 (citation omitted). On that issue, the court ruled that the jury had found that MGA had notice of the patent on its issue date "by awarding Innovention damages from the date the patent issued and finding that MGA's infringement was willful." A41. But the jury made no finding that MGA had notice on the issue date. Rather, the court held that the jury's findings necessarily implied that finding. Although the court instructed the jury that to prove willful infringement, Innovention had to prove that MGA was aware of Innovention's patent, the court did not instruct the jury that Innovention had to be aware of the patent on the day it issued.

The court further ruled that MGA had knowledge of the patent claims on the issue date, *id.*, even though undisputed evidence demonstrated MGA first knew about the patent when it received Innovention's letter the day Innovention filed suit. The court reasoned that Innovention had sent MGA the published application on October 18, 2006, and the application and patent claims were "substantially identical." A41-42. But see Sections I(A)(3) and (D), *supra*. The court therefore

concluded that the published application provided notice of the subsequently issued claims on September 4, 2007, the issue date.  A42.

Addressing the reasonableness of MGA's obviousness defense, the court considered the four *Graham* factors.  The court noted that this Court had resolved the first *Graham* factor in its previous decision that the Laser Chess articles constitute analogous prior art.

The court held that the second *Graham* factor, the differences between the claims and the prior art, indicated that the claimed invention was nonobvious, because MGA's expert admitted the combined teachings of the prior art do not disclose every claim limitation.  A45-48.  The court explained that (1) although Phillips "*initially* opined that the combination of the Laser Chess articles and the Swift patent disclosed every element of the asserted claims," after being advised that the court's construction of "game piece" required a physical structure, "Phillips admitted that the Laser Chess articles did not disclose game pieces," and that Phillips had admitted on direct examination that "the Swift patent did not disclose them";  (2) the combined prior-art teachings did not disclose "game pieces"; and (3) "the jury confirmed that the combination of the prior art did not disclose every element of the claims asserted."  A47-48 (emphasis added).

But Phillips testified (1) that the Laser Chess articles do not disclose "*physical* game pieces" (A1945);  (2) that Swift did not disclose "movable key

playing pieces having no mirrored surfaces" (A1893-94); and (3) that Swift discloses physical game pieces, the Laser Chess articles disclose movable key pieces without mirrors that are virtual rather than physical, and the combined prior-art teachings do teach all claim limitations (A1869, A1877-922, A1965-70, A5250-307). *See* Sections I(B) and (E)(1), *supra*.

The court held that the third *Graham* factor, the level of ordinary skill, also indicated that the claimed subject matter would have been nonobvious. A48-52. The court disagreed with MGA that the correct level must include significant knowledge of lasers and optics because, *inter alia*, without that knowledge, one could not make the invention work. A49 (citing Innovention's expert's testimony). On direct examination, Dr.Eimerl reasoned that the field of the invention "is strategy board games [such as Monopoly] with structural game board and physical playing pieces," and that persons in that field need have *no* experience with lasers and optics. A2083-90. But on cross, Dr.Eimerl admitted testifying in his deposition that even if a person had Innovention's patent in front of him, making or creating the claimed game "does require significant levels of skills in optics and lasers." See Section I(E)(2), *supra*. He similarly testified that because numerous requirements such as knowledge of kinematic mounts, displacement errors, and optical quality would be beyond the ability of "a person of ordinary skill in the art of making board games," a person of ordinary skill could not successfully combine

38

the prior-art teachings. *Id.* Moreover, the court and Dr.Eimerl failed to recognize that rather than being directed to simply board games, the field of the invention, the written description, and all asserted claims specify diverting laser beams with user-placed mirrors. See Section I(A)(2), *supra*.

Ignoring the intrinsic evidence, the court focused on only the expert testimony. It acknowledged that MGA's expert, Phillips, testified that he considered the factors in *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 666-67 (Fed. Cir. 2000)[7], but the court concluded that Phillips had *not* considered the *Ruiz* factors because he testified that applying the factors did not require "a lot of heavy-duty thinking." A50-51 & n.79. Phillips explained, however, that one of ordinary skill would need experience with lasers and optics because the invention involved lasers and optics and the patent's "description is not terribly complete." A1955-57. Indeed, Dr.Eimerl admitted the patent does not disclose what he described as the requirements for carrying out the claimed invention, such as the critical kinematic mount. See Section I(E)(2), *supra*.

---

[7] "Factors that may be considered in determining the ordinary level of skill in the art include: 1) the types of problems encountered in the art; 2) the prior art solutions to those problems; 3) the rapidity with which innovations are made; 4) the sophistication of the technology; and 5) the educational level of active workers in the field."

As to MGA's reliance on Dr.Eimerl's deposition admission that the skilled artisan must have "significant" knowledge of lasers and optics to practice the claimed invention, the court responded, "Eimerl confirmed on cross-examination that he did not agree with that argument from MGA's counsel.… Given that a 'person with a BS in mechanical engineering does have *some knowledge* of optics and lasers,' Eimerl continued, 'someone with a BS in mechanical engineering' would be able to practice the invention … without significant experience with lasers and optics."A51.   But as indicated above, on direct, Dr.Eimerl testified unequivocally that one of ordinary skill needed to have *no* experience with lasers and optics.  A2083-90.  The testimony the court quoted here was on redirect, *after* Dr.Eimerl's admission on cross-examination regarding his deposition testimony, and was laboriously coaxed from Dr.Eimerl with blatantly leading questioning that MGA objected to.  A2046-48.

Regarding the fourth *Graham* factor, evidence of secondary considerations, the court first addressed commercial success and industry praise.  A52-55.  The court recognized that the proponent of secondary considerations must establish that the commercially successful or praised product "is the invention disclosed and claimed."  A52 n.89.  And the court ruled, "Innovention also introduced evidence at trial that the [commercial] game embodies the claimed invention."  A53 & n.92.  But the court cited only the self-serving testimony of coinventor Dr.Larson that the

patent "describes our laser game product."  A1146.  Neither he nor the court mentioned the claims or the patent's failure to describe the critical bevel feature in the commercial products.  See Section I(E)(3), *supra*.  The court nevertheless concluded, "[B]ecause Innovention showed that the commercially successful product is the invention disclosed and claimed in the '242 patent, Innovention could rely on the presumption that the requisite nexus exists."  A54.

The court further ruled that MGA had failed to present rebuttal evidence that "something *other than* the invention claimed in the '242 patent was responsible for the game's commercial success and praise."  *Id*.  The court overlooked the testimony from Innovention's own witnesses that unclaimed features such as the critical kinematic mount were responsible.  See Section I(E)(3), *supra*.

The court noted that the jury found Innovention had established commercial success attributable to the merits of the claimed invention, praise for the invention, and also initial skepticism, long-felt need, and unexpected results.  A54 & n.93.  But the court cited the jury's finding of a nexus for only commercial success and industry praise.  Moreover, the court cited no evidence supporting that nexus or the remaining secondary considerations.  The court concluded, the "evidence of secondary considerations indicates that the '242 patent was not rendered invalid due to obviousness."  A55.

Finally, the court criticized MGA's expert for "improperly" failing to consider evidence of secondary considerations. A55 n.94. MGA contended, however, that technical experts were not qualified to address that evidence. A5497-510. Indeed, MGA moved to preclude Dr.Eimerl from doing so. *Id*. The court granted MGA's motion because the jury could consider that evidence without expert testimony. A5465. Consequently, Phillips's failure to consider secondary considerations was indeed of "no moment." A55 n.94.

The court separately considered copying, correctly observing, "Copying 'requires evidence of efforts to replicate a specific product.'" A56 (quoting *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1370 (Fed. Cir. 2011)). Despite the differences between the parties' games and Shapiro's learning about Innovention's game only after independently developing Laser Battle, see Section I(E)(4), *supra*, however, the court found the evidence of copying "overwhelming." A59.

The court provided several reasons. First, it asserted that MGA presented only the testimony of Shapiro to support its argument that he did not copy. A56. But in addition to the many differences between the parties' games, MGA introduced numerous exhibits corroborating Shapiro's testimony. See Section I(E)(4), *supra*, and exhibits cited by the court at A56, nn.96, 98. Those exhibits demonstrate Shapiro's independent conception of his invention in December 2004, before Innovention introduced its game at the February 2005 Toy Fair, and show

Shapiro's continuous activity developing his invention before he learned about Innovention's game in December 2005.

The court nevertheless relied on Shapiro's resumé's stating that products he developed were exhibited at the fair in 2002, 2003, and 2005, presumably constituting substantial evidence that Shapiro himself attended the 2005 fair.  A57. But the court and Innovention know that Shapiro testified unequivocally in his deposition that he did not attend the fair.  They also know that MGA did not counterdesignate that part of Shapiro's deposition simply because Innovention produced no evidence supporting an inference that Shapiro attended the fair, and that MGA objected to Innovention's use of Shapiro's resumé as evidence that Shapiro did attend.  A1175-79.

The court further relied on MGA's failure to introduce evidence that Shapiro responded after an MGA colleague to whom Shapiro in December 2005 sent Innovention's game bearing a patent-pending notice inquired which part of the game was patented.  A58.  The evidence establishes, however, that by December 2005, Shapiro had fully developed Laser Battle.  Moreover, a patent-pending notice does not reveal what an applicant claims, much less what, if anything, will issue.

The court further relied on evidence of similarities between the parties' games, A57, but the evidence establishes far more differences and further

43

establishes that to the extent similarities existed, the prior art discloses those features. See Section I(E)(4), *supra*. Indeed, the court acknowledged that Shapiro found the prior-art Laser Chess articles, which disclose all of Innovention's claimed features in the form of a computer game, on the Internet early in 2005. A58.

The court further relied on Shapiro's testimony that early in 2005 he found a game on the Internet having mirrors and laser beams illuminated with smoke while one of Innovention's inventors testified that Innovention's website included such a photograph in early 2005. A57-58 & n.105. But the court ignored Shapiro's equally plausible testimony that the game Shapiro viewed was a student's prototype, not Innovention's game, and that he did not derive anything for Laser Battle from it. A1471-73.

Finally regarding copying, the court relied on Innovention's evidence that in Shapiro's application to patent his game, he failed to disclose the Laser Chess articles and Innovention's game, "despite having a duty to do so." A58-59. But the court did not explain why that duty existed, did not compare Shapiro's application's claims to the undisclosed information, and did not explain the relevancy of the alleged failure to copying.

The court concluded as a matter of law that Innovention had proven, by clear and convincing evidence, that MGA's obviousness defense was not objectively

reasonable and that, therefore, Innovention had satisfied the objective *Seagate* prong. Regarding the subjective prong, the court correctly noted that MGA did not address it because MGA maintained that Innovention had failed to establish the objective prong. A65. Consequently, the court held as a matter of law that MGA had willfully infringed. A68.

### G.    The Trial Court's Opinion Denying JMOL

After the court entered judgment of willful infringement and awarded damages, treble damages, attorneys' fees, and costs, A1-4, MGA moved for JMOL based on, *inter alia*, its obviousness defense or, alternatively, a new trial. The court summarily denied the motion based on its holdings regarding obviousness in its willfulness opinion. A6.

## II.    SUMMARY OF THE ARGUMENT

1.    The court erred in denying JMOL that the asserted claims are invalid for obviousness in view of the Laser Chess articles and Swift. The Laser Chess articles disclose all claim limitations in a computer rather than physical game while Swift discloses most claim limitations in a physical game and discloses optionally implementing the game as a computer game. Implementing the game of the Laser Chess articles as a physical game would have been obvious in view of Swift's physical game. Conversely, making Swift's fixed key pieces movable and modifying some of Swift's rules to those in the asserted claims would have been

45

obvious in view of the Laser Chess articles.  The argument that one of ordinary skill, having no experience with lasers and optics, could not combine the prior-art teachings fails, because Innovention's patent neither discloses nor claims the alleged engineering obstacles and because one of ordinary skill would have significant experience with lasers and optics, given the field of the invention, the claimed subject matter, and Innovention's expert's admission that one attempting to carry out the claimed invention would require such experience.  The evidence of secondary considerations fails to save the claims, because it resulted from undisclosed and unclaimed features and because, as a matter of law, it cannot overcome the strong evidence of obviousness.

2.    The court erred for even greater reason in denying JMOL of no willful infringement, since MGA unquestionably presented an objectively reasonable obviousness defense.[8]  The court rejected that defense based on clearly erroneous findings about the content of the prior art, namely that the prior art does not disclose "game pieces," when the Laser Chess articles disclose electronic, not physical, game pieces, and Swift discloses fixed, not "movable," *key* game pieces, but both disclose game pieces.  Moreover, ample evidence supported MGA's

---

[8] *Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014), did not change the test for willful infringement and enhanced damages under section 284 but rather addressed the proper test for awarding attorneys' fees under section 285.  Moreover, MGA did not engage in unreasonable conduct even under *Octane Fitness*.

positions on level of skill in the art and secondary considerations.  Finally, contrary to the court's finding, MGA indisputably had no knowledge of the asserted claims until sued.

3.     The court erred as a matter of law in denying summary judgment of no provisional rights damages, since as a matter of law the asserted claims differ in scope from the published claims.  No published claim required *movable* key pieces.  Innovention overcame a rejection in view of Swift's fixed key pieces by amending the published claims to require movable key pieces.  The court erred in concluding that the amendment merely clarified the claims without changing their scope.

## III.     ARGUMENT

### A.     Standard of Review

Regional circuit law governs motions for JMOL.  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1301 (Fed. Cir. 2011).  The Fifth Circuit reviews a decision denying a JMOL motion *de novo*, reapplying the standard applied by the district court.  JMOL is granted when no legally sufficient evidentiary basis for the jury's finding exists.  *Goodner v. Hyundai Motor Co.*, 650 F.3d 1034, 1039-40 (5th Cir. 2011).  In considering JMOL, this Court reviews the entire record and draws all reasonable inferences in favor of the nonmoving party.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).  "This court

47

reviews a jury's conclusions on obviousness, a question of law, without deference, and the underlying findings of fact ... for substantial evidence." *LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1353 (Fed. Cir. 2001).

Regional circuit law applies also to a decision whether to grant a new trial. *Id*. A court may grant a new trial if "the verdict is against the weight of the evidence, . . . the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612-13 (5th Cir. 1985). The Fifth Circuit reviews decisions on new trial motions for abuse of discretion. 773 F.2d at 612.

"This court reviews a district court's decision on summary judgment *de novo*, reapplying the same standard applied by the district court.... Summary judgment is appropriate 'if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.' Fed. R. Civ. P. 56(a)." *Innovention Toys, LLC v. MGA Entertainment, Inc.*, 637 F.3d 1314, 1318 (Fed. Cir. 2011).

## B.    MGA Is Entitled to JMOL on Obviousness or, Alternatively, a New Trial

The jury's findings underlying obviousness are not supported by substantial evidence, and the district court erred as a matter of law in denying JMOL. MGA is at least entitled to a new trial because the verdict is against the great weight of the evidence.

In denying JMOL, the court adopted the reasoning in its willfulness opinion, which held that MGA's obviousness defense was not even reasonable. That ruling on its face was erroneous. See, e.g., this Court's discussion of the claims and the prior art in Section I(C), *supra*, and the questioning of District Court Judge Feldman on remand whether obviousness was still an issue. See also Section III(C), *infra*.

The evidence of obviousness is overwhelming. The Laser Chess articles disclose everything in the asserted claims in a computer game rather than a physical game, while Swift discloses a similar, but physical, game and discloses that "obvious modifications of the game allow for ... a single player playing against a computer." See Section I(B), *supra*. Indeed, Swift discloses all of the limitations of asserted claim 31 except "movable" key pieces, and all of the limitations of claim 39 except "movable" key pieces, the starting configuration, and how players may move the pieces, all of which the Laser Chess articles disclose. Given the similarity between the Swift and Laser Chess games, it would have been obvious to one of ordinary skill in view of the Laser Chess articles to make the Swift key pieces movable, to place all pieces in a starting configuration, and to permit players to rotate pieces or move one square; and in view of Swift to make a physical game with the features of the Laser Chess games. As this Court noted in reversing summary judgment of nonobviousness, Innovention's patent and the Laser Chess

49

articles relate to the same problem, designing a winnable and entertaining strategy game; "game elements from any strategy game, regardless of how implemented, 'logically would have commended itself to an inventor's attention in considering [this] problem'"; and "as MGA's evidence shows, inventors of numerous prior art patents contemplated the implementation of their strategy games in both physical and electronic formats."  See Section I(C), *supra*.  Thus, there were only a "finite number of identified, predictable solutions" to the problem.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).  One would have difficulty imagining a stronger case of obviousness.

The court nevertheless asserted that MGA's expert, Phillips, "admitted that the Laser Chess articles did not disclose game pieces," and that "the Swift patent did not disclose them," concluding that the combined prior-art teachings did not disclose "game pieces."  A47-48.  But Phillips testified that the Laser Chess articles did not disclose "*physical* game pieces" and that Swift did not disclose "movable key pieces without mirrors."  See Section I(F), *supra*.  Those errors fundamentally undermine the court's holding.  The combined teachings of the references indisputably include all of the asserted claims' limitations, as Phillips testified.  *Id*.

The court further erred in holding that substantial evidence supported Innovention's position that a person of ordinary skill required no experience with

lasers and optics. Once again, the evidence to the contrary was overwhelming, including intrinsic evidence and even the testimony of Innovention's witnesses, including its expert, Dr.Eimerl.

The intrinsic evidence includes the field of the invention, the claims, and Swift, which the drafter of Innovention's patent indisputably used as a template and which the patent discusses. See Sections I(A)(1) and (2), *supra*. All describe a chess-like game with user-placed mirrored pieces to selectively divert laser beams to attack an opponent's key piece.

The court relied on Dr.Eimerl's testimony, but that testimony distorted indisputable facts and cannot constitute substantial evidence. Dr.Eimerl testified that the field of the invention "is strategy board games [such as Monopoly] with structural game board and physical playing pieces," and that persons in that field need have no experience with lasers and optics. A2083-90. Thus, Dr.Eimerl distorted the field of the invention. He also testified that he did not know whether all claims of Innovention's patent require lasers, A2151, which all asserted claims do while all require at least beam-emitting devices.

Significantly, Dr.Eimerl's only reason for arguing that a person of ordinary skill could not successfully combine the prior-art teachings was that this would require significant levels of skill in optics and lasers, a skill set that according to Dr.Eimerl a person of ordinary skill would lack. See Sections I(E)(2) and (F),

*supra*.  Indeed, he testified that even if a person had the '242 patent disclosure, making or creating the claimed game "does require significant levels of skills in optics and lasers," including knowledge of kinematic mounts, displacement errors, and optical quality, all of which he testified would be beyond the ability of "a person of ordinary skill in the art of making board games."  See Section I(E)(2), *supra*.  But Dr.Eimerl admitted Innovention's patent does not disclose or claim any of those requirements, with the exception of kinematic mounts (which the patent also indisputably does not disclose or claim; see *id*.).  Consequently, an additional reason a person of ordinary skill must as a matter of law have significant experience with lasers and optics is that the claims of Innovention's patent otherwise would be invalid for lack of enablement.  Dr.Eimerl admitted that a person with significant experience with lasers and optics would have no difficulty with the critical kinematic mount because such a person "would know the answer before you even started....  And this problem was solved, oh, for the first time I would say 30 years ago."  A2120.

The court dismissed the evidence that a person of ordinary skill would be more skilled than a designer of board games such as Monopoly by asserting that Dr.Eimerl testified on *cross-examination* that such a person "does have *some knowledge* of optics and lasers," and "would be able to practice the invention" without significant experience with lasers and optics.  A51.  But

Dr.Eimerl unequivocally testified on *direct* examination that a person of ordinary skill in the art needed *no* experience with lasers and optics. Moreover, the testimony the court quoted was on *redirect*, *after* Dr.Eimerl's admissions on cross-examination, and was laboriously coaxed from Dr.Eimerl with blatantly leading questioning over MGA's objection. A2176-78.

Thus, contrary to the court's rulings, the prior art indisputably discloses all claimed limitations and one of ordinary skill would have the ability and would be motivated to combine the prior-art teachings since the references all address designing strategy games employing lasers and mirrors.

> When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, §103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.

*KSR*, 550 U.S. at 417.

In reaching its conclusion of nonobviousness, the court relied on evidence of commercial success, industry praise, and copying. See Sections I(E)(3) and (4) and (F), *supra*. But that evidence cannot save Innovention's patent. As explained below, Innovention failed to establish the requisite nexus between the secondary considerations and the claimed subject matter. Moreover, given the overwhelming

53

evidence of obviousness, even strong evidence of secondary considerations, as a matter of law, would not overcome obviousness. *See Wyers v. Master Lock, Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010) ("secondary considerations of nonobviousness ... cannot overcome a strong prima facie case of obviousness.... Here, where the inventions represented no more than 'the predictable use of prior art elements according to their established functions,' *KSR*, 550 U.S. at 417, the secondary considerations are inadequate to establish nonobviousness as a matter of law."); *Asyst Technologies, Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008); *Agrizap, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1344 (Fed. Cir. 2008); *Tokai Corp.*, 632 F.3d at 1370; *Dystar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1371 (Fed. Cir. 2006). In the present case, the claimed subject matter represents no more than the predictable use of prior-art elements according to their established functions. Consequently, as a matter of law, the alleged secondary considerations are inadequate to establish nonobviousness.

But the evidence of secondary considerations further fails because Innovention failed to establish the requisite nexus. All the evidence of secondary considerations was directed to Innovention's commercial product. Unrebutted evidence establishes that that product employed critical features, including kinematic mounts for the mirrored pieces, necessary for the product to be not only

successful, but operable.  See Sections I(E)(2)-(4), *supra*.  Innovention's patent neither claims nor discloses those features.  Consequently, Innovention failed to establish the requisite nexus.  *Wyers*, 616 F.3d at 1246.

Specifically, the patentee bears the burden of proving that the alleged secondary considerations result directly from the claimed features, not an unclaimed feature or one known in the prior art.  *See, e.g. Arcelormittal France v. AK Steel Corp.*, 700 F.3d 1314, 1326 (Fed. Cir. 2012); *Media Techs. Licensing, LLC v. Upper Deck Co.*, 596 F.3d 1334, 1339 (Fed. Cir. 2010); *In re Tiffen*, 448 F.2d 791, 792 (CCPA 1971).  No witness testified that the alleged secondary considerations relating to Deflexion/Khet resulted from claimed features.  On the contrary, Innovention's expert and fact witnesses admitted the numerous unclaimed requirements "for the game to be successful in the marketplace." A2123-26, A2144-47, A1591-92.

As to copying, as the court observed, "Copying 'requires evidence of efforts to replicate a specific product.'"  A56 (citation omitted).  MGA indisputably did not "replicate" Innovention's games, given the numerous differences between the accused Laser Battle game and Innovention's games and the resemblances between both of them and the prior art. See Section I(E)(4), *supra*.  For example, instead of kinematic mounts, the accused product uses a locking mechanism that Innovention's coinventor Hooper testified not only differs but does not work.  *Id*.

Moreover, because copying can occur for reasons besides nonobviousness, "[i]t is simplistic to assert that copying per se should bolster the validity of a patent." *Cable Electric Products, Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1027-28 (Fed. Cir. 1985), *overruled on other grounds by Midwest Indus. v. Karavan Trailers*, 173 F.3d 1356, 1358-59 (Fed. Cir. 1999).  Given the lack of evidence of a nexus between the alleged copying and the claimed subject matter including the numerous differences between the accused game and Innovention's games, and the overwhelming evidence that the claimed subject matter would have been obvious, as well as the evidence that MGA independently developed the accused game (see Section I(E)(4), *supra*), Innovention's reliance on alleged copying is insufficient as a matter of law to rebut the evidence of obviousness.

As to the court's reliance on Shapiro's resumé as evidence that Shapiro attended the February 2005 Fair, where Innovention introduced its game, that Shapiro's product was displayed does not support an inference that Shapiro attended the fair.  Indeed, it is surprising that the court relied on the resumé, since the court and Innovention know that Shapiro testified unequivocally that he did not attend the fair and no witness testified otherwise.  See Sections I(E)(4) and (F), *supra*.  Moreover, even if Shapiro had attended the fair, that would not rebut the evidence of obviousness.

As to the court's reliance on Shapiro's not disclosing the Laser Chess articles and Innovention's game in Shapiro's patent application, A58-59, the court did not compare Shapiro's claims to the undisclosed information, and Shapiro's application is irrelevant to whether Shapiro copied Innovention's game. *See Wyers*, 616 F.3d at 1242 ("Obviousness protects the public at large, not a particular infringer, and one is not estopped from asserting the invalidity of a patent by the fact that one has previously made an attempt to procure a patent for substantially the same invention.... What Master Lock employees subjectively knew or believed at the time they were considering filing the '905 patent application is irrelevant.").

For the foregoing reasons, the court erred in denying JMOL of obviousness.

## C.    The Court Erred in Concluding that Innovention Introduced Substantial Clear and Convincing Evidence of Willful Infringement

The court recognized that under the objective prong of the *Seagate* willfulness test, Innovention had to prove by clear and convincing evidence that MGA's obviousness defense was objectively reasonable.  A37-39.  For the reasons in the previous section, the court *a fortiori* erred in ruling that Innovention established the objective prong.  Even were this Court to conclude that MGA failed to establish its obviousness defense as a matter of law, a much heavier burden

rested on Innovention to prove by clear and convincing evidence as a matter of law that the defense was unreasonable.[9]

The previous section addresses most of the court's erroneous reasoning. Repeating those issues is unnecessary. (Note, however, that if MGA's position on the level of ordinary skill was reasonable, Innovention's expert admitted that the claimed invention would have been obvious. See Section I(E)(2), *supra*.) Furthermore, based on those issues alone, this Court should reverse the judgment of willful infringement. For the sake of completeness, however, the following discussion addresses the court's additional reasoning.

Specifically, the court observed that to "willfully infringe a patent, the patent must exist and one must have knowledge of it." A40 (citation omitted). The

---

[9] *Octane*, *supra*, addressed the proper test for awarding attorneys' fees for exceptional cases under §285, not the test for willful infringement and enhanced damages under §284. "Attorney fees are compensatory." *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1347 (Fed.Cir. 2004) (en banc). "Enhanced damages, however, are punitive." *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 37 (Fed. Cir. 2012). In *Octane*, the Supreme Court explained that compensatory attorneys' fees may be awarded under §285 for merely "unreasonable" litigation conduct. 134 S. Ct. at 1751. But "[i]t is well-settled that enhancement of damages must be premised on willful infringement or bad faith." *Yarway Corp. v. Eur-Control USA, Inc.*, 775 F.2d 268, 277 (Fed.Cir. 1985). And willfulness requires reckless behavior, which is subject to an objective standard. *In re Seagate Tech.*, LLC, 497 F.3d 1360, 1370-71 (Fed. Cir. 2007) (citing *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 69 (2007)). Since *Octane* eliminated the objective standard as a separate factor in a §285 analysis, it follows that *Octane* does not dictate the standard of review under §284, which retains the objective standard. Moreover, MGA did not engage in unreasonable litigation conduct.

court's reasons for concluding that MGA had knowledge of the patent on the date it issued cannot withstand scrutiny.

First, the court reasoned that the jury so concluded because it awarded damages from the date the patent issued. A41. It is blackletter law, however, that one need have no knowledge of a patent to be liable for infringing it. *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2065 n.2 (2011).

Second, the court reasoned that MGA received a copy of the published patent application well before the issue date and that the application and patent claims were "substantially identical." A41-42. But as a matter of law, the claims were not substantially identical. See Sections I(A)(3) and (D), *supra*. Innovention amended the published claims to require that the key pieces be movable to overcome the rejection in view of Swift. See Section III(D), *infra*. Furthermore, MGA had no way of knowing from the published application whether a patent would issue or what the scope of the claims would be. Most of the published claims were unpatentable on their face, since Innovention's application cited Swift, which anticipated or rendered obvious at least all except one claim. See Section I(A)(3), *supra*. The evidence is undisputed that MGA first knew the patent existed when it received Innovention's letter enclosing it the day that Innovention filed suit. See Sections I(E)(4) and (5), *supra*. Once sued, MGA raised a reasonable

defense, as set forth in the previous section.  The court manifestly erred in ruling as a matter of law that MGA willfully infringed Innovention's patent.

### D.    The Court Erred in Denying Summary Judgment on Provisional Rights, Because the '242 Patent Claims Are Not Substantially Identical to the Published Claims

It is black-letter law that claims that encompass different subject matter, i.e. differ in scope, are not substantially identical.  *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342 (Fed. Cir. 1998).   Since it is indisputable that no published claim required movable key pieces while all of the patent claims do, the published and issued claims as a matter of law differ in scope.  See Section I(A)(3), *supra*. Consequently, Innovention cannot recover provisional rights damages and the court erred in denying summary judgment.

*Laitram Corp.*, *supra*, controls this case.  In *Laitram*, the original claims claimed "alpha-numeric characters."  The patentee amended the claims during reexamination to overcome a prior-art rejection by limiting the claims to "type quality alpha-numeric characters."  The patentee argued that the prior art did not suggest "alpha-numeric characters of 'type quality.'"  Reversing the district court's holding that the claims were substantially identical, this Court explained,

> a plain reading of the claims would indicate that the original and reexamined claims are of different scope: the original claims appear to cover … *any* quality of alphanumeric characters, while the amended claims seem to cover only … "*type quality*" alphanumeric characters. Most significantly, however, the addition of the "type

> quality" limitation, along with the other amendments, resulted in allowance of claims that had been rejected in the reexamination proceeding over prior art; this is a highly influential piece of prosecution history.

163 F.3d at 1348.  *See also id*. at 1349.

The identical reasoning applies here.  A plain reading of the claims indicates that the published and patented claims differ in scope:  the original claims covered games without movable key pieces, while the patented, i.e. amended, claims require movable key pieces and therefore exclude games, like Swift's, that have only fixed key pieces, i.e. scoring modules.  See Sections I(B) and (C), *supra*.  And the addition of the "movable" limitation resulted in allowance of claims that had been rejected in view of Swift.   See Section I(A)(3), *supra*.   Innovention successfully argued, *inter alia*, "Swift also fails to disclose non-mirrored game pieces that are movable."  A5480-81.  (Innovention's key pieces have no mirrored surfaces.  See, e.g., A242-43 patent claims 31 and 39.)  Accordingly, the addition of "movable" narrowed the published claims, substantively changing them.

Although the court focused on published claim 39, indicated to be allowable without a requirement for "movable" key pieces, the indication of allowability is irrelevant, because published claim 39 had other narrow limitations that the examiner expressly recognized in his statement of reasons for allowability, A5495, and that Innovention subsequently broadened at the same time that it amended all independent claims that required key pieces, including claim 39, to require

"movable" key pieces, see Section I(A)(3), *supra*. Patent claim 39 therefore differs in scope from published claim 39 not only by requiring "movable" key pieces but also by being broader than the published claim in several respects.  See Section I(A)(3), *supra*.

Although before the PTO Innovention self-servingly asserted, not in the argument over the prior art but under the heading "Allowable Subject Matter," "[C]laim 39 was amended to provide further clarity.  This claim remains allowable" (see Section I(A)(3), *supra*), that statement does not mean that the amended claim is substantially identical to the published claim.  The court adopted Innovention's argument that the amendment was "simply to make [the claims] more definite," citing cases holding it "permissible to provide an antecedent basis without changing the scope of the patent."  A99-100.  But the examiner did not reject the claims for indefiniteness regarding whether key pieces had to be movable or lack of an antecedent basis.  The published claims left no doubt that no key pieces had to be movable.

The court fundamentally erred by failing to recognize that the requirement in the published claims for movable playing pieces did not require that *all* playing pieces be movable, and that a separate requirement for key pieces per se did not require movable key pieces.  That the examiner rejected claims in view of Swift until amended to require "movable" key pieces demonstrates, although no such

demonstration is necessary, that the amendment substantively changed their claim scope. Because no asserted claim is substantially identical to any published claim, Innovention is not entitled to provisional rights damages. This Court should reverse the denial of summary judgment.

## CONCLUSION

This Court should hold the asserted claims invalid for obviousness, reverse the judgment of willful infringement and the award of damages, fees, and costs, and reverse the denial of summary judgment of no provisional rights damages. Alternatively, the court should order a new trial on obviousness and willful infringement.

Respectfully submitted,


By:   /s/ Donald R. Dunner
      Donald R. Dunner
      Allen M. Sokal
      FINNEGAN, HENDERSON, FARABOW,
        GARRETT & DUNNER, L.L.P.
      901 New York Ave., N.W.
      Washington, D.C. 20001
      (202) 408-4000

# ADDENDUM

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

INNOVENTION TOYS, LLC,                    **CIVIL ACTION**
    **Plaintiff**

**VERSUS**                                        **No. 07-6510**

MGA ENTERTAINMENT, INC., et al.,            **SECTION "E"**
    **Defendants**

**JUDGMENT**

    **Jury Verdict.** This action came before the Court for a trial by jury starting on November 5, 2012. The issues were tried and the jury rendered its verdict.[1]

    **IT IS ORDERED, ADJUDGED, AND DECREED** that judgment is entered as follows:

1.    Judgment in favor of Plaintiff Innovention Toys, LLC ("Innovention") and against Defendants MGA Entertainment, Inc., Wal-Mart Stores, Inc., and Toys "R" Us, Inc. on Innovention's claims of infringement of United States Patent No. 7,264,242 ("the '242 patent");

2.    MGA's infringement of the '242 patent was willful;

3.    Claims 31-33, 39-41, 43-44, 48-50, and 53-54 of the '242 Patent are not invalid;

4.    Innovention is entitled to $167,455 as a reasonable royalty for the period from October 18, 2006 to September 3, 2007;[2]

5.    Innovention is entitled to lost profits from September 4, 2007 to January 12, 2010

---

[1] R. Doc. 574-3.

[2] R. Doc. 574-3 at 11.

1

**A1**

in the amount of $1,405,708;[3]

6. Innovention is entitled to treble lost profit damages in the amount of $4,217,124;[4]

7. This is an exceptional case within the meaning of 35 U.S.C. § 285[5] and Innovention is entitled to its reasonable attorneys' fees and costs in the amount of $1,871,826.90 in fees (without prejudice to Innovention's right to pursue additional fees for which it becomes liable in the Massachusetts case) and $264,662.29 in costs;[6] and

8. Innovention is entitled to pre-judgment interest on the royalty damages and lost profits damages at the prime rate,[7] compounded annually in the amount of $346,959.39 through May 7, 2014.[8]

9. Innovention is hereby awarded $6,521,068.19 in damages, fees, and costs, plus $346,959.39 in prejudgment interest.

10. Innovention is entitled to post-judgment interest pursuant to 28 U.S.C. § 1961.

**IT IS FURTHER ORDERED AND ADJUDGED** that the following permanent injunction be entered:

1. MGA Entertainment, Inc. and all its officers, directors, agents, servants, employees, attorneys, subsidiaries, successors, assigns and all those in active concert or participation with any of them who receive actual notice of this Order for Permanent

---

[3]R. Doc. 574-3 at 12.

[4]R. Doc. 640 at 1.

[5]R. Doc. 634 at 53.

[6]R. Doc. 634 at 62; R. Doc. 681 at 14; R. Doc. 689 at 5-6.

[7]R. Doc. 634 at 60.

[8]R. Doc. 659-6 at 4-6.

A2

Injunction, by personal service or otherwise, be and hereby are permanently enjoined from infringing, contributing to the infringement, or inducing the infringement of claims 31-33, 39-41, 43-44, 48-50, and 53-54 of the '242 Patent, by making, using, offering to sell, selling within the United States, or importing into the United States the "Laser Battle" game or any other infringing game that is not more than colorably different from the "Laser Battle" game; and

2.  Wal-Mart Stores, Inc. and all its officers, directors, agents, servants, employees, attorneys, subsidiaries, successors, assigns and all those in active concert or participation with any of them who receive actual notice of this Order for Permanent Injunction, by personal service or otherwise, be and hereby are permanently enjoined from infringing, contributing to the infringement, or inducing the infringement of claims 31-33, 39-41, 43-44, 48-50, and 53-54 of the '242 Patent, by making, using, offering to sell, selling within the United States, or importing into the United States the "Laser Battle" game or any other infringing game that is not more than colorably different from the "Laser Battle" game; and

3.  Toys "R" Us, Inc. and all its officers, directors, agents, servants, employees, attorneys, subsidiaries, successors, assigns and all those in active concert or participation with any of them who receive actual notice of this Order for Permanent Injunction, by personal service or otherwise, be and hereby are permanently enjoined from infringing, contributing to the infringement, or inducing the infringement of claims 31-33, 39-41, 43-44, 48-50, and 53-54 of the '242 Patent, by making, using, offering to sell, selling within the United States, or importing into the United States the "Laser Battle" game or any other infringing game that is not more

**A3**

than colorably different from the "Laser Battle" game.

**New Orleans, Louisiana, this 6th day of May, 2014.**

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

4

**A4**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

INNOVENTION TOYS, LLC,                  **CIVIL ACTION**
    **Plaintiff**

**VERSUS**                               **No. 07-6510**

MGA ENTERTAINMENT, INC., et al.,        **SECTION "E"**
    **Defendants**

**ORDER AND REASONS**

Defendants (collectively, "MGA") move for judgment as a matter of law or alternatively for a new trial.[1] Innovention opposes the motion.[2] The Court has reviewed the memoranda, the law, and the record, and now issues this Order and Reasons denying the motion.

The Court applies the Fifth Circuit's standards for motions for judgment as a matter of law and motions for a new trial. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1301 (Fed Cir. 2011). Judgment as a matter of law is only appropriate if "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Goodner v. Hyundai Motor Co.*, 650 F.3d 1034, 1039-40 (5th Cir. 2011) (internal quotation marks omitted). A new trial may be granted if "the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985) (internal quotation marks and citations omitted).

---

[1]    R. Doc. 699.

[2]    R. Docs. 707, 710 (corrected memorandum).

1

**A5**

First, MGA contends that it is entitled to relief on its obviousness defense.[3]  The Court has already concluded (1) the record amply supports the jury's finding that the '242 patent was nonobvious, and (2) MGA's obviousness defense was objectively unreasonable.[4]  MGA articulates no sound reason to displace that finding.

Second, MGA contends that it is entitled to relief with respect to the $1,405,708 in lost profit damages awarded by the jury, an amount which is "75% of the $1,874,277 lost profits figure advocated by Innovention's damages expert Mr. Boyles."[5]  The argument, boiled down to its essence, is that the jury should have believed MGA's damages expert instead of Innovention's.  The motion falls well short of establishing "that the award is, in view of all the evidence, either so outrageously high or so outrageously low as to be unsupportable as an estimation" of loss."  *See Energy Transp. Grp. v. William Demand Holding A/S*, 697 F.3d 1342, 1356 (Fed. Cir. 2012) (internal quotation marks omitted).

Third, MGA "incorporates by reference" arguments it asserted in various motions and memoranda.[6]  The Court incorporates by reference the orders and reasons rejecting those arguments.[7]

---

[3]      R. Doc. 699-1 at 7-23.

[4]      R. Doc. 634 at 16-33.

[5]      R. Doc. 699-1 at 24.

[6]      R. Doc. 699-1 at 31.

[7]      R. Docs. 342, 467, 634.

2

**A6**

For the foregoing reasons, **IT IS ORDERED** that MGA's motion is **DENIED.**

**New Orleans, Louisiana, this 7th day of July, 2014.**

_Susie Morgan_
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

3

**A7**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

INNOVENTION TOYS, LLC,                          **CIVIL ACTION**
    **Plaintiff**

**VERSUS**                                      **No. 07-6510**

MGA ENTERTAINMENT, INC., et al.,                **SECTION "E"**
    **Defendants**

**ORDER AND REASONS**

Before the Court are two motions.  The first motion, filed by defendant MGA Entertainment, Inc. ("MGA"), requests the Court to find that MGA's infringement of the '242 patent[1] *was not* willful under 35 U.S.C. § 284.[2]  The second motion, filed by plaintiff Innovention Toys, LLC ("Innovention"), requests the Court to (1) find that MGA's infringement of the '242 patent *was* willful under 35 U.S.C. § 284; (2) award Innovention enhanced damages, attorneys' fees, costs, expert fees, and interest; and (3) enjoin MGA from further infringing the '242 patent.[3]  For the following reasons, MGA's motion is **DENIED** and Innovention's motion is **GRANTED IN PART, DENIED IN PART** and **DEFERRED IN PART** as set forth below.

### *Background*

The above-captioned matter concerns infringement and validity of a patent for a chess-like board game in which opposing players shoot a laser beam at mirrored game pieces in order to reflect the beam in an attempt to strike (and thus eliminate from the

---

[1] U.S. patent no. 7,264,242.  *See* Tr. Exh. 1.

[2] R. Doc. 598.

[3] R. Doc. 602.

1

**A28**

game) an opponent's key playing piece. *Innovention Toys, LLC v. MGA Entm't, Inc.*, 665 F.Supp.2d 636, 639 (E.D. La. 2009) (Feldman, J.).[4]  In the more than five years that have passed since Innovention initiated this lawsuit, the parties have engaged in extensive motions practice.  Furthermore, defendants – MGA, Wal-Mart Stores, Inc. ("Wal-Mart"), and Toys "R" Us, Inc. ("Toys 'R' Us") (collectively, "Defendants") – filed an interlocutory appeal to the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit"), discussed *infra*.  As a result, the following procedural history and recitation of evidence introduced at trial is not an exhaustive overview of this case.  Rather, the Court has outlined what is necessary to support its findings that (1) MGA's infringement was willful; (2) Innovention is entitled to treble damages for MGA's willful infringement; (3) this is an exceptional case; (4) Innovention is entitled to attorneys' fees because this is an exceptional case; (5) Innovention is entitled to taxable and non-taxable costs; (6) Innovention is entitled to pre-judgment interest on the $1,573,163.00 damages award at the prime rate, to be compounded annually, calculated from the date infringement began through the date of final judgment; and (7) Innovention is entitled to post-judgment interest pursuant to 28 U.S.C. § 1961.

Dr. Michael Larson ("Larson"), a former professor at Tulane University, and Luke Hooper ("Hooper") and Del Segura ("Segura") (collectively, "the inventors"), two of Larson's former students, invented the light-reflecting board game ("the game")[5] in 2003-

---

[4] This matter was transferred from Section F (Judge Martin L.C. Feldman) to the undersigned on April 4, 2012.  *See* R. Doc. 407.

[5] The inventors originally named the game "Deflexion."  The name was later changed to "Khet" to avoid market confusion with a similarly-named tiddlywinks game.  After the game was redesigned in 2010, Innovention began selling the new version of the game under the name "Khet 2.0."  *See* R. Doc. 583 at pp. 40-41, 117 (Larson).

2

**A29**

2004 and produced the game's first mass production mold in the fall of 2004.[6] On February 14, 2005, and May 11, 2005, the inventors filed provisional patent applications with the U.S. Patent and Trademark Office ("PTO") that teach the game.[7] The inventors[8] exhibited the game at the February 2005 International Toy Fair in New York City, New York.[9] Later that year, Hurricane Katrina ("Katrina") made landfall in Louisiana on August 29, 2005. After delays due to Katrina, Innovention started selling the game in October 2005.[10] Soon thereafter, the game began to receive industry praise.[11] For example, the game was included in *Wired Magazine*'s December 2005 holiday gift guide, which was published in November 2005.[12]

On December 1, 2005, an MGA employee – Ami Shapiro ("Shapiro")[13] – purchased two copies of Innovention's game and had them shipped to MGA's headquarters at 16300 Rosco Blvd., Suite 150, Van Nuys, California 91406, where he worked.[14] The original

---

[6] PPE-1; PPE-11; R. Doc. 587 at pp. 28-33, 41-44, 46-56, 61-64; Tr. Exhs. 130, 131, and 133.

[7] The '242 patent claims priority to U.S. Patent Application Serial No. 11,353,863 ("the '863 application"), which was filed on February 13, 2006. The '863 application claims priority to Provisional Application No. 60/652,533, filed February 14, 2005, and to Provisional Application No. 60/679,821, filed on May 11, 2005. *See* R. Doc. 483 at p. 13 (pretrial order).

[8] Innovention is a limited liability company ("LLC") organized under the laws of Louisiana. The inventors are the LLC's members. R. Doc. 583 at pp. 34-35 (Larson). The inventors' rights in the '242 patent have been assigned to Innovention. Tr. Exh. 1.

[9] R. Doc. 583 at pp. 51-57 (Larson); R. Doc. 587 at pp. 71-73.

[10] R. Doc. 583 at pp. 63-64 (Larson).

[11] R. Doc. 583 at pp. 65-66 (Larson).

[12] R. Doc. 583 at pp. 65-66 (Larson); Tr. Exh. 7.

[13] Shapiro was the lead toy designer for MGA's Laser Battle game. R. Doc. 586 at p. 81 (Shapiro).

[14] R. Doc. 583 at pp. 66-68 (Larson); R. Doc. 586 at pp. 84-85 (Shapiro); Tr. Exhs. 137, 230, 246, 246; PPE-11.

3

packaging for the game was marked with the words "patent pending."[15]  After receiving the games, Shapiro kept one copy and sent the other copy to another MGA employee, Alex Fan ("Fan"), in Hong Kong.[16]  Upon receipt of the game on December 8, 2005, Fan e-mailed Shapiro.  In his e-mail, Fan observed that the game's box was marked "patent pending" and asked which part of the game was patented.[17]  No contemporaneous reply e-mail from Shapiro to Fan was produced during discovery or introduced into evidence at trial.  When queried about Fan's e-mail during his deposition,[18] Shapiro stated that he could not remember whether he had replied to Fan, but noted that MGA "ha[d], obviously, moved forward" with MGA's laser chess game, Laser Battle.[19]

In February 2006, the inventors returned to the International Toy Fair in New York. At the fair, buyers from Toys "R" Us and Wal-Mart informed the inventors that they liked Innovention's game, but they would not purchase it because they had committed to buy another game "just like" it from an undisclosed supplier.[20]  The inventors were unable to obtain any information regarding the other game or its supplier.[21]  A few months thereafter some time in the fall of 2006, MGA began retail sales of Laser Battle through Wal-Mart and

---

[15] R. Doc. 583 at p. 76 (Larson); R. Doc. 586, pp. 13-15, 85 (Shapiro); PPE-11.

[16] R. Doc. 586 at p. 84 (Shapiro); Tr. Exh. 246; PPE-11.

[17] R. Doc. 586 at p. 84 (Shapiro); Tr. Exh. 246; PPE-11.

[18] At the time of trial, Shapiro was no longer employed with MGA and was outside the Court's subpoena power.  Innovention and Defendants called Shapiro to testify via video deposition.  Shapiro's deposition was taken August 14, 2009. R. Doc. 586 at pp. 9-10 (Shapiro).

[19] R. Doc. 586 at p. 86 (Shapiro).

[20] R. Doc. 583 at pp. 78-84 (Larson).

[21] R. Doc. 583 at pp. 83-84 (Larson).

4

**A31**

Toys "R" Us.[22]

In August or September 2006, a friend of Larson's purchased five copies of MGA's Laser Battle at retail and shipped them to Larson.[23] Larson examined Laser Battle and believed it was very "similar" to Innovention's game.[24] "[R]ight after [the inventors] became aware of the Laser Battle game," the PTO published the '863 application on October 12, 2006.[25] Counsel for Innovention sent a letter, with a copy of the '863 application enclosed, to Isaac Larian ("Larian"), MGA's CEO, on October 18, 2006.[26] The letter informed Larian that the application "cover[ed] light-reflecting board games," that Laser Battle was "related to the subject matter and may be covered by at least one claim" of the '863 application, and that Innovention would "aggressively enforce its patent rights as they issue[d]."[27] MGA did not respond to Innovention's October 18, 2006 letter.[28]

On November 29, 2006, the PTO issued its First Office Action to Innovention in which it rejected certain claims in the pending '863 application as either anticipated by the Swift patent,[29] or as obvious from the Swift patent in view of another prior art reference.[30] Innovention responded to the PTO on February 27, 2007, by amending the '863 application

---

[22] R. Doc. 483 at p. 14 (pretrial order); R. Doc. 583 at pp. 90-93 (Larson).

[23] R. Doc. 583 at pp. 89-90 (Larson).

[24] R. Doc. 583 at pp. 90-93 (Larson).

[25] R. Doc. 583 at p. 96 (Larson); R. Doc. 483 at p. 13 (pretrial order); Tr. Exh. 90.

[26] R. Doc. 583 at pp. 95-97 (Larson); Tr. Exh. 157.

[27] Tr. Exh. 157.

[28] R. Doc. 583 at p. 106 (Larson).

[29] U.S. Patent No. 5,145,182.

[30] Tr. Exh. 142 at INNOV000141.

so that each of the rejected claims included a new requirement of "movable key pieces."[31] Based on these claim amendments, on May 3, 2007, the PTO agreed to issue the '863 application as a patent.[32] The '242 patent issued and was published on September 4, 2007.[33]

On October 5, 2007, Innovention initiated the above-captioned lawsuit against MGA and Wal-Mart, alleging that they had infringed and were continuing to infringe the '242 patent by making, using, importing, selling and/or offering for sale products – i.e., Laser Battle – covered by one or more of the '242 patent claims.[34] Innovention further alleged that MGA's infringement of the '242 patent was willful.[35] Via a letter to Larian also dated October 5, 2007, Innovention notified MGA that the '242 patent had issued and that Innovention had instituted this lawsuit to enforce its rights under the patent.[36] While the letter alleged that "MGA's Laser Battle[TM] game plainly infringe[d] Innovention's '242 patent," Innovention informed MGA that it sought an "amicable resolution," if possible, before Innovention lost sales to MGA for the 2007 holiday season.[37] The letter further informed Larian that if he did not respond by October 12, 2007, Innovention would "serve the complaint and seek an immediate injunction."[38]

---

[31] Tr. Exh. 142 at INNOV000119 to INNOV000129.

[32] Tr. Exh. 142 at INNOV000101 to INNOV000106.

[33] R. Doc. 483 at p. 13 (pretrial order); R. Doc. 583 at p. 105 (Larson); Tr. Exh. 1.

[34] R. Doc. 1.

[35] R. Doc. 1 at p. 3.

[36] R. Doc. 484 at p. 62-64 (Larson); Tr. Exh. 202.

[37] Tr. Exh. 202.

[38] Tr. Exh. 202.

6

**A33**

The parties were unable to amicably resolve the dispute. Innovention effected service of its original complaint on MGA and Wal-Mart.[39] Before MGA and Wal-Mart answered, Innovention filed an amended complaint adding Toys "R" Us as a defendant on December 4, 2007.[40] Defendants answered and counterclaimed, seeking a declaratory judgment that the '242 patent was invalid and unenforceable and that Defendants had not infringed the patent.

Defendants further moved for summary judgment, arguing that the '242 patent was invalid and therefore that Defendants' conduct did not infringe a valid patent. Innovention cross-moved for summary judgment, arguing that the patent was valid and that Laser Battle infringed the patent. Prior to ruling on the motions for summary judgment, the Court held a *Markman*[41] hearing on May 13, 2009,[42] and construed the disputed claim interpretations.[43] Applying the claim constructions set forth in the *Markman* order, the Court determined that MGA's Laser Battle game infringed the '242 patent. *Innovention*, 665 F.Supp.2d at 647. The Court further concluded that the '242 patent was valid because the claims of the '242 patent were not anticipated by the prior art references and were not rendered obvious in light of the prior art references. *Innovention*, 665 F.Supp.2d at 647-55. With respect to its determination that the patent's claims were not obvious, the Court specifically held that two articles ("the Laser Chess articles") disclosing a computer-based

---

[39] R. Docs. 5 and 6.

[40] R. Doc. 11.

[41] *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

[42] R. Docs. 109 and 173.

[43] R. Doc. 110.

laser chess game were not analogous prior art under 35 U.S.C. § 103 and that Defendants had not come forward with any evidence indicating that the level of ordinary skill in the art was greater than that of a layperson. *Innovention*, 665 F.Supp.2d at 653-54.

Following the Court's October 14, 2009 ruling on the motions for summary judgment, Innovention immediately moved for a permanent injunction to enjoin Defendants from continuing to make, import, sell or offer to sell MGA's Laser Battle game. The Court granted Innovention's motion on January 13, 2010, reasoning in part that "MGA . . . used its superior market power to deny Innovention the opportunity to sell its Khet game through retailers like Wal-Mart and Toys 'R' Us, which only sell one laser strategy board game," – i.e., MGA's Laser Battle.[44]

On February 11, 2010, Defendants filed a notice of appeal challenging the Court's order granting a permanent injunction, as well as the underlying rulings in which it construed certain claim terms and determined that the asserted claims of the '242 patent were valid and infringed. The Federal Circuit affirmed the Court's finding that Laser Battle infringed the '242 patent.[45] *See Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1319-20 (Fed. Cir. 2011). The Federal Circuit further determined that "the district court clearly erred in several of the factual findings underlying its obviousness analysis." *Innovention*, 637 F.3d at 1321. The Federal Circuit found that, because the Court erred in determining that the Laser Chess articles were not prior analogous art, "the district court failed to properly consider the scope and content of the relevant prior art as well as the differences between that art and the claimed invention, including whether one of ordinary

---

[44] R. Doc. 220 at p. 5.

[45] Defendants did not appeal the Court's finding regarding anticipation.

skill in the art would have been motivated to combine the teachings of the Laser Chess references with the Swift patent in light of the standard articulated in *KSR International Co. v. Teleflex, Inc.*, 550 U.S. 398, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007)." *Innovention*, 637 F.3d at 1323. Thus, the Federal Circuit vacated the Court's ruling with respect to obviousness, and remanded the case for further proceedings on that issue. "[S]hould the district court [on remand] conclude that MGA has made out a *prima facie* case of obviousness based on the Laser Chess articles and the Swift patent," the Federal Circuit instructed, "the court must then determine whether Innovention's secondary considerations overcome MGA's *prima facie* case." *Innovention*, 637 F.3d at 1323.

Consequently, on remand the only issues remaining for trial were whether any claims of the '242 patent were obvious, whether Innovention could establish any evidence of "secondary considerations" proving the claims set forth in the '242 patent were not obvious, whether MGA's infringement was willful, and the amount of Innovention's damages, if any. Those issues were tried to a jury from November 5, 2012, to November 9, 2012.[46] The jury returned a verdict in favor of Innovention, finding that

    (1)    a hypothetical person of ordinary skill in the art relevant to the '242 patent would have a bachelor's degree in mechanical engineering or equivalent experience;

    (2)    there are differences between the combination of the prior art and the asserted claims of the '242 patent;

    (3)    as to all claims of the '242 patent, it was not highly probable that a person of ordinary skill in the art, as of the date of the invention of the '242 patent, would have had a motivation to combine the teachings of the Laser Chess articles and the Swift patent to create the invention set forth in the claims, and would have had a

---

[46] R. Docs. 566, 571, 572, 573 and 574.

reasonable success in doing so;

(4)     Innovention had established six objective factors relating to nonobviousness;

(5)     it was not highly probable that each claim in the '242 patent would have been obvious to a person having ordinary skill in the art as of the date of the invention of the '242 patent; and

(6)     MGA's infringement of the '242 patent was willful.[47]

The jury awarded Innovention $167,455 in pre-issuance reasonable royalty damages and $1,405,708 in post-issuance lost profit damages.[48]

## *Law and Analysis*

### I.     Willful Infringement

At trial, the Court instructed the jury on the legal standard for willful infringement and submitted an interrogatory to the jury asking whether it was "highly probable that MGA's infringement of the '242 patent was willful."[49]  The jury answered "yes" to such interrogatory.[50]  MGA[51] argues that, despite the jury's verdict, the Court should enter judgment that MGA's infringement was not willful.  Innovention counters that the jury properly found MGA's infringement was willful and requests the Court to enter judgment accordingly.  This issue is before the Court for decision because, as explained below, willful

---

[47] R. Doc. 574-3 (jury verdict form).

[48] R. Doc. 574-3 (jury verdict form).

[49] R. Doc. 575 at p. 9 (jury instructions) and R. Doc. 574-3 at p. 12 (jury verdict form).

[50] R. Doc. 574-3 at p. 12 (jury verdict form).

[51] At trial, Wal-Mart and Toys "R" Us moved for judgment as a matter of law that they did not willfully infringe the '242 patent, which Innovention did not oppose.  The Court granted the motion.  R. Doc. 590 at pp. 69-70.  Consequently, the jury was asked only whether MGA's infringement was willful.

10

**A37**

infringement is in part a question to law that must be decided by the Court. *See Bard Peripheral Vascular, Inc. v. W.L. Gore & Assoc., Inc.*, 682 F.3d 1003, 1006-07 ("While the ultimate question of willfulness based on an assessment of the second prong of *Seagate* may be a question of fact, *Seagate* also requires a threshold determination of objective recklessness. That determination entails an objective assessment of potential defenses.").

According to the Federal Circuit, "proof of willful infringement permitting enhanced damages requires at least a showing of objective recklessness." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007). In order to establish the requisite recklessness, a patentee must satisfy two factors set forth in *Seagate*, and later clarified in *Bard*.[52] *Seagate*, 497 F.3d at 1371; *Bard*, 682 F.3d at 1006-07. First, "a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *Seagate*, 497 F.3d at 1371. This first, objective prong – though often predicated on underlying mixed questions of law and fact – is ultimately a question of law for the Court and is subject to *de novo* review. *Bard*, 682 F.3d at 1006-07. If this first, objective *Seagate* prong is satisfied, the patentee must satisfy the second, subjective *Seagate* prong by showing that the objectively-defined risk that the alleged infringer's actions constituted infringement of a valid patent was either known, or so obvious that it should have been known, to the accused infringer. *Seagate*, 497 F.3d at 1371. The second, subjective *Seagate* prong is a question of fact to be decided by the jury.

---

[52] Prior the Federal Circuit's 2007 decision in *Seagate*, the "ultimate question of willfulness ha[d] long been treated as a question of fact." *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assoc., Inc.*, 682 F.3d 1003, 1006 (Fed. Cir. 2012) (citation omitted). In *Seagate*, the Federal Circuit set forth the modern, two-step test for proving willful infringement, but recognized that it would be further refined in future caselaw. *Seagate*, 497 F.3d at 1371 ("We leave it to future cases to further develop the application of this standard."). In *Bard*, the Federal Circuit clarified that the first, objective *Seagate* prong is a question of law for the Court, while the second, subjective *Seagate* prong remains a question of fact for the jury. *See Bard*, 682 F.3d at 1008.

*See Bard*, 682 F.3d at 1008.

Following *Seagate*, the Federal Circuit announced that the first, objective prong "tends not to be met where an accused infringer relies on a reasonable defense to a charge of infringement." *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1319 (Fed. Cir. 2010). In other words, if an accused infringer has an objectively reasonable defense, it is unlikely that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent.[53] *See Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1236 (Fed. Cir. 2011). In this case, MGA has advanced both invalidity defenses and a non-infringement defense and argues that such defenses were objectively reasonable. Consequently, the Court must review MGA's defenses in light of the first, objective *Seagate* prong and determine whether, as a matter of law, they were or were not objectively reasonable.

In *Bard*, the Federal Circuit provided procedural guidance for courts on how to review the first, objective *Seagate* prong depending on whether a defendant advances defenses that are purely legal, purely factual, or mixed questions of law and fact. "When a defense or noninfringement theory asserted by an infringer is *purely legal* (e.g., claim construction), the objective recklessness of such a theory is a purely legal question to be determined by the judge." *Bard*, 682 F.3d at 1007 (emphasis added). "[W]hen the defense is a question of fact or a mixed question of law and fact [, the judge may] allow the jury to determine the underlying facts relevant to the defense in the first instance, for example, the questions of anticipation or obviousness." *Bard*, 682 F.3d at 1008. Because MGA has

---

[53] As this Court has previously recognized, "[t]he law does not require MGA's defenses to be successful. Rather, the question is whether MGA's defenses are reasonable." R. Doc. 467 at p. 7 (citing *Bard*, 682 F.3d at 1005).

argued throughout this litigation that the '242 patent is obvious, a defense which turns on

underlying facts, the Court submitted interrogatories regarding such facts relating to

obviousness and willful infringement to the jury.[54]

Finally, in order for a defendant to "willfully infringe a patent, the patent must exist

and one must have knowledge of it." *State Indus. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236

(Fed. Cir. 1985) (emphasis removed). The Court will first examine whether MGA had notice

---

[54] Prior to trial, MGA moved for summary judgment that it could not be liable for willful infringement, because, according to MGA, it had relied on reasonable defenses to Innovention's allegations that Laser Battle infringed the '242 patent. *See* R. Doc. 423. Thus, MGA argued that Innovention could not satisfy the first, objective *Seagate* prong, and without satisfying the first prong, Innovention's willful infringement claim failed. The Court examined MGA's allegedly reasonable defenses, and concluded that they turned on mixed questions of fact and law. *See* R. Doc. 467 at p. 5. Noting that the *Bard* Court approved of allowing a jury to determine the underlying facts relevant to an obviousness defense, *Bard*, 682 F.3d at 1008, the Court informed the parties that it would "reserve *Seagate*'s first, objective prong until the parties make a full presentation of the evidence, subject to cross-examination, on the record and the jury has been given an opportunity to resolve any necessary factfinding." *See* R. Doc. 467 at p. 6.

At the time MGA filed its motion for summary judgment regarding willful infringement, the Federal Circuit's decision in *Bard* was less than three months old. As a result, there was no Federal Circuit caselaw reviewing a trial court's post-*Bard* procedure in dividing the duties between the jury and the trial court for determining whether a defendant's infringement was willful. According to the Court's independent research at the time it denied MGA's motion for summary judgment, other federal district courts confronting such post-*Bard* procedural issues indicated they would reserve the first, objective *Seagate* prong until after trial. *See* R. Doc. 467 at p. 5 n.14.

Since the date of the Court's order denying summary judgment, many more federal district courts have likewise decided to reserve the first, objective *Seagate* prong until after a full presentation of the evidence at trial. *See, e.g., Grant Street Grp., Inc. v. Realauction.com, LLC*, 2013 WL 2404074, at *5 (W.D. Pa. May 31, 2013) ("This Court . . . will present any questions of fact necessary to the objective recklessness issue to the jury, the Court will then resolve the legal question of objective recklessness upon the appropriate motion."); *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 2013 WL 2319145 (D. Utah May 28, 2013) (ruling on the issue of willful infringement as a matter of law after jury returned a verdict finding that the plaintiff "had proven it was highly probable that [the defendant]'s infringement was willful"); *Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*, 2012 WL 5417552, at *2 ("The Court finds that there are mixed questions of law and fact in regards to [defendant]'s defenses, insofar as the jury should be presented the evidence to determine the underlying facts relevant to the defenses before this Court rules on the objectiveness prong of willful infringement." (internal quotation marks omitted, brackets omitted)); *Illinois Tool Works, Inc. v. MOC Prods. Co., Inc.*, ___ F.Supp.2d ___, 2012 WL 8169898, at *5 (E.D. Cal. Oct. 15, 2012) ("Here, to decide the objective prong of willfulness, the Court will need to evaluate [the defendant's] potential defenses of anticipation and obviousness, both of which turn either in whole or in part on factual questions. . . . Delaying a ruling until after a jury verdict in the infringement proceedings is consistent with *Bard* and is more likely to produce an accurate and informed ruling.").

of the '242 patent as soon as it issued on September 4, 2007.[55]  Then, the Court will turn to

its analysis of the first, objective *Seagate* prong and the second, subjective *Seagate* prong.

### A.    MGA's Notice of the '242 Patent

MGA argues that it had no notice of the '242 patent – which issued on September

4, 2007 – until Innovention initiated this lawsuit on October 5, 2007, and informed MGA

of the lawsuit via a letter dated that same day.  Consequently, MGA asserts, it had no

knowledge the patent had issued and therefore its infringement was not willful.[56]  Whether

MGA had notice of the '242 patent from the date of issuance is a question of fact, which the

jury answered in the affirmative by awarding Innovention damages from the date the patent

issued and finding that MGA's infringement was willful.[57]  *Coupe v. Royer*, 155 U.S. 565,

585 (1895) (stating that notice is a question of fact); *Kinetic Concepts, Inc. v. Smith &*

*Nephew, Inc.*, 688 F.3d 1342, 1359 (Fed. Cir. 2012) ("[F]actual findings in support of the

general verdict are implied when a verdict form under Rule 49(b) is used.").  Thus,

Innovention responds that the "jury's findings, including all implied findings in support of

the verdict, are founded on substantial evidence, and thus MGA's attempt to re-argue the

facts [regarding MGA's notice of the '242 patent] necessarily fails."[58]

A review of the evidence shows that MGA had knowledge of the claims that were

ultimately covered by the '242 patent on the date the '242 patent issued.  Innovention sent

MGA a copy of the '863 application – which was published October 12, 2006 – as an

---

[55] The parties do not dispute that the patent issued on September 4, 2007.

[56] R. Doc. 617 at p. 11 (footnote omitted).

[57] R. Doc. 574-3 at p. 12 (jury verdict form question nos. 7 and 8).

[58] R. Doc. 605 at p. 15.

enclosure to its October 18, 2006 letter to Larian. The Court previously concluded as a matter of law that the claims which issued in the '242 patent are "substantially identical" to the claims covered in the '863 application.[59]   Consequently, the published '863 application, of which MGA had a copy, provided notice of the claims in the ultimately issued '242 patent. As a result, MGA was already on notice of the claims covered by the '242 patent when the patent issued on September 4, 2007. *See K-TEC v. Vita-Mix Corp.*, 696 F.3d 1364, 1378-79 (Fed. Cir. 2012) (finding that infringer had notice of a patent when it issued in December 2005 because infringer had notice of the patent's parent patent in March 2005 and notice of the patent's pending application in late October 2005, and affirming a finding of willful infringement); *Nat'l Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1193 (Fed. Cir. 1996) (affirming judgment of willfulness despite patentee filing suit on the day patent issued because infringer had "several months' advance notice" of patentee's application); *Tomita Techs. USA, LLC v. Nintendo Co., Ltd.*, 2012 WL 2524770, at *10 (S.D.N.Y. June 26, 2012) ("[T]his case amply demonstrates that, in certain circumstances, an alleged infringer can know of an 'objectively high likelihood' of infringement even though she does not know that the relevant patent has issued. Here, [plaintiff] has produced evidence that [plaintiff's agent] specifically told [infringing

---

[59] R. Doc. 342 at pp. 6-10 ("The Court finds that the scope of the claims of the '242 patent is substantially identical to the scope of the claims of the patent application."). The Court recognizes that MGA challenges Innovention's reliance on the Court's finding that the claims of the '242 patent were substantially identical to those set forth in the '863 patent application. According to MGA, the Court's decision concerned the issue of whether Innovention was entitled to provisional rights damages, and thus is not determinative with respect to whether the '863 application put MGA on notice of the '242 patent for the purposes of determining willful infringement. *See* R. Doc. 617 at p. 11 n.2. MGA's argument is not persuasive. The Court agrees with Innovention that the Court's conclusion as a matter of law that the claims of the published '863 application – which Innovention in fact sent to MGA – are substantially identical to the claims in the '242 patent necessarily means that MGA had notice of the '242 patent claims at the time the patent issued.

defendant's] employees that he had applied for a patent under the [Patent Cooperation Treaty]. [Plaintiff] has further shown that the [infringed] patent is virtually identical to an English translation of the [Patent Cooperation Treaty] application that [plaintiff's agent] submitted.").

## B.    The First, Objective *Seagate* Prong

Having found that MGA had notice of the claims covered by the '242 patent on the date the '242 patent issued, the Court turns to the first, objective *Seagate* prong. A patentee must establish willful infringement by clear and convincing evidence. *Seagate*, 497 F.3d at 1368. As a result, Innovention has the burden to prove, by clear and convincing evidence, that it has satisfied the first, objective *Seagate* prong.

*Seagate*'s objective prong "requires a retrospective assessment of the merits of the entire litigation determined 'based on the record ultimately made in the infringement proceedings.' " *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1310 (Fed. Cir. 2012) (quoting *Bard*, 682 F.3d at 1008). "The question is whether, in light of that record, no reasonable litigant could realistically expect success on the merits." *Highmark*, 687 F.3d at 1310 (internal quotation marks and citation omitted). Thus, according to the Federal Circuit, the "objective prong is a single backwards-looking inquiry into the reasonableness of the claims in light of the full record." *Highmark*, 687 F.3d at 1310-11 (discussing the objective reasonableness standard in the context of the analogous issue of litigation misconduct for the purposes of 35 U.S.C. § 285).

During this litigation, MGA relied on an invalidity[60] defense – obviousness – and a

---

[60] Earlier in the litigation MGA also asserted an anticipation defense to argue the '242 patent was invalid. This Court rejected that defense on summary judgment, *see Innovention*, 665 F.Supp.2d at 651, and MGA did not seek appellate review on that issue. At this time, MGA does not assert that its

16

**A43**

non-infringement defense. According to MGA, Innovention cannot prove the first, objective *Seagate* prong by clear and convincing evidence because Innovention cannot show that MGA acted despite an objectively high likelihood that its actions constituted infringement of a valid patent. In other words, MGA contends Innovention cannot prove that MGA's defenses were not objectively reasonable. According to MGA, as *Seagate* requires Innovention to satisfy a two-pronged test to prevail on a claim for willful infringement, and as Innovention has allegedly failed to satisfy the first, objective *Seagate* prong, the Court should find that MGA's infringement was not willful. Innovention opposes MGA's motion, arguing that MGA's defenses have been "flimsy" throughout the entire litigation and that a reasonable litigant asserting MGA's defenses could not have been expected to succeed on such defenses. In addition, Innovention cross-moves the Court to affirm the jury's finding that MGA's infringement was objectively willful. The Court addresses the objective reasonableness of each of MGA's defenses in turn.

### (1) MGA's Invalidity Defense: The Obviousness Defense

First, the Court examines the objective reasonableness of MGA's defense that the '242 patent was invalid because the claimed invention was obvious. "A patent is obvious, and, therefore, invalid 'if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.' " *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012) (quoting 35 U.S.C. § 103(a)). "Obviousness is a question of law based

---

anticipation defense was objectively reasonable.

on underlying factual findings: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective indicia of nonobviousness." *Kinetic Concepts*, 688 F.3d at 1360 (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18, 86 S.Ct. 684 (1966)).  These four factual findings are referred to as the "*Graham* factors." *Kinetic Concepts*, 688 F.3d at 1360.

In this case, the Federal Circuit resolved the first *Graham* factor and remanded the remaining second through fourth *Graham* factors for resolution in this Court.  MGA contends its obviousness defense was objectively reasonable because the remaining *Graham* factors demonstrate that the '242 patent is obvious.  Specifically, MGA argues that it (1) consistently relied on the same three prior art references, which is relevant to the second *Graham* factor; (2) put forth evidence that the level of ordinary skill in the relevant art was high, which is relevant to the third *Graham* factor; (3) demonstrated that Innovention did not come forward with sufficient evidence of secondary considerations of nonobviousness regarding recognition, acclaim, and sales, which is relevant to the fourth *Graham* factor; and (4) demonstrated that Innovention did not come forward with sufficient evidence of secondary considerations of nonobviousness regarding copying, which is also relevant to the fourth *Graham* factor.[61]

### (a)    Second *Graham* Factor

The three prior art references MGA contends it has consistently relied[62] upon are the

---

[61] R. Doc. 598-1 at pp. 27-33.

[62] The Court observes that MGA began "consistently rel[ying]" on the Laser Chess articles as prior analogous art only after Innovention alleged that MGA's Laser Battle infringed the '242 patent, even though Shapiro was "aware of" the Laser Chess articles "in the first half of 2005."  R. Doc. 586 at p. 83 (Shapiro).  Indeed, when the patent application covering Laser Battle was filed with the PTO on July 12, 2007 (Application No. 11/776,701), Shapiro, his co-inventor Daniel Garcia and their counsel failed to disclose the Laser Chess articles as prior analogous art, despite having an obligation to do so under 27

Swift patent[63] and the Laser Chess articles.[64]  MGA argues that the combination of the Swift

patent and the Laser Chess[65] articles discloses every element of the asserted claims of the

'242 patent, and thus this supports MGA's argument that its obviousness defense was

reasonable because there are no differences between the prior art and the asserted claims

---

C.F.R. § 1.56.  R. Doc. 605-2; Tr. Exhs. 247 and 248.

[63] *See supra* n.29.  The Swift patent was cited as a reference in the '242 patent.  *See* Tr. Exh. 1 at INNOV000238.

[64] As summarized by the Federal Circuit,

> The Laser Chess game is described in an article entitled "Laser Chess™ First Prize $5,000.00 Winner Atari ST Programming Contest," published in the April 1987 edition of *Compute!*. . . . Advanced Laser Chess is described in an article published in the Summer 1989 edition of *Compute!'s Amiga Resource*. . . .  Both articles disclose chess-like computer games with virtual lasers and mirrored and non-mirrored pieces, which are moved or rotated by players during alternating turns on a virtual, chess-like playing board.

*Innovention Toys*, 637 F.3d at 1317-18.  *Laser Chess* and *Advanced Laser Chess* were developed by Mike Duppong.  R. Doc. 589 at p. 82 (Phillips).  Certain witnesses sometimes refer to the Laser Chess articles as the "Duppong articles" in the record.  *See, e.g.*, R. Doc. 589 at p. 85 (Phillips).

[65] The Federal Circuit confirmed that the Laser Chess articles are in fact prior analogous art to be considered in determining whether the '242 patent is obvious.  *See Innovention*, 637 F.3d at 1322-23.  Nevertheless, as this Court has previously stated, "the Federal Circuit remanded the entirety of the second *Graham* factor without qualification" and thus did not resolve whether there were differences between the prior art and the claims set forth in the '242 patent.  *See* R. Doc. 522 at p. 4.

MGA continues to quote extensively from the Federal Circuit's opinion in order to argue that the Federal Circuit made certain factual findings regarding whether any differences exist between the claims of the '242 patent and the prior art.  *See* R. Doc. 598-1 at p. 9 (quoting *Innovention*, 637 F.3d at 1322-23).  This Court has already rejected this argument.  As the Court ruled prior to trial,

> the Court does not agree with Defendants' suggestion that the jury should be informed of, or instructed on, the Federal Circuit's observations set forth in footnote 9, *supra*.  The Federal Circuit made the observations set forth in footnote 9 in its analysis of why the Laser Chess articles constitute analogous prior art. The Federal Circuit did not instruct this Court, in making those observations, that it was resolving several of the differences between the prior art and the claimed invention such that these statements would be binding on this Court. Rather, the Federal Circuit held that Judge Feldman failed to properly consider "the differences between [the prior] art and the claimed invention" with respect to the second Graham factor and remanded "these factual determinations to the district court to consider *in the first instance*." *See Innovention Toys*, 637 F.3d at 1323 (emphasis added).

R. Doc. 552 at p. 4.

of the '242 patent.  *See Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1347-48 (Fed. Cir. 2012) (stating that in order to establish a *prima facie* case of obviousness, the party challenging a patent's validity must show that every element of the asserted claims was taught in the combination of the prior art).  At trial, MGA's expert witness regarding obviousness – Samuel Phillips ("Phillips") – initially opined that the combination of the Laser Chess articles and the Swift patent disclosed every element of the asserted claims of the '242 patent.[66]  However, on cross-examination, counsel for Innovention asked Phillips whether he applied the Court's claim constructions[67] when forming his opinion that every element was disclosed.  Phillips responded that "[t]here are two definitions that two sets of judges have issued in this case."[68]  At that time, Phillips was escorted from the courtroom so that defense counsel could instruct him to apply the Court's claim constructions, including the Court's construction that a "game piece" had to be "a mirrored or non-mirrored structure that can be placed on the game board and moved by the players during the course of game playing."[69]  When Phillips returned to the witness stand and applied the correct claim construction of "game piece," Phillips admitted the Laser Chess articles did not disclose game pieces.[70]  Prior to this

---

[66] R. Doc. 589 at pp. 65 and 75 (Phillips).

[67] R. Doc. 110 (order on claim construction).

[68] R. Doc. 589 at p. 138 (Phillips).  Phillips was referring to this Court's claim constructions and the Federal Circuit's opinion in *Innovention*, 637 F.3d 1314.  The Federal Circuit did not alter this Court's claim constructions, but rather affirmed them, thereby making such claim constructions the law of the case.  *See Innovention*, 637 F.3d at 1320.  Phillips' statement was incorrect.

[69] R. Doc. 110 at p. 1 (order on claim construction); R. Doc. 552 (*see also supra* n.65); R. Doc. 589 at pp. 138-141 (colloquy between the Court and counsel).  The Court gave a curative instruction to the jury when Phillips returned to the witness stand.  R. Doc. 589 at p. 141.

[70] R. Doc. 589 at p. 149 (Phillips).

admission, Phillips had testified on direct examination that he relied on the Laser Chess articles to show the prior art disclosed game pieces, because the Swift patent did not disclose them.[71]   Consequently, Phillips' new testimony undercut MGA's obviousness defense because he conceded that neither the Laser Chess articles nor the Swift patent disclosed game pieces.[72]  As neither the Laser Chess articles nor the Swift patent disclose game pieces, the prior art cannot be combined to establish a *prima facie* showing of obviousness.   *Transocean*, 699 F.3d at 1347-48.   Indeed, the jury confirmed that the combination of the prior art did not disclose every element of the claims asserted in the '242 patent.[73]  Consequently, the second *Graham* factor indicated that the '242 patent was not obvious.

### (b)    Third *Graham* Factor

Next, with respect to its obviousness defense, MGA argues it came forward with evidence indicating the level of ordinary skill in the relevant art was high.  According to the Federal Circuit, "it is generally easier to establish obviousness under a higher level of ordinary skill in the art."  *Kinetic Concepts*, 688 F.3d at 1366; *Innovention*, 637 F.3d at 1323 ("A less sophisticated level of skill generally favors a determination of nonobviousness, and thus the patentee, while a higher level of skill favors the reverse." (citing *Union Carbide*

---

[71] R. Doc. 589 at pp. 90-91, 97 (Phillips).   Using the numbering system Phillips employed in his demonstrative claim charts shown to the jury at trial (*see* R. Docs. 624-1 and 624-2), Phillips testified on direct examination that the limitations met solely in the Laser Chess articles were 4, 11, 12, 18, 20, 21, 22, 28, 32 and 39.  R. Doc. 589 at pp. 83-117 (Phillips).

[72] Innovention's expert witness David Eimerl later testified that game pieces and other asserted claim elements were missing from both the Laser Chess articles and the Swift patent.  *See* R. Doc. 590 at pp. 102-116 (Eimerl).  The jury agreed.  *See* R. Doc. 574-3 at p. 3 (jury verdict form).

[73] R. Doc. 573-4 at p. 3 (jury verdict form finding that there are differences between the combination of the prior art and the asserted claims of the '242 patent).

21

**A48**

*Corp. v. Am. Can Co.*, 724 F.2d 1567, 1573 (Fed. Cir. 1984)).  Following the Federal Circuit's remand of this matter,[74] MGA has argued that a person having ordinary skill in the art of the '242 patent would be a person with a mechanical engineering degree (or equivalent work experience) as well as "three years of experience designing optical systems involving lasers, laser detectors, mirrors, and precision alignment."[75]  Innovention, however, has asserted that the level of ordinary skill was much lower, requiring only a bachelor's degree in mechanical engineering (or equivalent work experience).[76]  The jury agreed with Innovention, finding that a "hypothetical person of ordinary skill in the art relevant to the '242 patent would have a Bachelor's Degree in Mechanical Engineering or equivalent experience."[77]

MGA asserts that although the jury found no additional experience with lasers and optics was necessary, "the facts . . . overwhelmingly demonstrate the contrary, that without [significant lasers and optics] knowledge one could not make the invention work."[78]  The Court disagrees with MGA, given that Innovention came forward with more persuasive expert testimony regarding the level of ordinary skill, which the jury rightly credited over

---

[74] The Court notes that from the outset of this litigation until the interlocutory appeal, MGA never came forward with *any* evidence regarding the level of ordinary skill in the relevant art.  *See Innovention*, 665 F.Supp.2d at 654 ("The plaintiff points out that the defendants have not provided any evidence that a layperson would have known of the Laser Chess references or other references cited or that a layperson would have any reason to modify the Laser Chess teachings; the defendants have thus failed to state a prima facie case of obviousness.  The Court agrees.  There is no record evidence suggesting what capabilities one with the level of ordinary skill in the art would have perceived as to obviousness.").

[75] R. Doc. 434-1 at p. 14 (motion for summary judgment of obviousness); *see also* R. Doc. 589 at pp. 73-75 (Phillips).

[76] R. Doc. 590 at pp. 80-90 (Eimerl).

[77] R. Doc. 574-3 at p. 2 (jury verdict form).

[78] R. Doc. 598-1 at p. 28.

22

**A49**

MGA's expert testimony.

The Federal Circuit has set forth several factors that should be considered when determining the level of ordinary skill in the art, including (1) the educational level of active workers in the field (like the inventors and others), (2) the types of problems encountered in the art, (3) the prior art solutions to those problems, (4) the rapidity with which innovations are made, and (5) the sophistication of the technology. *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 666-67 (Fed. Cir. 2000). On direct examination, counsel for MGA asked Phillips whether he considered the *Ruiz* factors[79] in reaching his opinion. While Phillips testified at that time — without explanation or references to evidence regarding the *Ruiz* factors — that he had considered them,[80] on cross-examination Phillips clarified that he actually had determined the level of ordinary skill in the art without considering the *Ruiz*

---

[79] Regarding the factors he considered, Phillips testified as follows:

| | | |
|---|---|---|
| Counsel: | [U]nder that heading Ordinary Skill in the Art, do you list the factors that you considered in coming up with your opinion? |
| Phillips: | Yes. Would you like me to state them? |
| Counsel: | Yes. |
| Phillips: | They include the types of problems that a person might encounter. The prior art solutions to these problems. The [rapidity], the speed with which innovations are made. How sophisticated the technology is. And the educational level of active workers in the field, and you can include the inventors of the 242 [patent]. |
| Counsel: | And did you consider each and every one of those factors in coming up with your definition of the person of ordinary skill? |
| Phillips: | Yes, I did. |

R. Doc. 589 at p. 75 (Phillips). While these factors are not identified as the *Ruiz* factors in Phillips' testimony, Phillips in fact recited all of the factors set forth in *Ruiz*. *See Ruiz*, 234 F.3d at 666-67.

[80] *See supra* n.80.

factors because this inquiry did not require "a lot of heavy-duty thinking."[81]

By contrast, Innovention's expert witness David Eimerl ("Eimerl") testified in great detail about the evidence he considered *vis-à-vis* the *Ruiz* factors in reaching his conclusion that the level of ordinary skill in the relevant art did not require an additional three years of experience designing optical systems involving lasers after obtaining a bachelor's degree in mechanical engineering.[82] While MGA contends that Eimerl "admi[tted] that the skilled artisan must have 'significant levels of skill in lasers and optics' to practice the '242 patent,"[83] thereby supporting the objective reasonableness of MGA's defense, Eimerl confirmed on cross-examination that he did not agree with that argument from MGA's counsel.[84] Rather, Eimerl reiterated, the "patent must contain enough information . . . to enable a person of ordinary skill to practice the invention."[85] Given that a "person with a BS in mechanical engineering does have *some knowledge* of optics and lasers," Eimerl continued, "someone with a BS in mechanical engineering" would be able to practice the invention claimed in the '242 patent without the need for *an additional* three years of experience working with lasers and optics.[86] The jury, after weighing the evidence, rightly concluded that the level of ordinary skill in the relevant art was not nearly as high as MGA

---

[81] R. Doc. 589 at pp. 152-53 (Phillips).

[82] R. Doc. 590 at pp. 80-90 (Eimerl).

[83] R. Doc. 617 at p. 17 (quoting R. Doc. 591 at pp. 44-46 (Eimerl)).

[84] R. Doc. 591 at pp. 47-49 (Eimerl).

[85] R. Doc. 591 at p. 47 (Eimerl).

[86] R. Doc. 591 at p. 47 (Eimerl) (emphasis added).

asserted. Consequently, the third *Graham* factor indicated that the '242 patent was not obvious.

> **(c)** **Fourth *Graham* Factor: Recognition, Acclaim, and Sales**

Furthermore, with respect to its obviousness defense, MGA contends it demonstrated at trial that Innovention did not come forward with sufficient evidence of secondary considerations[87] of nonobviousness regarding recognition, acclaim, and sales, because there was no indication that the game's success was connected to any specific feature claimed in the '242 patent. Thus, MGA argues, Innovention failed to "show that any commercial success and industry praise is a direct result of the claimed invention, and not an unclaimed feature of the device, or some feature known in the prior art."[88] Innovention responds that it satisfied its own initial burden to show a nexus[89] between the claimed invention and the commercial success of the game by demonstrating that the '242 patent's

---

[87] "Secondary considerations" of nonobviousness includes, but is not limited to, evidence such as commercial success, long felt need, or skepticism of experts. The Federal Circuit " 'has repeatedly explained, [that secondary consideration evidence] is not just a cumulative or confirmatory part of the obviousness calculus but constitutes independent evidence of nonobviousness.' " *Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1319 (Fed. Cir. 2010) (quoting *Ortho-McNeil Pharm., Inc. v. Mylan Labs.*, Inc., 520 F.3d 1358, 1365 (Fed. Cir. 2008)) (brackets in original).

[88] R. Doc. 598-1 at p. 29 (citing *ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1326 (Fed. Cir. 2012); *Media Techs. Licensing, LLC v. Upper Deck Co.*, 596 F.3d 1334, 1339 (Fed. Cir. 2010)) (emphasis omitted).

[89] In order for secondary considerations "to be accorded substantial weight, its proponent [i.e., the patentee] must establish a nexus between the evidence and the merits of the claimed invention." *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) (citation omitted). "A prima facie case of nexus is made when the patentee shows both that there is commercial success, and that the product that is commercially successful is the invention disclosed and claimed in the patent. *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1295, 1311 (Fed. Cir. 2010) (citing *In re GPAC Inc.*, 57 F.3d at 1580). "Once the patentee demonstrates a prima facie nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger." *Crocs*, 598 F.3d at 1311 (citing *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387 (Fed. Cir. 1988)).

claims are coextensive with the embodying product.[90]  As a result, Innovention contends, it succeeded in shifting the burden to MGA to show that the game's success or praise was due to something other than the claimed invention.

At trial, Innovention offered substantial evidence of secondary considerations of nonobviousness, including (1) impressive sales figures of the game despite the fact that Innovention is a very small company with almost no advertising budget, (2) frequent industry articles highly praising the game, and (3) the awards the game has won or the awards for which the game has been nominated.[91]  Innovention also introduced evidence at trial that the game embodies the claimed invention taught in the '242 patent.[92]  In addition, the parties agree that the game is *not* a discrete, patented component of a larger system, such as a patented automatic-locking feature contained in a utility lighter with an extended rod (e.g., the type of lighter "useful for lighting barbecue grills").  *See Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1370 (Fed. Cir. 2011) ("[Plaintiff]'s corporate representative not once referred to the automatic locking feature of [plaintiff]'s lighters – *i.e.*, the feature that purportedly distinguishes the claimed inventions from prior art utility lighters.  The district court thus held that because [plaintiff] failed to establish a nexus between the automatic safety feature and the alleged commercial success, [Plaintiff]'s sales data were not pertinent to the court's obviousness determination.  We agree with the district court with respect to the final *Graham* factor.  [Plaintiff] proffered no evidence from

---

[90] R. Doc. 605 at p. 30 (citing *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1295, 1310-11 (Fed. Cir. 2010); *J.T. Eaton & Co., Inc. v. Atl. Paste & Glue, Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997)).

[91] *See, e.g.*, R. Doc. 583 at pp. 65, 85-88, 99-102 (Larson); R. Doc. 587 at pp. 100-106 (Hooper); R. Doc. 585 at pp. 40-135 (Boyles); Tr. Exhs. 5, 7, 8, 160, 161, 198, 199, 215, 216, 217, 227, 372, and 373.

[92] R. Doc. 583 at pp.39-40 (Larson).

26

**A53**

which one could reasonably infer a nexus between its sales data and its utility lighters' automatic-locking features."). Accordingly, because Innovention showed that the commercially successful product is the invention disclosed and claimed in the '242 patent, Innovention could rely on the presumption that the requisite nexus exists. *See Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1295, 1310-11 (Fed. Cir. 2010); *J.T. Eaton & Co., Inc. v. Atl. Paste & Glue, Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997); *Demaco Corp. v. F. Von Langsdorff Licensing, Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). Thus, Innovention shifted the burden to MGA to show that the game's success or praise was due to some feature other than the claims covered in the '242 patent. *Crocs*, 598 F.3d at 1310-11; *Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000). Even though the burden shifted to MGA to come forward with rebuttal evidence, MGA failed to do so. Thus, MGA did not show that something *other than* the invention claimed in the '242 patent was responsible for the game's commercial success and praise.

Ultimately, the jury confirmed that Innovention had established, with respect to objective factors of nonobviousness, (1) "[c]ommercial success of a product embodying the patented invention [was] due to the merits of the claimed invention, rather than due to advertising, promotion, or salesmanship," (2) "[a]cceptance by others of the claimed invention as shown by praise from others in the field or from the licensing of the claimed invention," and (3) "[s]urprise, initial skepticism, or disbelief regarding the claimed invention."[93] Given that the jury found Innovention established a nexus between the

---

[93] R. Doc. 574-3 at p. 7 (jury verdict form). The jury also found that Innovention had established, with respect to objective factors of nonobviousness, (4) "[a] long felt need for the solution that is provided by the claimed invention," (5) "[u]nexpected and superior results from the claimed invention over the closest prior art," and (6) "copying of the claimed invention by others." *See id.* The Court discusses the significance of copying *infra*.

27

**A54**

patented invention and the secondary considerations of commercial success and industry praise, which MGA failed to rebut,[94] Innovention's evidence of secondary considerations indicates that the '242 patent was not rendered invalid due to obviousness. *Crocs*, 598 F.3d at 1311.

---

[94] MGA also argues that "[e]ven if there were sufficient evidence of secondary considerations, however, that would not necessarily defeat the obviousness defense, much less render it unreasonable." *See* R. Doc. 598-1 at p. 30 (citing *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008); *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1372 (Fed. Cir. 2007); *Richardson-Vicks, Inc. v. UpJohn Co.*, 122 F.3d 1476, 1483 (Fed. Cir. 1997)). The Court observes that prior to Defendants' appeal to the Federal Circuit, MGA never addressed Innovention's secondary considerations evidence when arguing to this Court that the '242 patent is invalid. *See* R. Doc. 126 (Defendants' pre-appeal motion for summary judgment regarding the '242 patent's invalidity) and R. Docs. 161 and 169 (Defendants' memoranda in opposition to Innovention's pre-appeal motions for summary judgment regarding the '242 patent's validity).

While a court *may* determine that a patent is invalid when the first three *Graham* factors strongly indicate a patent is obvious and the patentee's evidence of secondary considerations is very weak, *see KSR*, 550 U.S. at 426 (affirming summary judgment where patentee "had shown no secondary factors to dislodge the determination that [the relevant claim] is obvious"), a court must nevertheless still examine a patentee's evidence of secondary considerations of nonobviousness when a patentee submits such evidence. *See Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1378-79 (Fed. Cir. 2012) (stating that the Federal Circuit "requires consideration of these objective indicia because they provide objective evidence of how the patented device is viewed in the marketplace, by those directly interested in the product." (internal quotations marks and citation omitted)). Indeed, according to the Federal Circuit, secondary considerations "can be the most probative evidence of non-obviousness in the record." *Crocs*, 598 F.3d at 1310; *Mintz*, 679 F.3d at 1378-79 ("These objective criteria thus help turn back the clock and place the claims in the context that led to their invention. Technical advance, like much of human endeavor, often occurs through incremental steps toward greater goals. These marginal advances in retrospect may seem deceptively simple, particularly when retracing the path already blazed by the inventor.). The fact that MGA refused to acknowledge Innovention's secondary considerations evidence prior to appeal indicates that this aspect of MGA's obviousness defense is MGA's attempt at Monday-morning quarterbacking.

Likewise, following remand, Phillips' testimony that MGA instructed him to ignore Innovention's secondary considerations evidence when forming his expert opinion expressly contradicts caselaw requiring courts to examine secondary considerations evidence. *See* R. Doc. 589 at p. 171 (Phillips); R. Doc. 603-3 at pp. 66-69. MGA speciously argues that Phillips' failure to weigh Innovention's secondary considerations evidence is of no moment because "[e]ven if the report did include such an analysis, Mr. Phillips would not have been able to present it at trial" due to one of this Court's pre-trial rulings. R. Doc. 617 at p. 17. The Court again reminds MGA that Phillips was prevented from testifying at trial about secondary considerations evidence *precisely because* he improperly disregarded precedent requiring an examination of the fourth *Graham* factor. *See* R. Doc. 468 at p. 11 ("*Graham* and the Federal Circuit's instructions to this Court in *Innovention Toys* require the jury to consider the fourth *Graham* factor before resolving the ultimate question of whether the '242 patent is obvious or nonobvious. *See Graham*, 383 U.S. at 17-18; *Innovention Toys*, 637 F.3d at 1323. . . . Phillips testified [at his deposition] that he did not consider the required fourth *Graham* factor in any way in forming his opinion and Defendants' counsel conceded at oral argument that he is not qualified to do so. *As a result*, Phillips may not testify regarding secondary considerations evidence.") (footnote omitted, emphasis added).

### (d)    Fourth *Graham* Factor: Copying

Finally, with respect to its obviousness defense, MGA argues Innovention did not come forward with sufficient evidence of secondary considerations of nonobviousness regarding copying.  In sum, MGA submits that "substantial evidence introduced at trial confirms that MGA did not copy" Innovention's game.[95]  Thus, MGA contends, its defense that Innovention had no secondary considerations evidence of copying was objectively reasonable.

"Copying 'requires evidence of efforts to replicate a specific product.' " *Tokai*, 632 F.3d at 1370 (citing *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010)).  At trial, MGA argued that Shapiro independently invented Laser Battle at the end of 2004.[96] However, MGA presented only Shapiro's testimony[97] to support its argument that Shapiro did not copy Innovention's game; likewise, Shapiro was MGA's only witness who could authenticate and discuss the relevant exhibits implicated by Shapiro's testimony.[98]  MGA did not call Fan, the MGA employee in Hong Kong to whom Shapiro sent a copy of Innovention's game in December 2005.  MGA also did not call David Garcia, the co-inventor with whom Shapiro allegedly collaborated to create Laser Battle.  MGA did not produce, much less introduce into evidence, any e-mail correspondence between Shapiro and Fan after Fan inquired which part of the Innovention's game was patented.  Similarly,

---

[95] R. Doc. 598-1 at p. 31.

[96] Shapiro's "Durka-Durka" sketch was drawn on the back of a Bratz doll comment card pertaining to comments MGA received from December 8-16, 2004.  Tr. Exh. 271.  Nothing on the comment card indicates the date the card was printed or the date when Shapiro drew the sketch.

[97] As discussed *supra* at n.18, Shapiro testified via video deposition.

[98] *See* R. Doc. 586 (Shapiro); Tr. Exhs. 36, 37, 38, 39, 63, 110, 112, 114, 116, 118, 120, 271, 272, 273, 274, 276, 278, 280, 282, 284, 286, 288, 289; DXP-6.

MGA did not introduce any contemporaneous evidence of Shapiro's claim of independent invention – such as e-mails, drawings, etc. – that were dated before the end of August 2005.[99]

By contrast, Innovention delineated the similarities between Innovention's game and MGA's Laser Battle,[100] and drew the jury's attention to substantial evidence supporting its allegation that MGA copied a specific product – Innovention's game. *Tokai*, 632 F.3d at 1370. First, Innovention introduced evidence documenting that its game was exhibited at the February 2005 International Toy Fair to great "buzz."[101] Innovention also introduced a copy of Shapiro's resume stating, in pertinent part, "Exhibitions: . . . NY Toy Fair, 2002, 2003, 2005, MGA showroom: a variety of products including remote controlled vehicles, Brats Vehicles, Brats consumer electronics, and others."[102] Furthermore, Innovention elicited testimony from Shapiro that MGA required him to search the Internet during product development for information regarding competitive products[103] and that in early 2005 he found a game on the Internet with "a board that had mirrors and lasers on top of it" where the laser's path was illuminated using "smoke or something."[104] Innovention's

---

[99] The first e-mail reference MGA's "Laser Strategy Game" is dated August 30, 2005. *See* Tr. Exh. 288 at p. 7.

[100] R. Doc. 583 at pp. 91-92 (Larson); R. Doc. 587 at pp. 78-86 (Hooper); Tr. Exhs. 246, 289, 380, 387; PPE-1, PPE-4, PPE-11

[101] R. Doc. 583 at pp. 57-58 (Larson); R. Doc. 587 at pp. 71-73 (Hooper); Tr. Exh. 179.

[102] Tr. Exh. 136. MGA argues that "Shapiro's resume states only that certain of his creations were exhibited at the Fair, not that he was there. There is no evidence in the record that Mr. Shapiro attended that Fair." R. Doc. 617 at p. 7. The Court observes that there is no evidence in the record of Shapiro denying that he attended the 2005 International Toy Fair.

[103] R. Doc. 586 at p. 16 (Shapiro); R. Doc. 588 at pp. 78-79 (Phillips)

[104] R. Doc. 586 at pp. 18-19 (Shapiro).

website promoting its game – which included photographs of lasers passing through smoke – had launched prior to the February 2005 International Toy Fair.[105]  In addition, Shapiro admitted that he found the Laser Chess articles on the Internet in the first half of 2005 and played the game.[106]  Shapiro further confirmed that he had purchased two copies of Innovention's game on December 1, 2005, and played the game[107] and then sent one copy of Innovention's game to Fan.[108]  However, Shapiro testified he could not recall whether he responded to Fan's e-mail inquiring which part of Innovention's game was covered by the "patent pending"[109] language on the box.[110]  Finally, Innovention introduced evidence

---

[105] R. Doc. 587 at pp. 69-71 (Hooper).

[106] R. Doc. 586 at pp. 82-83 (Shapiro).

[107] R. Doc. 583 at pp. 67-68 (Larson); Tr. Exh. 137.  At trial, the jury heard the following colloquy:

| Counsel: | [D]id you buy two [of Innovention's] games? |
| Shapiro: | Apparently so. |
| | . . . |
| Counsel: | What made you decide to purchase these games? |
| Shapiro: | As with any other competitive items, whenever we find anything interesting, relating or not relating to what we're working on, we'll purchase it. This is policy. |
| | . . . |
| Counsel: | Okay.  What did you do with them? |
| Shapiro: | I played with it when it finally arrived. |

R. Doc. 586 at pp. 84-85 (Shapiro).

[108] R. Doc. 586 at pp. 85-86 (Shapiro) (authenticating e-mail from Fan).

[109] PPE-11.

[110] Tr. Exh. 246.  At trial, the jury heard the following colloquy:

| Counsel: | [Showing Trial Exhibit 246 to Shapiro].  Can you tell us what this is? |

31

**A58**

indicating that Shapiro failed to disclose the Laser Chess articles and Innovention's game to the PTO in connection with his patent application, despite having a duty to do so.[111]  In sum, the overwhelming evidence indicated that MGA copied Innovention's game, and the jury accordingly resolved all issues of credibility against Shapiro's self-serving, uncorroborated denials and in favor of Innovention.[112]

**(e)    The Court Finds that MGA's Obviousness Defense Was Not Objectively Reasonable**

To find that Innovention satisfied *Seagate*'s first, objective prong by clear and convincing evidence, the Court must retrospectively assess the entire litigation and determine that "no reasonable litigant could realistically expect success on the merits." *Highmark*, 687 F.3d at 1310.  In other words, for Innovention to succeed, the Court must

---

| | |
|---|---|
| Shapiro: | This is an e-mail from Alex [Fan] telling us: "I received a laser game sample on this evening. I found it marked with 'patent pending' on the box. Do you know which part did they patent?" |
| Counsel: | And what's the date of this e-mail? |
| Shapiro: | This is December 8th[, 2005]. |
| Counsel: | Okay.  Is this referring to one of [Innovention's] games? |
| Shapiro: | I believe it is. I can't say for certain, but it seems like it is. |
| | . . . |
| Counsel: | What did you do when you received this e-mail? |
| Shapiro: | I probably replied.  I'm not sure what I did, but we have, obviously, moved forward with our game.  I don't know -- I don't remember exactly what I was doing. |

R. Doc. 586 at pp. 85-86 (Shapiro).

[111] R. Doc. 586 at pp. 82-83, 89-91 (Shapiro); Tr. Exh. 250.

[112] R. Doc. 574-3 at p. 7 (jury verdict form, question no. 4).

32

**A59**

conduct "a single backwards-looking inquiry into the reasonableness" of MGA's obviousness defense in light of the full record, *Highmark*, 687 F.3d at 1310-11, and conclude as a matter of law that MGA's obviousness defense was not objectively reasonable.

As set forth above, the Court has reviewed the jury's underlying factual findings, which completely rejected MGA's obviousness defense, and found such findings were supported by substantial evidence. Having carefully considered the entire record, the evidence introduced at trial, and the jury's factual findings, the Court finds as a matter of law Innovention has proven, by clear and convincing evidence, that MGA's obviousness defense was not objectively reasonable.[113] Consequently, the Court finds as a matter of law that Innovention has satisfied the first, objective *Seagate* prong as to MGA's obviousness defense.

### (2) MGA's Non-Infringement Defense

Second, the Court examines the objective reasonableness of MGA's non-infringement defense. "Determining whether a patent claim has been infringed involves two steps: (1) claim construction to determine the scope of the claims, followed by (2) determination whether the properly construed claim encompasses the accused structure." *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998) (citations omitted). The first step, claim construction, is a question of law. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d

---

[113] Likewise, MGA's reliance on the fact that the Court permitted MGA's obviousness to go to the jury – by denying MGA's motion for summary judgment of no willful infringement and denying Innovention's motion for judgment as a matter of law – as proof that its obviousness defense was objectively reasonable is unavailing. Allowing a defense to go to the jury does not expressly foreclose a finding of willfulness. *See K-TEC*, 696 F.3d at 1378 (affirming willful infringement even though obviousness defense went to the jury); *see also Tomita*, 2012 WL 2524770, at *9 ("The mere existence of a defense cannot preclude that possibility of an 'objectively high likelihood' of infringement. Indeed, those who knowingly infringe a patent presumably attempt to manufacture defenses, however contrived and unavailing they may prove.").

1448, 1455 (citation omitted). The second step, determining infringement, whether literal or under the doctrine of equivalents, is a question of fact. *Bai*, 160 F.3d at 1353. Literal infringement may be properly decided upon summary judgment – as this Court previously did in rejecting MGA's infringement defense – when no genuine issue of material fact exists. *Innovention Toys*, 637 F.3d at 1319. That is, "when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device." *Innovention Toys*, 637 F.3d at 1319.

At the time MGA moved for summary judgment, MGA argued that Laser Battle did not infringe the '242 patent because the "Towers"[114] in Laser Battle are not a "movable key piece." Following the *Markman* hearing, the Court construed the claim limitation "movable key piece" to mean "capable of movement as called for by the rules of the game or game strategy."[115] According to MGA, its non-infringement defense was objectively reasonable because "the Laser Battle game rules make [it] clear that the 'Towers should always remain in their original position on the board' – that is, a player cannot move the Tower once the game starts."[116] The Laser Battle Rules also include a section entitled "Advanced Game Play," which includes a "Note" stating that "Except for Advanced Game Play, the Target Tower and Laser Guns will remain in their standard positions in all formations."[117] MGA contends that this Court and the Federal Circuit erred in construing the Note to mean that

---

[114] A "Tower" is a piece that is analogous to the king in chess. R. Doc. 598-1 at p. 24. Each Tower is a six-sided piece with a target area on only three of the Tower's sides. The backside of each Tower does not have any target areas. Tr. Exh. 289 at INNOV000267.

[115] *Innovention*, 665 F.Supp.2d at 644-45.

[116] R. Doc. 598-1 at p. 25 (citing Tr. Exh. 289 at INNOV000267).

[117] Tr. Exh. 289 at INNOV000268.

the Tower can move during the game in Advanced Game Play because, MGA argues, "if the rules allowed a player to rotate his Tower into different positions on the board during the game, that player could potentially 'game' the game, and position his Tower to expose only the [target-less] backside."[118] Such maneuvering would, in effect, prevent the opponent's laser beam from ever hitting the Tower's target area, according to MGA.[119] "That, then, would not be the Laser Battle game described in the rules," MGA contends.[120] Indeed, MGA submits, Eimerl advanced this same theory when he testified that Swift's mirrored pieces are not "movable" game pieces as called for by the '242 patent because they may not be moved under the rules of the game embodied in the Swift patent.[121]

MGA's reasoning regarding its non-infringement defense contains numerous logical flaws. First, MGA does not address this Court's finding, affirmed on appeal, that Laser Battle has movable key pieces because the Towers may be placed in different spaces on the game board during game set-up.[122] Second, MGA has not provided any evidentiary support that moving the Towers during game play, as contemplated by the Advanced Game Play instructions, would lead to an absurd result. Contrary to MGA's argument, as this Court found and the Federal Circuit affirmed, Advanced Game Play connotes additional complexity such that players can move and rotate the various pieces, including the Towers. Given that three sides of a Tower have targets, and the Advanced Game Play instructions

---

[118] R. Doc. 598-1 at p. 25.

[119] R. Doc. 598-1 at p. 25.

[120] R. Doc. 598-1 at p. 25 (citing Tr. Exh. 289 at fig. 12).

[121] R. Doc. 598-1 at pp. 25-26.

[122] *Innovention*, 665 F.Supp.2d at 646-47 & 647 n.18; *Innovention*, 637 F.3d at 1320.

contemplate that the Laser Guns can move and rotate,[123] players may achieve a laser strike under the Advanced Game Play instructions. Thus, MGA has not shown that a player could position its Tower in Advanced Game Play such that it could never be struck. Third, Eimerl's testimony that MGA cites in support of its argument does not solely focus on whether Swift's game pieces are "movable" under the rules of the Swift game.[124] Rather, Eimerl testified that Swift does not disclose a "game board" because the Swift game is played in the void between two pieces of Plexiglas, rather than on a physical structure that supports the game pieces. Furthermore, Eimerl testified that there are no "game pieces" in Swift because game pieces must be "*placed on the game board*" – a physical structure – in addition to being capable of movement during the course of the game.[125] MGA's non-infringement defense hinging on the fact that the Towers are not "movable" is completely unsuccessful.

Again, the Court's role is to conduct "backwards-looking inquiry into the reasonableness" of MGA's non-infringement defense in light of the full record," *Highmark*, 687 F.3d at 1310-11, and determine whether MGA's non-infringement defense was objectively reasonable. Having carefully considered the entire record and the evidence introduced at trial, the Court finds as a matter of law that Innovention has proven, by clear

---

[123] Tr. Exh. 289 at p. INNOV000267.

[124] R. Doc. 598-1 at pp. 25-26 (citing R. Doc. 590 at pp. 106-107 (Eimerl)).

[125] R. Doc. 590 at pp. 106-107 (Eimerl). In addition to recognizing that the Swift mirror assemblies cannot be moved once they are inserted into Swift's x-shaped slots, Eimerl further testified that there are other differences between Swift and the claims the '242 patent, including that (1) Swift has no starting configuration because Swift's mirror assemblies are not placed in Swift's chamber at the start of game play, R. Doc. 590 at p. 112 (Eimerl) and Tr. Exh. 128 at p. 9:47-53; and (2) Swift's scoring module is not a "movable key playing piece" because it is fixed in place such that it can never be placed or moved, R. Doc. 590 at pp. 96-97 (Eimerl), R. Exh. 128 at p. 7:11-17. Unlike Swift, the '242 patent requires, and Laser Battle has, game pieces and key pieces that are positioned on the game board in a starting configuration and are capable of being moved according to the rules of the game.

and convincing evidence, that MGA's non-infringement defense was not objectively reasonable. Thus, the Court finds that Innovention has satisfied the first, objective *Seagate* prong as to MGA's non-infringement defense.

### C. The Second, Subjective *Seagate Prong*

Because the Court has found as a matter of law that Innovention has satisfied the first, objective *Seagate* prong, the Court now turns to the second, subjective *Seagate* prong. *Seagate*'s second prong is a question of fact for the jury, *Bard*, 682 F.3d at 1008, which the jury answered in the affirmative by finding that MGA's infringement was subjectively willful.[126] The Court reviews the jury's subjective willfulness finding to determine whether it is supported by substantial evidence. *Power Integrations, Inc. v. Fairchild Semiconductor, Int'l*, 711 F.3d 1348, 1357 (Fed. Cir. 2013); *Bard*, 682 F.3d at 1008.

To satisfy the second, subjective *Seagate* prong, Innovention must prove by clear and convincing evidence that the objectively-defined risk that MGA's actions constituted infringement of a valid patent was either known, or so obvious that it should have been known, to MGA. *Seagate*, 497 F.3d at 1371. "[I]n considering a party's subjective state of mind, [the Court must] 'to take into account the totality of circumstances.' " *Highmark*, 687 F.3d at 1311 (quoting *Mach. Corp. of Am. v. Gullfiber AB*, 774 F.2d 467, 473 (Fed. Cir. 1985)). "Unlike the objective prong, which is a single retrospective look at the entire litigation, the subjective prong may suggest that a case initially brought in good faith may be continued in bad faith depending on developments during discovery and otherwise." *Highmark*, 687 F.3d at 1311.

---

[126] R. Doc. 574-3 at p. 12 (jury verdict form).

MGA has declined to address the second, subjective *Seagate* prong, arguing instead that consideration of the second prong is unnecessary because its defenses were objectively reasonable. Innovention argues that the evidence summarized above showing that Shapiro not only copied Innovention's game, but further failed to disclose the game and the Laser Chess articles to the PTO when seeking a patent covering Laser Battle, is more than substantial evidence to support the jury's finding that the objectively-defined risk MGA's actions constituted infringement of a valid patent was either known, or so obvious that it should have been known, to MGA. The Court agrees. Innovention's evidence at trial demonstrated that MGA had knowledge of the '242 patent and yet MGA, "obviously, moved forward"[127] with Laser Battle despite having knowingly copied Innovention's game. Thus, the Court concludes that substantial evidence supports the jury's verdict finding that MGA knew, or should have known, of the obvious, objectively-defined risk that its actions constituted infringement of a valid patent. *Seagate*, 497 F.3d at 1371. Innovention has satisfied the second, subjective *Seagate* prong by clear and convincing evidence.

The Court takes a moment to note – and provide context why – certain evidence regarding MGA's state of mind is missing from the record. Though MGA was not required to obtain any opinion of counsel,[128] MGA obtained an opinion from Ira Siegel ("Siegel")

---

[127] R. Doc. 586 at p. 86 (Shapiro).

[128] Following *Seagate*, alleged infringers are no longer obligated to obtain an opinion of counsel when faced with a patent infringement charge. *See Seagate*, 497 F.3d at 1371 ("Accordingly, we overrule the standard set out in *Underwater Devices* and hold that proof of willful infringement permitting enhanced damages requires at least a showing of objective recklessness. Because we abandon the affirmative duty of due care, we also reemphasize that there is no affirmative obligation to obtain opinion of counsel.").

regarding invalidity and non-infringement *vis-à-vis* the '242 patent.[129]  Throughout the litigation, MGA maintained that what it characterized as Siegel's opinion – contained in two letters marked as trial exhibits 86 and 268 – was protected by the attorney-client privilege.[130]  However, at trial, MGA sought to introduce Siegel's letters through the testimony of MGA's in-house counsel, Sam Khare ("Khare").  MGA intended to use the letters to show that it did not have the requisite state of mind necessary for Innovention to prove that the infringement was subjectively willful.[131]  Thus, the Court concluded that MGA speciously used Siegel's opinion as a sword and a shield.[132]  Nevertheless, because excluding the exhibits would have unduly prejudiced MGA, the Court allowed the admission of trial exhibits 86 and 268 on Innovention being allowed to depose Khare.[133]  The Court also ordered MGA to "produce all documents responsive to" Innovention's document request

---

[129] *See, e.g.*, R. Doc. 423-1 at p. 17 ("Although it was not required to do so, MGA obtained an opinion of counsel regarding both invalidity and non-infringement, and provided the opinion of counsel letter to plaintiff before plaintiff served MGA.") (capitalization removed).

[130] R. Doc. 584 at pp. 17-18.  MGA produced Shapiro as MGA's corporate representative pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure.  MGA refused to allow Innovention's counsel to question Shapiro about any opinions of counsel regarding non-infringement or invalidity.  R. Doc. 584 at p. 18.  Likewise, MGA refused to produce any documents responsive to Innovention's discovery requests directed toward opinions of counsel.  R. Doc. 584 at p. 18 ("Then the plaintiffs also propounded Document Request 33 that asked for the production of all documents that were communications. In its response MGA asserted an attorney-client privilege. The plaintiffs propounded Interrogatory No. 6 where they asked for all opinions, and that's opinions whether written or oral; and they also asked for the [identity of the] persons most knowledgeable about such information and all documents that constitute, refer, or relate to those, to such information. In their response the defendants again asserted an attorney-client privilege.").

[131] R. Doc. 584 at p. 19.

[132] R. Doc. 584 at pp. 17-19.

[133]  After hearing argument from counsel, the Court ruled that these exhibits were admissible.  R. Doc. 584 at pp. 17-21.  Because MGA declined to call Khare, ultimately the exhibits were not admitted into evidence at trial.  Nevertheless, copies of Siegel's letters  are contained in the record in the above-captioned matter as exhibits to MGA's motion for summary judgment of no willful infringement.  *See* R. Doc. 423-11 at pp. 2-3 (October 12, 2007 letter from Ira Siegel to Matthew Lowrie; referred to in the trial record as Tr. Exh. 268) and R. Doc. 423-11 at pp. 2-73 (October 19, 2007 letter from Ira Siegel to Robert J. Silverman; referred to in the trial record as Tr. Exh. 86).

number 33.[134]  After repeatedly representing to the Court that the documents Innovention

had been seeking since at least 2008 did not exist,[135]  MGA produced documents responsive

to Innovention's discovery requests.[136]   As a result, the Court sanctioned MGA.[137]

Thereafter, even though MGA had relied on Siegel's opinion as a defense and represented

that it planned to present Siegel's opinion as evidence at trial via Khare's testimony, MGA

put Khare on a plane back to Los Angeles, California, rather than call him to testify.  Khare's

testimony may have indicated whether MGA had the requisite state of mind necessary to

support Innovention's case regarding the second, subjective *Seagate* prong.  By abandoning

its strategy at the last minute, MGA deprived Innovention of an opportunity test the

veracity of this evidence in open court.[138]  Nevertheless, even without Khare's testimony,

the Court finds that substantial evidence supports the jury's verdict regarding the second,

---

[134] *See* R. Doc. 503-1 at p. 13 ("All studies, investigations, determinations, opinions or other documents, including without limitation, opinions of counsel and any documents generated in connection with this or any prior suit or threat of suit, concerning the scope or interpretation, patentability or unpatentability, validity or invalidity, enforceability or unenforceability, or infringement or non-infringement of any claim of any patent-in-suit.").

[135] *See, e.g.,* R. Doc. 584 at p. 16 ("Your Honor, may I just make one point?  I apologize, I know it's late, I know we're close to the jury.  But Mr. Baum stood here and said I was disingenuous to you either today or yesterday. One, I didn't say there were lots of communications, Mr. Khare was the person who spoke to them, there are no written communications, you've already ordered that, your Honor, you've recognized that. I'm sorry I can't produce oral communications in response to a request for production, that's just not possible.").

[136] *See* R. Doc. 587 at p. 156 ("And then counsel said in court yesterday: There are no written communications. You've already ordered that. You've recognized that. So the representation was made, to me, in court, that there were no other communications.  And the only reason these were produced was because I specifically ordered you to produce them yesterday, and to either produce them to the plaintiffs or to produce them to me in camera.  So, if I hadn't done that, we still wouldn't have those.  So it's clear to me that the defendants did not comply with their obligation with respect to the production of documents.").

[137] R. Doc. 587 at p. 157; R. Doc. 576.

[138] In reciting this aspect of the case's history, the Court emphasizes that it is not drawing a negative inference from MGA's decision not to call Khare to testify, but instead is providing context for MGA's actions.

subjective *Seagate* prong. The Court concludes that Innovention has proven the second, subjective *Seagate* prong by clear and convincing evidence.

### D. The Court Finds that MGA Willfully Infringed the '242 Patent

In sum, as set forth above, Innovention has satisfied both prongs of *Seagate* by clear and convincing evidence. As a result, the Court finds a matter of law that MGA willfully infringed the '242 patent and will enter judgment accordingly. Consequently, MGA's motion to have the Court enter judgment that MGA's infringement was not willful pursuant to 35 U.S.C § 284 is **DENIED** and Innovention's motion with respect to its request for the Court to enter judgment that MGA's infringement was willful is **GRANTED**.

### II. Enhanced Damages Pursuant to 35 U.S.C. § 284

Given that the Court found as a matter of law that MGA's infringement was willful, the Court now turns to Innovention's request for treble damages pursuant to 35 U.S.C. § 284. Title 35, United States Code, Section 284 allows a court to award up to treble damages to a plaintiff as compensation for a defendant's willful infringement.[139] Innovention argues that an award of treble damages is appropriate here because "[t]his is a particularly

---

[139] Title 35, United States Code, Section 284 provides:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

> When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed. Increased damages under this paragraph shall not apply to provisional rights under section 154(d).

> The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances.

41

**A68**

egregious case of patent infringement."[140] MGA responds that enhancement is unwarranted because its defenses were not objectively unreasonable under the first, objective prong of *Seagate* and, therefore, MGA did not willfully infringe the '242 patent. The Court has already rejected MGA's arguments regarding the first *Seagate* prong.[141] Thus, the Court considers MGA's argument in alternative, which urges the Court to exercise its discretion not to award any enhanced damages because, according to MGA, this case is not one warranting enhancement.

"Enhanced damages are a punitive measure taken by a court to penalize a willful infringer for his or her increased culpability." *SSL Services, LLC v. Citrix Sys., Inc.*, 2012 WL 4092449, at *2 (E.D. Tex. Sept. 17, 2012) (citing *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1570 (Fed. Cir. 1996)). Whether to grant enhanced damages pursuant to 35 U.S.C. § 284 requires the Court to conduct a two-step analysis. *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 37 (Fed. Cir. 2012) (citing *Jurgens*, 80 F.3d at 1570). "First, the fact-finder must determine whether an infringer is guilty of conduct upon which increased damages may be based" – referred to as the "culpability" prong. *Whitserve*, 694 F.3d at 37 (quoting *Jurgens*, 80 F.3d at 1570). "If so, the court then determines, exercising its sound discretion, whether, and to what extent, to increase the damages award given the totality of the circumstances." *Whitserve*, 694 F.3d at 37 (quoting *Jurgens*, 80 F.3d at 1570). A court, in its discretion, may decline to award enhanced damages or may award up to treble

---

[140] R. Doc. 602 at p. 9.

[141] Again, MGA has not advanced any argument that its actions were not subjectively willful under the second prong of *Seagate*. Given that the Court found that the jury's verdict as to the second, subjective *Seagate* prong was supported by substantial evidence, and thus that Innovention has satisfied the second, subjective *Seagate* prong, any argument that MGA's actions were not subjectively willful would be unpersuasive.

damages.  35 U.S.C. § 284 ("[T]he court may increase the damages up to three times the amount found [by the jury] or assessed" by the court.); *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1378 (Fed. Cir. 2002).

### A.    MGA's Culpability

"An act of willful infringement satisfies th[e] culpability requirement and is, without doubt, sufficient to meet the first requirement to increase a compensatory damages award." *Whitserve*, 694 F.3d at 37 (quoting *Jurgens*, 80 F.3d at 1570 (citing *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826-27 (Fed. Cir. 1992)).  "While a finding of willful infringement does not mandate that damages be increased . . . , after an express finding of willful infringement, a trial court should provide reasons for not increasing a damages award." *Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 972 (Fed. Cir. 2000) (internal quotation marks omitted) (citing *Jurgens*, 80 F.3d at 1573).  As this Court has found as a matter of law that MGA's infringement was willful, the culpability prong of the Court's analysis is satisfied.  Thus, the Court proceeds to the second step of the inquiry, and considers whether the totality of the circumstances justifies an award of enhanced damages in this case.

### B.    The Totality of the Circumstances Justifies an Award of Enhanced Damages

"The paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances." *Read*, 970 F.2d at 826; *Cleancut, LLC v. Rug Doctor, Inc.*, 2013 WL 441209, at *2 (D. Utah Feb. 5, 2013) (analyzing the *Read* factors and awarding enhanced damages after a finding of willful infringement). When considering the totality of the

43

**A70**

circumstances, the Court must examine the "*Read* factors." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 859 (Fed. Cir. 2010) (citing *Read*, 970 F.2d at 267-27); *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1469 (Fed. Cir. 1997) (citing *Read*, 970 F.2d at 826-27). The nine *Read* factors include "(1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent, investigated the patent and formed a good faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior in the litigation; (4) the infringer's size and financial condition; (5) the closeness of the case; (6) the duration of the misconduct; (7) the remedial action by the infringer; (8) the infringer's motivation for harm; and (9) whether the infringer attempted to conceal its misconduct." *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1348 (Fed. Cir. 2011) (citing *Read*, 970 F.2d at 826-27).

### (1)    Infringer's Copying

First, Innovention argues that MGA deliberately copied its game and submits that "[c]opying is undoubtedly the most significant factor in deciding whether enhanced damages are warranted."[142]  MGA reiterates the argument that it "presented substantial evidence at trial that it independently developed Laser Battle."[143]  The jury found that MGA copied Innovention's game.  As set forth above, the Court has held that substantial evidence supports the jury's verdict and has found the same.[144]  Likewise, the Court agrees with Innovention that copying is a very important factor in deciding whether enhanced damages are warranted.  *See Amsted Indus., Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178 (Fed.

---

[142] R. Doc. 602 at p. 20.

[143] R. Doc. 607 at p. 23.

[144] R. Doc. 574-3 (jury verdict form).

44

**A71**

Cir. 1994) (affirming an award of treble damages and attorneys' fees in view of infringer's copying, inappropriate litigation behavior and jury's finding of willfulness); *Engineered Prods. Co. v. Donaldson Co., Inc.*, 147 F. App'x 979, 991-92 (Fed. Cir. 2005) (affirming award of treble damages where infringer engaged in "deliberate copying"); *Jurgens*, 80 F.3d at 1569-73 (requiring the district court to reconsider its decision not to enhance damages in a case where the infringer copied the patented invention); *Powell v. Home Depot, USA, Inc.*, 715 F.Supp.2d 1285, 1296 (S.D. Fla. 2010) (awarding treble damages where infringer "deliberately and callously" copied the claimed invention). Because MGA copied Innovention's game, the first *Read* factor weighs heavily in favor of enhancement in this case.

### (2)    Infringer's Investigation of the '242 Patent

Second, Innovention asserts that MGA "did virtually nothing to investigate the scope of Innovention's patent rights, despite numerous warnings."[145]  MGA argues – given that it had no duty to obtain an opinion of counsel following *Seagate* and it did not have notice of the '242 patent until it was sued – that "this *Read* factor should be deemed no more than neutral."[146]  The Court has already concluded, above, that MGA had notice of the claims covered in the '242 patent on the date the patent issued.  Furthermore, though the law did not require MGA to obtain an opinion of counsel from Siegel, MGA did so.  MGA would not allow Innovention to conduct discovery regarding Siegel's opinion, claiming that it was protected by the attorney-client privilege.  Later, MGA sought to use Siegel's opinion as a defense to Innovention's allegation of willful infringement.  Consequently, the Court

---

[145] R. Doc. 602 at p. 20.

[146] R. Doc. 607 at p. 25.

sanctioned MGA for using the Siegel letters as both a sword and shield. After being sanctioned, MGA did not call Khare as a witness, which deprived Innovention of the opportunity to cross-examine Khare regarding the Siegel letters. Thus, the record contains no evidence that MGA "investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed" by obtaining an opinion of counsel, *or otherwise*. *Read*, 970 F.2d at 827. Consequently, the Court finds that the second *Read* factor weighs in favor of enhancement. *See Spectralytics, Inc. v. Cordis Corp.*,834 F.Supp.2d 920, 924 & 924 n.2 (D. Minn. 2011) ("[Defendant's] letter [prepared by defendant's in-house lawyer] in response to [patentee's] infringement allegations was both superficial and tardy. Because the record contains no other evidence to show that [defendant] 'investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed,' the Court finds that this second *Read* factor weighs in favor of awarding enhanced damages.").

### (3) Infringer's Behavior in the Litigation

Third, in support of its assertion that "MGA's behavior in this case has been deplorable," Innovention contends that MGA (1) has been sanctioned several times in this matter, (2) filed seven motions for summary judgment, none of which were granted, (3) frivolously moved to reopen discovery to support a post-trial motion under 35 U.S.C. § 285, (4) untimely moved to sever and stay the case against Wal-Mart and Toys "R" Us, and (5) engaged in misconduct that required Innovention to prepare for and file additional motions during trial. According to Innovention, "[i]t is clear that MGA was seeking to use its superior size and resources to bully Innovention into submission."[147] MGA responds that

---

[147] R. Doc. 602 at p. 22.

Innovention itself "has engaged in a pattern and practice of deplorable and sanctionable conduct in this case."[148]   MGA further observes that Innovention's cross-motions for summary judgment were also denied.

Though Innovention has also been sanctioned in this case, the Court concludes that the third *Read* factor nevertheless weighs in favor of enhancement.  MGA engaged in misconduct throughout this litigation and employed particularly aggressive tactics immediately prior to and during trial.  As detailed above, MGA's actions required Innovention and the Court to devote significant resources to addressing the admissibility of the Siegel letters both before and during trial.  Because MGA refused to produce communications regarding the Siegel letters, the Court had to order MGA to produce them. Innovention also had to prepare to depose Khare regarding the Siegel letters, only to be informed that MGA would not longer call Khare at trial.  Likewise, Innovention had to depose two undisclosed witnesses during the trial after a long day in the courtroom, rather than preparing for the next day.[149] Indeed, even after the jury returned its verdict, MGA continued to unnecessarily multiply the proceedings by filing untimely objections to which Innovention had to respond.[150]   *Jurgens*, 80 F.3d at 1571 (stating that an infringer's "egregious conduct in infringement litigation . . . may be used as a factor in determining

---

[148] R. Doc. 607 at p. 25.

[149] *See* R. Doc. 553 (finding that "Defendants failed to comply with the Court's scheduling order by their late disclosure of the names of Carter and Bland" and that "[Defendants'] failure has caused and will continue to cause substantial inconvenience and cost to Plaintiff," and permitting Innovention to depose such witnesses in an effort to cure the prejudice)

[150] *See* R. Doc. 593 at p. 8 (finding that Defendants' statement "that they were unable to review the Court's verdict form and to enter their objections before the verdict form was given to the jury" was "patently false.").

whether or how much to increase a damages award once [willful infringement] is found"). As a result, the Court finds that the third *Read* factor weighs in favor of enhancement.

### (4)    Infringer's Size and Financial Condition

Fourth, Innovention reiterates that this litigation has been a David-verus-Goliath fight, given that Innovention is a tiny three-person company[151] and MGA is a toy behemoth with sales of $300 million in 2011.[152]  With respect to this factor, a "[d]efendant's size and financial condition should be viewed both relative to the Plaintiff and also individually to ensure that enhanced damages would not unduly prejudice [defendant's] non-infringing business." *SSL Services*, 2012 WL 4092449, at *5 (internal quotation marks and citations omitted); *see also Read*, 970 F.2d at 827 (citing with approval a trial court's holding that, "[i]f defendant were the giant and plaintiff the small independent, I would make it treble") (citation omitted).  Evidence introduced at trial indicates that MGA is a large company with a solid financial condition arguably profitable enough to pay enhanced damages.  Moreover, if the Court were to award enhanced damages, such an award would not unduly prejudice MGA's non-infringing business.  *SSL Services*, 2012 WL 4092449, at *5; *Cleancut*, 2013 WL 441209, at *3.  Thus, the fourth *Read* factor weighs in favor of enhancement.

### (5)    The Closeness of the Case

Fifth, as to the closeness of the case, the Court disposed of MGA's anticipation defense on summary judgment and MGA did not appeal the Court's decision.  Moreover, the jury completely rejected all of MGA's theories, and after just three hours of

---

[151] R. Doc. 583 at p. 34 (Larson).

[152] R. Doc. 588 at p. 75 (Butler).

deliberations, swiftly returned a verdict in favor of Innovention on all issues.[153]  The jury also found that MGA's infringement was willful.  After reviewing the entire record, the evidence introduced at trial, and the jury's findings of fact, the Court determined as a matter of law that MGA's defenses were not objectively reasonable.  In sum, this case was not close.  *SSL Services*, 2012 WL 4092449, at *5; *Cleancut*, 2013 WL 441209, at *3.  The fifth *Read* factor weighs in favor of enhancement.

### (6)    Duration of Infringer's Misconduct

Sixth, as to the duration of MGA's infringement, MGA only ceased its willful infringement – more than two years after Innovention initiated this lawsuit – because this Court enjoined MGA from making, importing, selling and/or offering Laser Battle for sale.[154]  Given the manner in which this case has been litigated, there is no indication MGA would have voluntarily ceased its infringing behavior absent Court order.  *Univ. of Pittsburgh of Com. Sys. of Higher Educ. v. Varian Med. Sys., Inc.*, 2012 WL 1436569, at *6 (W.D. Pa. Apr. 25, 2012).   The sixth *Read* factor weighs in favor of enhancement.

### (7)    Infringer's Remedial Actions

Seventh, as to MGA's remedial measures, MGA argues that this factor weighs against enhancement because it did not begin selling Laser Battle after the Federal Circuit vacated the permanent injunction this Court entered.  The remedial measures factor examines whether an alleged infringer took any affirmative action after receiving notice it needed to remedy its actions.  *Varian Med. Sys., Inc.*, 2012 WL 1436569, at *6.  At the time the

---

[153] R. Doc. 591 at p. 591 at p. 137 (jury charged); R. Doc. 592 at p. 3 (jury verdict returned); R. Doc. 574-3 (jury verdict form).

[154] R. Doc. 220.

Federal Circuit remanded this case, the Court's injunction had been in effect for more than one year. Innovention continued to press forward with its allegations against MGA. Consequently, MGA's decision to refrain from engaging in further allegedly infringing behavior is not the type of affirmative action courts look to in order to determine whether a defendant has sought to remedy his actions. MGA's decision to forgo any remedial measures weighs in favor of enhancement. *Varian Med. Sys., Inc.*, 2012 WL 1436569, at *6.

### (8)  Infringer's Motivation for Harm

Eighth, given that both MGA and Innovention are in the business of selling toys, they are direct business competitors. This *Read* factor weighs in favor of enhancement. *Cleancut*, 2013 WL 441209, at *3; *Varian Med. Sys., Inc.*, 2012 WL 1436569, at *6.

### (9)  Infringer's Concealment of Misconduct

The final *Read* factor requires the Court to determine whether MGA concealed its infringement "either through advertising and selling the products covertly or through concealing evidence of [the] infringing conduct." *Varian Med. Sys., Inc.*, 2012 WL 1436569, at *7 (quotation marks and citation omitted). While there is evidence in the record that Shapiro inappropriately concealed information regarding Innovention's game from the PTO, MGA openly sold Laser Battle at retail without making any attempt to hide its infringing activities. As a result, the Court concludes that this is the only *Read* factor that does not weigh in favor of enhancement.

Having considered the entire record, the manner in which this case has been litigated, the sizable disparity been Innovention and MGA, MGA's willful infringement of the '242 patent, and the fact that on balance the *Read* factors weigh heavily in favor of

50

**A77**

enhancement, the Court finds, in its discretion and based on the totality of the circumstances, that an award of treble damages is warranted in this case. *See SDS Korea Co. Ltd. v. SDS USA, Inc.*, 2012 WL 3114753, at * 3 (D. N.J. July 31, 2012) (awarding treble damages where infringer's behavior was willful and ongoing for several years, infringer acted in bad faith, and did not attempt to investigate the proper scope of the patents infringed). As a result, Innovention's motion with respect to its request for enhanced damages pursuant to 35 U.S.C. § 284 is **GRANTED**. The Court will treble the amount of the damages the jury awarded[155] to **$4,719,489.00**.

### III.     Finding of Exceptional Case and Attorneys' Fees

Innovention further requests the Court to find that this case is exceptional within the meaning of 35 U.S.C. § 285 and, accordingly, to award Innovention the attorneys' fees it incurred in this matter. Title 35, United States Code, Section 285 ("Section 285") provides that"[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." When deciding whether to award attorneys' fees under Section 285, this Court must conduct a two-step analysis. "First, the court must determine whether the prevailing party has proved by clear and convincing evidence that the case is exceptional." *MarcTec, LLC v. Johnson & Johnson and Cordis Corp.*, 664 F.3d 907, 915-16 (Fed. Cir. 2012) (internal citations omitted). "If the district court finds that the case is exceptional, it must then determine whether an award of attorneys fees is justified." *MarcTec*, 664 F.3d at 915-16. According to the Federal Circuit, "[a]n award of attorneys fees is permissible 'when there has been some material inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in procuring the patent, misconduct

---

[155] That is, $1,573,163.00. *See* R. Doc. 574-3 (jury verdict form).

during litigation, vexatious or unjustified litigation, conduct that violates Fed. R. Civ. P. 11, or like infractions.' " *iLOR, LLC v. Google Inc.*, 631 F.3d 1372, 1376-77 (Fed. Cir. 2011) (quoting *Brooks Furniture Mfg., Inc. v. Dutailier Int'l Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005)); *see also Tate Access Floors*, 222 F.3d at 972 ("While a finding of willful infringement does not mandate . . . that attorneys fees be awarded, after an express finding of willful infringement, a trial court should provide reasons . . . for not finding a case exceptional for the purpose of awarding attorneys fees." (internal quotation marks omitted) (citing *Jurgens*, 80 F.3d at 1573)); *Modine Mfg. Co. v. Allen Group, Inc.*, 917 F.2d 538, 543 (Fed. Cir. 1990) ("An express finding of willful infringement is a sufficient basis for classifying a case as 'exceptional,' and indeed, when a trial court denies attorney fees in spite of a finding of willful infringement, the court must explain why the case is not 'exceptional' within the meaning of the statute.").

"Willful infringement is one of the permissible reasons for awarding attorneys fees." *Varian Med. Sys., Inc.*, 2012 WL 1436569, at *8 (citing *Brooks Furniture*, 393 F.3d at 1381). Innovention has satisfied its burden of proving, by clear and convincing evidence, that this is an exceptional case under Section 285 in light of the jury's verdict finding that MGA's infringement was willful and the Court's finding as a matter of law that MGA's infringement was willful. *Varian Med. Sys., Inc.*, 2012 WL 1436569, at *8; *SDS Korea Co.*, 2012 WL 3114753, at * 3. In addition, the Court may consider the same *Read* factors set forth above *vis-à-vis* enhanced damages when determining whether a case is exceptional. *See nCube Corp. v. Seachange Int'l, Inc.*, 436 F.3d 1317, 1325 (Fed. Cir. 2006) (affirming trial court's finding of exceptional case and decision to award attorney's fees where the jury made a willfulness finding and the *Read* factors weighed in favor of enhanced damages).

**A79**

Given that the *Read* factors overwhelming weigh in favor of enhanced damages, the Court concludes that these factors also indicate that this litigation has been "exceptional" within the meaning of Section 235. As a result, the Court finds that this is an exceptional case.

Next, the Court must determine, in its discretion, whether an award of attorneys' fees is justified. Though our legal system generally adheres to the "American Rule," whereby each party in a lawsuit ordinarily bears its own attorneys' fees, "in certain categories of cases Congress has carved out exceptions to the American Rule and allowed for recovery of attorneys' fees." *Bywaters v. United States*, 670 F.3d 1221, 1227 (Fed. Cir. 2012). Section 285 is such an exception to the American Rule. *Wedgetail Ltd. v. Huddleston Deluxe, Inc.*, 576 F.3d 1302, 1304 (Fed. Cir. 2009). The purpose of Section 285 is "to compensate the prevailing party for its monetary outlays in the prosecution or defense of the suit." *Mathis v. Spears*, 857 F.2d 749, 755 (Fed. Cir. 1988) (quotation marks, citation, and emphasis omitted); *Varian Med. Sys., Inc.*, 2012 WL 1436569, at *8 ("Section 285 was designed to discourage individuals from wasting the resources of both the litigants and the Court, by engaging in practices such as willful infringement and unnecessary litigation tactics."). Consequently, the amount awarded should – if appropriate – include time spent preparing the party's claim for attorneys' fees. *Central Soya Co., Inc. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983). Having considered the purpose of Section 285, the record, and the entire history of this litigation, the Court finds, exercising its discretion, that an award of attorneys' fees is appropriate. *Varian Med. Sys., Inc.*, 2012 WL 1436569, at *8; *SDS Korea Co.*, 2012 WL 3114753, at * 3. Innovention's motion with respect to its request for a finding of exceptional case and an award of attorneys' fees pursuant to 35 U.S.C. § 285 is **GRANTED**.

While the Court has the discretion to award attorneys' fees, the ultimate amount of attorneys' fees recovered must nevertheless be reasonable. *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1068 (Fed. Cir. 1983); *SDS Korea Co.*, 2012 WL 3114753, at * 3. The parties have litigated this case for six long years – so long in fact that both Innovention and MGA have changed counsel. The Court must review thousands of pages of billing records to determine whether the amount Innovention has requested is reasonable. As a result, the Court **DEFERS** ruling on the amount of attorneys' fees to be awarded and hereby **REFERS** this issue to the assigned U.S. Magistrate Judge for a report and recommendation.[156]

## IV. Costs

Innovention also seeks recovery of its taxable costs under 28 U.S.C. § 1920. Innovention further seeks non-taxable costs under 35 U.S.C. § 285 because this is an exceptional case.

### A. Taxable Costs

Pursuant to 28 U.S.C. § 1920, the Court may tax the following costs:

(1)     Fees of the clerk and marshal;

(2)     Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

(3)     Fees and disbursements for printing and witnesses;

(4)     Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

---

[156] By referring this issue to the assigned U.S. Magistrate Judge, the Court is in no way assessing the reasonableness of the sum Innovention has requested. Both local counsel and patent counsel retained to represent Innovention in this case are well-qualified and respected.

(5)     Docket fees under section 1923 of this title;

(6)     Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

Innovention seeks to recover fees (1) assessed by the Clerk of Court and the U.S. Marshal ($910); (2) for printed or electronically recorded transcripts ($13,889.98); (3) for exemplification and the costs of making copies of materials ($86,983.45); and (4) for compensation of court appointed experts and interpreters, and salaries, fees, expenses and costs of a special interpretation service under 28 U.S.C. § 1928 ($17,156.00). MGA challenges Innovention's request for copying and exemplification because "Innovention provided no proof that they were necessary for use in this case."[157] MGA also challenges Innovention's request to recover its interpreters' fees.[158] At this time, the Court will award Innovention its fees assessed by the Clerk of Court and the U.S. Marshal ($910) and fees incurred for printed or electronically recorded transcripts ($13,889.98). As to Innovention's request for exemplification and copying costs and interpreters' costs, a determination of those amounts is also **REFERRED** to the assigned U.S. Magistrate Judge for a report and recommendation. As a result, Innovention's motion with respect to its request to recover taxable costs is **GRANTED IN PART** and **DEFERRED IN PART**.

---

[157] R. Doc. 607 at p. 35.

[158] R. Doc. 607 at pp. 35-36. Innovention's game is manufactured in China. *See, e.g.*, R. Doc. 583 at p. 104 (Larson). As part of the damages portion of the trial, Innovention elicited testimony from the Wugeng Li ("Li"), the president of the company that manufactures Innovention's game. Li testified through an interpreter. *See, e.g.*, R. Doc. 585 at pp. 12-23 (Li).

### B.  Non-Taxable Costs

Because this is an exceptional case, Innovention seeks recovery of non-taxable costs pursuant to 35 U.S.C. § 285 for (1) fees for trial presentation professionals ($36,122.88); (2) legal research costs ($10,690.33); (3) courier and postage costs ($4,929.13); (4) telephone costs ($110.77); (5) travel and lodging expenses ($53,833.18); and (6) any of the costs, identified above as taxable costs, if the Court determines such requested taxable costs are in fact non-taxable costs.  MGA argues that Innovention's requested non-taxable costs are not reasonable.

"The Federal Circuit has interpreted 35 U.S.C. § 285 as including not only the recovery of attorney fees, but also the recovery of all reasonable expenses incurred in prosecuting the entire action.  Thus, upon finding a case exceptional, an award of all reasonable and necessary expenses related to the litigation is properly within the scope of 35 U.S.C. § 285."  *Nikko Materials USA, Inc. v. R.E. Serv. Co., Inc.*, 2006 WL 118438, at *5 (N.D. Cal. Jan. 13, 2006); *see also Powell v. Home Depot, USA, Inc.*, 2010 WL 4116488, at *24 (S.D. Fla. Sept. 14, 2010) (recommending that the prevailing party be awarded travel expenses incurred from attending a meeting with witnesses as part of attorneys' fees award), *rep. & recommendation adopted by* 2010 WL 4102933 (S.D. Fla. Oct. 18, 2010). Given that this is an exceptional case, the Court agrees that Innovention should be awarded its non-taxable costs, provided that the amount of non-taxable costs requested is reasonable.  The Court **REFERS** a determination of Innovention's reasonable non-taxable costs to the assigned U.S. Magistrate Judge for a report and recommendation.  As a result, Innovention's motion with respect to its request to recover non-taxable costs is **GRANTED IN PART** and **DEFERRED IN PART**.

56

**A83**

## V.    Expert Witness Fees

Innovention further requests the Court, using its inherent authority, to award Innovention the fees it incurred to retain expert witnesses in order to sanction Defendants for their misconduct.  MGA, on behalf of all Defendants, responds that "none of Defendants' alleged misconduct approaches 'defiling the temple of justice.' "[159]  Consequently, MGA argues that "sanctions beyond those contemplated by the Federal Rules and the patent laws are unwarranted."[160]

Title 35, United States Code, Section 285 does not permit a federal district court to award a prevailing party its expert witness fees.  35 U.S.C. § 285; *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1391 (Fed. Cir. 2008).  Nevertheless,  a court has inherent authority "to impose sanctions in the form of reasonable expert fees in excess of what is provided for by statute." *Takeda,* 549 F.3d at 1391; *MarcTec*, 664 F.3d at 921 (citing *Takeda*, 549 F.3d at 1391).  A court should award expert witness fees under its inherent authority only when it makes  a "finding of fraud or bad faith whereby the 'very temple of justice has been defiled.' " *Amsted Indus.*, 23 F.3d at 378 (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991)); *MarcTec*, 664 F.3d at 921.  "[N]ot every case that qualifies as exceptional under § 285 will also qualify for sanctions under the court's inherent power." *MarcTec*, 664 F.3d at 921.

The Court concludes that Innovention should not be awarded its reasonable expert witness fees.  As summarized above, Defendants engaged in wasteful litigation tactics that required the Court and Innovention to devote many precious resources to remedying

---

[159] R. Doc. 607 at p. 36.

[160] R. Doc. 607 at p. 36.

Defendants' misconduct.  Nevertheless, Defendants' conduct was not so egregious that justifies a "finding of fraud or bad faith whereby the very temple of justice has been defiled." *Amsted Indus.*, 23 F.3d at 378.  Consequently, the Court, having considered the entire record and the proceedings before, during and after trial, declines to exercise its discretion to award Innovention its reasonable expert witness fees  under the Court's inherent authority.  Thus, Innovention's motion with respect to its request for reasonable expert witness fees is **DENIED.**

### VI.    Prejudgment Interest

Upon a finding of patent infringement, "the court shall award patent damages . . . together with interest and costs as fixed by the court." 35 U.S.C. § 284. Prejudgment interest should be awarded under Section 284 absent some justification for withholding such an award. *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983); *Telcordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1378 (Fed. Cir. 2010). Thus, Innovention is entitled to prejudgment interest on the compensatory damages award pursuant to 35 U.S.C. § 284, calculated from the date infringement began to the date of judgment.  *Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 967 (Fed. Cir. 1986).

"The purpose of prejudgment interest is to place the patentee in as good a position as he would have been had the infringer paid a reasonable royalty instead of infringing." *SSL Services*, 2012 WL 4092449, at *6 (citing *Beatrice Foods v. New England Printing*, 923 F.2d 1576, 1580 (Fed. Cir. 1991)).  Innovention argues that in order to fully compensate it for the use of funds Innovention would have had but for Defendants' infringement, the Court should award Innovention prejudgment interest at the prime rate, compounded

annually.[161]  Innovention has submitted a 28 U.S.C. § 1746 declaration from its damages expert, Steven Boyles ("Boyles"), in support of its request for prejudgment interest. According to Boyles, an award of prejudgment interest at the prime rate, compounded annually, is appropriate because (1) Innovention borrowed money at a rate of interest that exceeded the prime rate; (2) Innovention, in essence, provided Defendants with an involuntary, unsecured loan at times when it could have used those funds to avoid having to draw on its lines of credit; (3) MGA entered into numerous licensing agreements in which it agreed to compensate licensors at the prime rate of interest, or in some instances, at a higher rate, for overdue royalties; and (4) Innovention's invoices reflect that it charges customers at a rate of 1.5% per month (18% per year) for unpaid balances on purchases made.[162]  Boyles has supplied the Court with an analysis of the interest that would be due if the Court applied the average prime interest rate from the date Defendants' infringement began through the date of judgment.

MGA responds that Innovention's requested interest rate is too high, because it "incorrectly assumes [Innovention] could charge Defendants the 'prime rate.' "[163]  MGA submits that, because the risk MGA would default on its obligations is very low, any hypothetical loan Innovention would make to MGA would charge a very low interest rate to reflect that there would be little risk of default.  MGA argues the Court "should adopt the

---

[161] R. Doc. 602 at p. 26.

[162] R. Doc. 602 at pp. 27-28; R. Doc. 602-2 (Boyles declaration and exhibits referenced therein); R. Doc. 602-3 (Larson declaration and exhibits referenced therein); R. Doc. 602-8 (Otteson declaration and exhibits referenced therein).

[163] R. Doc. 607 at p. 33.

average commercial interest rate (minimal risk of default) values" set forth in exhibit 2 of MGA's opposition memorandum.[164]

After carefully considering the parties' positions, the Court finds that an award of prejudgment interest at the prime rate, compounded annually, would serve to place Innovention in as good a position as it would have been had Defendants paid Innovention a reasonable royalty. As a result, the Court awards Innovention prejudgment interest on the $1,573,163.00 damages award at the prime rate, compounded annually, calculated from the date infringement began to the date of judgment. The Court believes that awarding Innovention prejudgment interest at the prime rate is the fairest way to achieve the compensatory purpose of prejudgment interest. *See SSL Services*, 2012 WL 4092449, at *7 (awarding patentee prejudgment interest, compounded quarterly, at the prime rate averaged over the actual period of infringement). The Court will determine the amount of prejudgment interest to be awarded on the date it enters judgment. As a result, Innovention's motion with respect to its request for prejudgment interest at the prime rate, compounded annually, is **GRANTED IN PART** and **DEFERRED IN PART**.

## VII.   Post-Judgment Interest

Innovention is entitled to post-judgment interest calculated from the date of entry of judgment at a rate equal to the weekly average 1-year constant maturity U.S. Treasury yield, for the calendar week preceding the date of the judgment. *See* 28 U.S.C. § 1961(a). The "[i]nterest shall be computed daily to the date of payment" and "shall be compounded annually." 28 U.S.C. § 1961(b). Furthermore, an award of post-judgment interest applies to all elements of the judgment, including damages and prejudgment interest. *Fuchs v.*

---

[164] R. Doc. 607-2 (exhibit 2 to MGA's opposition memorandum).

*Lifetime Doors, Inc.*, 939 F.2d 1275, 1280 (5th Cir. 1991); *Boston Old Colony Ins. v. Tiner Assocs., Inc.*, 288 F.3d 222, 234 (5th Cir. 2002) (citations omitted). As a result, Innovention's motion with respect to its request for post-judgment interest is **GRANTED**.

### VIII.  Injunction

As a practicing patentee, Innovention also requests the Court to enter a permanent injunction to prevent MGA from further infringing the '242 patent. *See eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006). Defendants ceased selling Laser Battle in 2010 and do not oppose Innovention's request for a permanent injunction "with the caveat that their opposition not be deemed an admission with respect to any other issue in the case."[165] Innovention "accepts that caveat."[166] The Court will enter a permanent injunction. Innovention shall provide language for the proposed injunction to the Court.

### *Conclusion*

Accordingly, for the reasons set forth above,

**IT IS ORDERED** that MGA's motion is **DENIED**.[167]

**IT IS FURTHER ORDERED** that Innovention's motion with respect to its request that the Court enter judgment that MGA's infringement was willful is **GRANTED**.

**IT IS FURTHER ORDERED** that Innovention's motion with respect to its request for enhanced damages is **GRANTED**. The Court will treble the amount of the damages the jury awarded to **$4,719,489.00**.

---

[165] R. Doc. 602 at p. 9 n.1.

[166] R. Doc. 602 at p. 9 n.1.

[167] R. Doc. 598.

**IT IS FURTHER ORDERED** that Innovention's motion with respect to its request for a finding of exceptional case and an award of attorneys' fees pursuant to 35 U.S.C. § 285 is **GRANTED IN PART** and **DEFERRED IN PART**. Given that this is an exceptional case, the Court will **AWARD** attorneys' fees. The Court **DEFERS** ruling on the amount of attorneys' fees to be awarded and hereby **REFERS** this issue to the assigned U.S. Magistrate Judge for a report and recommendation.

**IT IS FURTHER ORDERED** that Innovention's motion with respect to its request for taxable costs pursuant to 28 U.S.C. § 1920 is **GRANTED IN PART** and **DEFERRED IN PART**. The Court **AWARDS** Innovention its fees assessed by the Clerk of Court and the U.S. Marshal ($910) and fees incurred for printed or electronically recorded transcripts ($13,889.98). As to Innovention's request for exemplification and copying costs and interpreters' costs, a determination of those reasonable amounts is hereby **REFERRED** to the assigned U.S. Magistrate Judge for a report and recommendation.

**IT IS FURTHER ORDERED** that Innovention's motion with respect to its request for non-taxable costs pursuant to 35 U.S.C. § 285 is **GRANTED IN PART** and **DEFERRED IN PART**. The Court **AWARDS** Innovention its reasonable non-taxable costs pursuant to 35 U.S.C. § 285. The Court hereby **REFERS** a determination of Innovention's reasonable non-taxable costs to the assigned U.S. Magistrate Judge for a report and recommendation.

**IT IS FURTHER ORDERED** that Innovention's motion with respect to its request for expert witness fees pursuant to 35 U.S.C. § 285 is **DENIED**.

**IT IS FURTHER ORDERED** that Innovention's motion with respect to its request for prejudgment interest is **GRANTED IN PART** and **DEFERRED IN PART**. The Court

62

**A89**

**AWARDS** Innovention prejudgment interest on the $1,573,163.00 damages award at the prime rate, compounded annually, calculated from the date infringement began to the date of judgment. The Court **DEFERS** calculating the amount of prejudgment interest to be awarded until the date it enters judgment.

IT IS FURTHER ORDERED that Innovention's motion with respect to its request for post-judgment interest is **GRANTED**. The Court **AWARDS** Innovention post-judgment interest pursuant to 28 U.S.C. § 1961.

IT IS FURTHER ORDERED that Innovention shall provide proposed language for the injunction to the Court.

New Orleans, Louisiana, this __17th__ day of June, 2013.

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

INNOVENTION TOYS, LLC                    CIVIL ACTION

v.                                       NO. 07-6510

MGA ENTERTAINMENT, INC.,                 SECTION "F"
WAL-MART STORES, INC. and
TOYS "R" US, INC

ORDER AND REASONS

Before the Court is the defendants' motion for summary judgment as to plaintiff's claims for lost profits damages and provisional rights damages.  For the reasons that follow, the motion is GRANTED in part (as to lost profits damages) and DENIED in part (as to provisional rights damages).

Background

The facts are completely set forth in this Court's October 14, 2009 Order and Reasons, in which this Court ruled that the asserted claims of United States Patent No. 7,264,242 (the '242 patent) are both valid and infringed by MGA's Laser Battle Game, which is sold through Wal-Mart and Toys "R" Us.  Because the parties failed to address remedies in their cross-motions for summary judgment on validity and infringement, the Court noted that the damages issue remained for trial.  On January 13, 2010, the Court granted the plaintiff's motion for permanent injunction, enjoining the defendants from any further acts of infringement of claims 31-33,

1

**A91**

39-41, 43, 44, 48-50, 53, and 54.

On February 11, 2010 the defendants filed a Notice of Appeal in the Fifth Circuit; the appeal was subsequently transferred to the Federal Circuit. They appeal this Court's order granting a permanent injunction, as well as the underlying rulings in which the Court construed certain claim terms and determined that the asserted claims of the '242 Patent were valid and infringed. On April 14, 2010 the Court denied the defendants' motion to stay further proceedings pending appeal.

On July 26, 2010 the defendants moved for summary judgment directed to issues underlying plaintiff's claims for provisional rights damages and for lost profits damages; after granting a joint motion to continue the hearing date on the defendants' motion for summary judgment, the motion was set for hearing on September 22, 2010. On August 20, 2010, pursuant to Federal Rule of Civil Procedure 26(e), the plaintiff produced more than 1,000 pages of new documents, comprising invoices and other documents dated from May 2007 through July 2010, relating to the damages claim. Ten days later, on August 30, 2010, the defendants filed a motion to preclude plaintiff from relying on late-produced damages-related documents at trial or in response to defendants' pending motion for summary judgment. On September 14, 2010 this Court denied the motion, insofar as it sought to preclude the plaintiff from using its recently-produced damages evidence, but granted the motion to

2

**A92**

the extent it sought monetary sanctions; the Court also continued
the trial in order to permit discovery on the new document
production.

Innovention has since produced more materials[1] and, after
ordering supplemental papers addressing the new discovery, the
defendants now seek summary relief as to the plaintiff's claims for
provisional rights damages and lost profits damages.

## I. Standard for Summary Judgment

Federal Rule of Civil Procedure 56 instructs that summary
judgment is proper if the record discloses no genuine issue as to
any material fact such that the moving party is entitled to
judgment as a matter of law. No genuine issue of fact exists if
the record taken as a whole could not lead a rational trier of fact
to find for the non-moving party. See Matsushita Elec. Indus. Co.
v. Zenith Radio., 475 U.S. 574, 586 (1986). A genuine issue of
fact exists only "if the evidence is such that a reasonable jury

---

[1]In August 2010 Innovention began a rolling production of
documents relating to its claim to recover lost profits and/or a
reasonable royalty. Innovention has since produced more than 4,000
pages of material that it suggests goes to its damages claims.
Specifically, Innovention asserts that it has produced documents
such as sales invoices for each Khet game sold; purchase orders;
income tax statements; profit and loss statements; vendor invoices
and other documents relating to the cost of manufacture, shipping,
storage and handling of the Khet laser board game; and additional
documents relating to Innovention's marketing and manufacturing
capacity to have sold additional Khet games. Also, Innovention co-
founder and Chief Executive Officer Michael Larson and Innovention
President Luke Hooper have recently been deposed.

3

**A93**

could return a verdict for the non-moving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. <u>See</u> <u>id</u>. Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. <u>Id</u>. at 249-50 (citations omitted). Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. <u>See</u> <u>Donaghey v. Ocean Drilling & Exploration Co.</u>, 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. <u>Id</u>. Hearsay evidence and unsworn documents do not qualify as competent opposing evidence. <u>Martin v. John W. Stone Oil Distrib., Inc.</u>, 819 F.2d 547, 549 (5th Cir. 1987). Finally, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party. <u>Anderson</u>, 477 U.S. at 255.

## II.

Pursuant to 35 U.S.C. § 284, upon a finding of infringement, a patent owner is entitled to damages that are adequate to compensate for the infringement, but not less than a reasonable

4

**A94**

royalty. <u>Lam, Inc. v. Johns-Manville Corp.</u>, 718 F.2d 1056, 1064 (Fed. Cir. 1983)(citing <u>General Motors Corp. v. Devex Corp.</u>, 461 U.S. 648 (1983) and 35 U.S.C. § 284); <u>Aro Manufacturing Co. v. Convertible Top Replacement Co.</u>, 377 U.S. 476, 507 (1964)("The question to be asked in determining damages is "how much had the Patent Holder...suffered by the infringement. And that question [is] primarily: had the Infringer not infringed, what would the Patent Holder[] have made?")(citation omitted); <u>Rite-Hite Corp. V. Kelley Co., Inc.</u>, 56 F.3d 1538, 1580 (Fed. Cir. 1995).[2]

The defendants seek summary relief on the two distinct types of damages claimed by the plaintiff: provisional rights damages and lost profits damages.

---

[2]35 U.S.C. § 284 provides:

Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed. Increased damages under this paragraph shall not apply to provisional rights under section 154(d) of this title.

The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances.

A.  Provisional Rights Damages

Upon a finding of infringement, the patentee may be entitled to pre-issuance royalties.  Title 35 U.S.C. § 154(d) grants to a patentee

> the right to obtain a reasonable royalty from any person who, during the period beginning on the date of publication of the application for such patent...makes, uses, offers for sale, or sells in the United States the invention as claimed in the published patent application or imports such an invention into the United States.

35 U.S.C. § 154(d)(1)(A)(i).  The right to a reasonable royalty is available only if the claims of the issued patent are "substantially identical" to those as claimed in the published patent application.  35 U.S.C. § 154(d)(2).  Under this standard, "identical" does not mean verbatim; rather, the Court's focus is on whether the claims have undergone a substantive change.  <u>Slimfold Mfg. v. Kinkead Indus.</u>, 810 F.2d 1113, 1115 (Fed. Cir. 1987); <u>Laitram Corp. v. NEC Corp.</u>, 163 F.3d 1342, 1346 (Fed. Cir. 1998)(The proper inquiry is whether the scope of the claims has substantively changed, "not merely whether different words are used."); <u>Pandora Jewelry, LLC v. Chamilia, LLC</u>, No. 06-600, 2008 WL 3307156, at *9 (D. Md. Aug. 8, 2008)(The standard for substantial identity is the same as the one applied under 35 U.S.C. § 252 with respect to reissue patents).

Determining whether there has been a substantive change is a question of law for the Court to decide.  <u>Westvaco Corp. v. Int'l Paper Co.</u>, 991 F.2d 735, 741 (Fed. Cir. 1993).  Claim changes that

6

**A96**

simply clarify language used in the claims are not substantive changes.  Id. at 742.  In determining whether there has been a substantive change, the Court considers the claim language in the patent application and the issued patent, in light of the facts, including the prior art, the prosecution history, and other claims. See Laitram Corp., 163 F.3d at 1347-48 (noting that "it is difficult to conceive of many situations in which the scope of a rejected claim that became allowable when amended is not substantively changed by the amendment").

Applying these principles, the defendants' request for summary relief as to provisional rights damages hinges on whether the scope of the '242 patent is substantially identical to the scope of the '602 patent application.  If it is, then summary judgment is inappropriate.  If it is not, then summary judgment is warranted.

The defendants contend that, as a result of Innovention's narrowing of the published claims during prosecution, the claims of the '242 patent are not substantially similar to the broader claims in the published application, and Innovention is therefore not entitled to provisional rights damages pursuant to 35 U.S.C. § 154(d).  Specifically, the defendants contend that the option of having non-movable key pieces was present in the claims before Innovention amended them, but was excluded as a result of the narrowing amendments.

Innovention counters that the claims of the '602 publication

7

**A97**

were amended simply to recite explicitly that which was already implicitly claimed. Significantly, Innovention insists, the Patent Office Examiner found that claim 39 (as it appeared in the '602 application) was patentable even without the use of the word "movable" in the original claim. The concept of movable playing pieces is implicitly claimed in the '602 patent application: for example, published claim 31 recites a game "wherein alternate turns are taken to move playing pieces." Published claim 39 discloses a method whereby players take turns "moving, either in translation or a rotation, a piece..., said alternating moves continuing until one player illuminates the opposing player's key piece." Published claim 41 recites a game "wherein alternate turns are taken to move playing pieces. Thus, Innovention notes, the claims of the '602 publication always required that the pieces be movable. Therefore, the amendment to explicitly recite "movable game pieces" and "movable key game pieces" simply recites explicitly that which was necessarily and implicitly claimed in the '602 publication. Accordingly, Innovention concludes, the "movable" amendment did not alter the scope of the claims. The Court agrees; the prosecution history supports the plaintiff's contention; in the November 29, 2006 Office Action communication,[3] the Examiner explains the

---

[3]Innovention suggests that the defendants wrongly rely on page 1 of the November 29, 2006 Office Action communication; the face of page one identifies claims 39-54 as rejected but, a review of the complete communication, reveals the inclusion of claim 39 as rejected is simply a typographical error.

"Allowable Subject Matter":

> 8. Claims 35-39 are objected to as being dependent upon
> a rejected base claim, but would be allowable if
> rewritten in independent form including all of the
> limitations of the base claim and any intervening claims.
> 9. The following is a statement of reasons for the
> indication of allowable subject matter: The prior art
> does not disclose according to claim 39, a board game by
> opposed players; said game consisting of two sets of
> distinguishable playing pieces, one set for each player,
> each set having pieces with no mirrored surfaces, of
> which one is a key piece, pieces with one mirrored
> surface, and pieces with two mirrored surfaces, a game
> board consisting of a first end, a second end, and a
> plurality of rows and columns, said rows and columns
> intersecting to form a plurality of squares, the method
> comprising the steps of: a) placing each player's set of
> playing pieces on the game board in a pre-determined
> starting configuration; b) said players alternating
> turns, each turn consisting of moving, either a
> translation or a rotation, a piece followed by activation
> of a laser; said alternating moves continuing until one
> player illuminates the opposing player's key piece; and
> c) the moves of said pieces consisting of a movement one
> square in any horizontal, vertical, or diagonal direction
> to any unoccupied adjacent square.

While it is true that the plaintiff amended claim 39 to add "movable", the record supports its contention that it did so for clarity purposes. No substantive change occurs where the claims are amended simply to make them more definite. <u>Tennant Co. v. Hako Minuteman, Inc.</u>, 878 F.2d 1413 (Fed. Cir. 1989). Indeed, Innovention invokes cases in which the later addition of an element already present in the claim by implication was permissible to provide an antecedent basis without changing the scope of the patent. <u>See</u> <u>Slimfold Mfg. Co. v. Kinkead Indus.</u>, 810 F.2d 1113, 1116-17 (Fed. Cir. 1987)(no change in scope where patentee added "a

9

**A99**

collar on said sleeve" to provide antecedent basis for later-recited "said collar"); Dart Indus., Inc. v. E.I. Du Pont de Nemours & Co., 348 F. Supp. 1338, 1343 (N.D. Ill. 1972), rev'd on other grounds, 489 F.2d 1359 (7th Cir. 1973), cert. denied, 417 U.S. 933 (1974)(no change in scope where "elongated" added to claim to provide antecedent basis for "longitudinally"). Innovention notes that the other claim language (which describes moving game pieces) makes clear that being stationary rather than movable was not an option for the game pieces.

The Court finds that the scope of the claims of the '242 patent is substantially identical to the scope of the claims of the patent application. Accordingly, the defendants have failed to show that they are entitled to judgment as a matter of law on the issue of Innovention's assertion of entitlement to provisional rights damages.

B. Lost Profits Damages Claim

If a patent owner seeks recovery beyond a reasonable or established royalty, it "must prove actual damages to establish entitlement to lost profits." Oiness v. Walgreen Co., 88 F.3d 1025, 1029 (Fed. Cir. 1996)(citation omitted). "Proof of actual damages must include a causal connection between the infringement and the lost profits." Id. (citing Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1585 (Fed. Cir.)(en banc), cert. denied, 516 U.S. 867 (1995)).

10

**A100**

"To recover lost profits as actual damages, a patent holder must demonstrate that there was a reasonable probability that, but for the infringement, it would have made the infringer's sales." Oiness v. Walgreen Co., 88 F.3d at 1029 (quoting Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc., 976 F.2d 1559, 1577 (Fed. Cir. 1992)(citation omitted)); Wechsler v. Macke Int'l Trade, Inc., 486 F.3d 1286, 1293 (Fed. Cir. 2007) (citation omitted)(When the patent owner's claim for lost profits is based on lost sales, "the patent owner has an initial burden to show a reasonable probability that he would have  made the asserted sales 'but for' the infringement."). Once the patent owner satisfies this burden, "the burden then shifts to the accused infringer to show that [the patent owner's 'but for' causation showing] is unreasonable for some or all of the lost sales." Id. (citations omitted). The availability of lost profits damages is a question of law that is appropriate for summary relief.  Id. ("the availability of lost profits is a question of law for the court, not the jury.... Only after the court has decided, as a matter of law, that lost profits are available does the jury then get to determine the amount of those lost profits.")(citations omitted).

To establish entitlement to lost profits, a patentee "need not negative every possibility that the purchaser might not have bought another product other than his absent the infringement.  Instead, the patentee need only show that there was a reasonable probability

11

**A101**

that the sales would have been made 'but for' the infringement." Kaufman Co., Inc. v. Lantech, Inc., 926 F.2d 1136, 1141-42 (Fed. Cir. 1991). "Any doubts regarding the calculatory precision of the damage amount must be resolved against the infringer." Id. However, "[t]o show causation and entitlement to lost profits, the patentee must reconstruct the market to show 'likely outcomes with infringement factored out of the economic picture.'" Shockley v. Arcan, Inc., 248 F.3d 1349, 1362 (Fed. Cir. 2001)(citation omitted). This "requires 'sound economic proof of the nature of the market.'" Id. (citation omitted).

Again, once the Court determines that lost profits are available, quantum is for the jury. See, e.g., Utah Medical Prods., Inc. v. Graphic Controls Corp., 350 F.3d 1376, 1385 (Fed. Cir. 2003)(affirming jury's identification of relevant market under two-supplier market test); Micro Chemical, Inc. v. Lextron, Inc., 318 F.3d 1119, 1123-24 (Fed. Cir. 2003)(holding that there was a genuine issue of material fact concerning product demand factor, applying test articulated in Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152 (6th Cir. 1978), because a reasonable jury could find demand for the patented features of the machines).

"The Panduit and two-supplier market tests are recognized methods of showing 'but for' causation." Micro Chemical, Inc., 318 F.3d at 1122 (citation omitted)("Admittedly, this court's precedent has not reconciled completely the two-supplier test with the

12

**A102**

Panduit test).    The patentee must prove four requirements to satisfy the Panduit test: (1) a demand for the patented product, (2) the marketing and manufacturing capability to exploit demand, (3) an absence of acceptable non-infringing substitutes, and (4) the amount of profit the patentee would have made.  Kaufman Co., Inc., 926 F.2d at 1140-41 (citing Panduit Corp, 575 F.2d 1152). Satisfying the elements of this test creates an inference that it probably would have made all the sales but for the occurrence of the infringing sales.  Id. at 1141.

"The same inference can be compelled by another course[,]" the Federal Circuit has observed: "When the patentee and the infringer are the only suppliers present in the market, it is reasonable to infer that the infringement probably caused the loss of profits." Id.  Under this two-supplier test, a patentee must show (1) the relevant market contains only two suppliers, (2) its own manufacturing and marketing capability to make the sales that were diverted to the infringer, and (3) the amount of profit it would have made from these diverted sales.  Micro Chemical, Inc., 318 F.3d at 1122 (citation omitted)("In essence, the two-supplier market test collapses the first two Panduit factors into one 'two suppliers in the relevant market' factor").

Innovention invokes the two-supplier market test.  The defendants challenge Innovention's ability to establish a reasonable probability that it would have made the asserted sales

13

**A103**

but for the infringement; they suggest that Innovention has offered only inadmissible evidence on this issue and therefore cannot satisfy its burden.  Innovention counters that it has offered such proof as documentation from Innovention's Chinese manufacturer, Temaru Electronics Technology Co., Ltd., which shows that it had the capacity since 2007 to manufacture 200,000 games per year and could increase its volume to 300,000 per year with three months' notice.  Innovention also points to documentation from Express Logistics, Inc. (which received, stored, and filled Innovention's orders), showing the company's ability to have met increased demand from Innovention during the lost profits period.

The defendants object to this evidence, contending that it is inadmissible hearsay.  The plaintiff counters that the offered evidence satisfies the business records exception to the hearsay rule, and also suggests that Innovention intends to have representatives of Temeru and Express Logistics testify as trial witnesses.[4]  Innovention adds that it has evidence of its marketing ability because Larson was told by buyers for Wal-Mart and Toys 'R Us that they were not interested in stocking the Khet game because they were already selling a competitor's similar game.  The hearsay obstacle rears itself here, too.  But the plaintiff urges, or hopes, that statements by unidentified agents constitute admissions by a party opponent and therefore are not hearsay under Federal

---

[4] Which merely seems to underscore the hearsay taint.

14

**A104**

Rule of Evidence 801(d)(2)(D).

Even assuming that Innovention had shown that Innovention and MGA were the only two suppliers in the relevant market, the Court finds that Innovention fails to meet its burden to establish its own manufacturing and marketing capability to make the sales that were diverted to MGA. The defendants correctly note that the only evidence submitted by Innovention in support of this element of its lost profits claim constitutes inadmissible hearsay, which cannot be relied upon by the Court for the purposes of summary judgment.[5]

---

[5] Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Innovention seeks to rely on a document Mr. Larson says is from its manufacturer; it offers this document for the truth of the matter asserted (that Temaru has had the capacity since 2007 to manufacture 200,000 games per year and could increase its volume to 300,000 per year with three months' notice). Innovention also seeks to rely on a document purportedly from the company tasked with receiving, storing, and fulfilling its Khet orders; it offers a letter from the Vice President of Express Logistics for the truth of the matter asserted (that Express Logistics would have been able to meet increased demand from Innovention during the lost profits period). Innovention fails to establish a foundation in the record for its suggestion that these documents meet the requirements of the business records exception (Fed.R.Evid. 803(6)) to the hearsay rule. The records pointed to are not Innovention's records. Finally, as to its marketing capacity, Innovention relies on Larson's statement that he spoke with unidentified buyers from Wal-Mart and Toys 'R Us at the 2006 toy fair. However, "in situations where a purported agent is not identified by name, a district court should be presented with sufficient evidence to conclude that the person who is alleged to have made the damaging statement is in fact a party or an agent of that party for purposes of making an admission with the contest of [Federal Rule of Evidence] 801(d)(1)(D)." Recursion Software, Inc. v. Interactive Intelligence, Inc., 425 F. Supp. 2d 756, 770 (N.D. Tex. 2006). Innovention fails to convince the Court to treat the hearsay statements as admissions by a party-opponent.

15

**A105**

Accordingly, the defendants' motion for summary judgment as to plaintiff's claims for lost profits damages and provisional rights damages is GRANTED in part (as to lost profits damages) and DENIED in part (as to provisional rights damages).

New Orleans, Louisiana, February 3, 2011.

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

16

**A106**

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| INNOVENTION TOYS, LLC | |
| Plaintiff, | Civ. A. No. 07-6510 |
| v. | Section E |
| | JUDGE MORGAN |
| MGA ENTERTAINMENT, INC., WAL-MART STORES, INC. and TOYS "R" US, INC., | |
| Defendants. | |

## JURY VERDICT FORM

When answering the following questions and filling out this verdict form, please follow the directions provided throughout the form. Your answer to each question must be unanimous. Some of the questions contain legal terms that are defined and explained in detail in the jury instructions. Please refer to the jury instructions if you are unsure about the meaning or usage of any legal term that appears in the questions below.

We, the jury, unanimously agree to the answers to the following questions and return them under the instructions of this Court as our verdict in this case.

# I. FINDINGS ON OBVIOUSNESS

The ultimate conclusion that must be reached on the obviousness question is whether Defendants have proven that it is highly probable that the inventions claimed in the '242 patent would have been obvious to a person of ordinary skill in the field at the time of the invention. In order to properly reach the ultimate conclusion in Question No. 5, the following preliminary questions (Question Nos. 1-4) must be answered:

## QUESTION NO. 1: LEVEL OF ORDINARY SKILL IN THE ART

When evaluating the obviousness or nonobviousness of the '242 patent, you must view the prior art from the perspective of a person of ordinary skill in the art at the time of the invention. The parties disagree on the definition of the level of ordinary skill in the art to be used in that evaluation. Having heard their respective positions, select the level of skill of the person of ordinary skill in the art at the time of invention that you determine has been shown by the evidence. Please check only one answer.

_____X_____ **(For Innovention)**. A hypothetical person of ordinary skill in the art relevant to the '242 patent would have a Bachelor's Degree in Mechanical Engineering or equivalent experience.

_____ **(For Defendants)**. A hypothetical person of ordinary skill in the art relevant to the '242 patent would have at least a Bachelor's Degree in Mechanical Engineering, or the equivalent, and three years of experience designing optical systems involving lasers, laser detectors, mirrors, and precision alignment.

*Please proceed to Question No. 2.*

## QUESTION NO. 2:  DIFFERENCES BETWEEN THE CLAIMS AND THE PRIOR ART

Are there any differences between the combination of the prior art and the asserted claims of the '242 patent?  Please check only one answer.

    ____X____  **Yes,** there are differences (for Innovention).

    _____  **No,** there are no differences (for Defendants).

*Please proceed to Question No. 3.*

**QUESTION NO. 3: MOTIVATION TO COMBINE**

For each of the following claims of the '242 patent, is it highly probable that a person having ordinary skill in the art, as of the date of the invention of the '242 patent, would have been motivated to combine the teachings of Laser Chess/Advanced Laser Chess with the Swift patent to create the invention set forth the claim, and would have had a reasonable expectation of success in doing so?

Marking "no" is a finding in favor of Innovention. Marking "yes" is a finding in favor of Defendants.

**For Claim 31:**

No____X____ (for Innovention)          Yes_____ (for Defendants)

**For Claim 32:**

No____X____ (for Innovention)          Yes_____ (for Defendants)

**For Claim 33:**

No____X____ (for Innovention)          Yes_____ (for Defendants)

**For Claim 39:**

No____X____ (for Innovention)          Yes_____ (for Defendants)

**For Claim 40:**

        No_____X_____ (for Innovention)        Yes_____ (for Defendants)

**For Claim 41:**

        No_____X_____ (for Innovention)        Yes_____ (for Defendants)

**For Claim 43:**

        No_____X_____ (for Innovention)        Yes_____ (for Defendants)

**For Claim 44:**

        No_____X_____ (for Innovention)        Yes_____ (for Defendants)

**For Claim 48:**

        No_____X_____ (for Innovention)        Yes_____ (for Defendants)

**For Claim 49:**

        No_____X_____ (for Innovention)        Yes_____ (for Defendants)

**For Claim 50:**

No_____X_____ (for Innovention)          Yes_____ (for Defendants)

**For Claim 53:**

No_____X_____ (for Innovention)          Yes_____ (for Defendants)

**For Claim 54:**

No_____X_____ (for Innovention)          Yes_____ (for Defendants)

*Please proceed to Question No. 4.*

## QUESTION NO. 4: OBJECTIVE FACTORS RELATING TO NONOBVIOUSNESS

Which, if any, of the following objective factors has Innovention established with respect to the claimed inventions? Checking the box "Established" is a finding in favor of Innovention. Checking the box "Not Established" is a finding in favor of Defendants.

| Factor | Established (for Innovention) | Not Established (for Defendants) |
|---|---|---|
| Commercial success of a product embodying the patented invention due to the merits of the claimed invention, rather than due to advertising, promotion, or salesmanship | X | |
| A long felt need for the solution that is provided by the claimed invention | X | |
| Copying of the claimed invention by others | X | |
| Unexpected and superior results from the claimed invention over the closest prior art | X | |
| Acceptance by others of the claimed invention as shown by praise from others in the field or from the licensing of the claimed invention | X | |
| Surprise, initial skepticism, or disbelief regarding the claimed invention | X | |

*Please proceed to Question No. 5.*

## QUESTION NO. 5: WHETHER EACH CLAIM IS OBVIOUS

After considering your answers to Question Nos. 1-4, for each of the following claims of the '242 patent, have Defendants proven that it is highly probable that such claim would have been obvious to a person having ordinary skill in the art as of the date of the invention of the '242 patent?

For the following series of questions, marking "no" is a finding in favor of Innovention. Marking "yes" is a finding in favor of Defendants.

**For Claim 31:**

No_____X_____ (for Innovention)          Yes_____ (for Defendants)

**For Claim 32:**

No_____X_____ (for Innovention)          Yes_____ (for Defendants)

**For Claim 33:**

No_____X_____ (for Innovention)          Yes_____ (for Defendants)

**For Claim 39:**

No_____X_____ (for Innovention)          Yes_____ (for Defendants)

**For Claim 40:**

      No_____X_____ (for Innovention)        Yes_____ (for Defendants)


**For Claim 41:**

      No_____X_____ (for Innovention)        Yes_____ (for Defendants)


**For Claim 43:**

      No_____X_____ (for Innovention)        Yes_____ (for Defendants)


**For Claim 44:**

      No_____X_____ (for Innovention)        Yes_____ (for Defendants)


**For Claim 48:**

      No_____X_____ (for Innovention)        Yes_____ (for Defendants)


**For Claim 49:**

      No_____X_____ (for Innovention)        Yes_____ (for Defendants)

**A115**

**For Claim 50:**

      **No**_____X_____ (for Innovention)      **Yes**_____ (for Defendants)

**For Claim 53:**

      **No**_____X_____ (for Innovention)      **Yes**_____ (for Defendants)

**For Claim 54:**

      **No**_____X_____ (for Innovention)      **Yes**_____ (for Defendants)

*If you answered "Yes" for every claim in Question No. 5, skip the remaining questions and proceed to the final page of this form.*

*If you answered "No" as to any claim in Question No. 5, proceed to Question No. 6.*

## II. DAMAGES

**QUESTION NO. 6:  For the period from October 18, 2006, to September 3, 2007 (Pre-Issuance Reasonable Royalty Damages)**

What amount of damages, if any, has Innovention proven, more likely than not, that it is entitled to as a reasonable royalty for the period from October 18, 2006, to September 3, 2007?

$ _167,455_

*Please proceed to Question No. 7.*

**QUESTION NO. 7:** **For the period from September 4, 2007, to January 12, 2010 (Post-Issuance Lost Profit Damages and/or Post-Issuance Reasonable Royalty Damages)**

7A.  What amount of lost profits, if any, has Innovention proven that it more likely than not suffered as a result of the Defendants' infringement from September 4, 2007, to January 12, 2010?

$ _1,405,708_ (This amount should not include the amount, if any, that you award to Innovention in response to Question No. 7B, below.)

7B.  With respect to Defendants' infringing sales during the period from September 4, 2007, to January 12, 2010, for which Innovention has not proven that it is entitled to lost profits, to what amount of reasonable royalty damages is Innovention entitled?

$ _0_ (This amount should not include the amount, if any, that you awarded to Innovention in response to Question No. 7A, above.)

*Please proceed to Question No. 8.*

## III.  WILLFUL INFRINGEMENT

**QUESTION NO. 8:**  Has Innovention proven that it is highly probable that MGA's infringement of the '242 patent was willful?

Yes___X___ (for Innovention)     No_____ (for MGA)

*Please proceed to the next page.*

You have now reached the end of the verdict form and should review it to ensure that it accurately reflects your unanimous determinations.  The Foreperson should then sign and date the verdict form in the spaces below and notify the U.S. Marshal that you have reached a verdict.

New Orleans, Louisiana, this _____9 th_____ day of November 2012.

_____
FOREPERSON SIGNATURE

_____
FOREPERSON NAME (PRINTED)

US007264242B2

(12) **United States Patent**
Hooper et al.

(10) **Patent No.: US 7,264,242 B2**
(45) **Date of Patent: Sep. 4, 2007**

(54) **LIGHT-REFLECTING BOARD GAME**

(75) Inventors: **Luke Jackson Hooper**, Norman, OK (US); **Del Alan Segura**, Denham Springs, LA (US); **Michael Charles Larson**, New Orleans, LA (US)

(73) Assignee: **Innovention Toys, L.L.C.**, Denham Springs, LA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/353,863**

(22) Filed: **Feb. 13, 2006**

(65) **Prior Publication Data**

US 2006/0226602 A1    Oct. 12, 2006

**Related U.S. Application Data**

(60) Provisional application No. 60/652,533, filed on Feb. 14, 2005, provisional application No. 60/679,821, filed on May 11, 2005.

(51) Int. Cl.
*A63F 3/00* (2006.01)

(52) **U.S. Cl.** ....................... **273/238**; 273/237; 273/460

(58) **Field of Classification Search** ............... 273/275, 273/288, 289, 290–291, 236–237, 459–460, 273/339, 364, 284

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,516,671 A | 6/1970 | Estrin |
| 4,017,072 A | 4/1977 | Kurtz |
| 4,182,514 A | 1/1980 | Magid et al. |
| 4,376,538 A | 3/1983 | Keenan |
| 5,145,182 A * | 9/1992 | Swift et al. ................. 273/238 |
| 6,488,583 B1 | 12/2002 | Jones et al. |
| 2004/0080107 A1 * | 4/2004 | Triplette .................... 273/237 |

* cited by examiner

*Primary Examiner*—Robert E. Pezzuto
*Assistant Examiner*—Alex F. R. P. Rada, II
(74) *Attorney, Agent, or Firm*—Lowrie, Lando & Anastasi, LLP

(57) **ABSTRACT**

A board-type game to be played by two or more players. The game includes lasers where players selectively divert the path of the laser beams. The board apparatus comprises a surface, bounded by a frame, over which laser beams are directed down symbolic rows and columns which constitute a matrix of squares. Each square is a subregion of the surface piece, and is bounded along its four sides by raised edges which are parallel and perpendicular rows and columns of the board. The raised edges, creating recessed squares, assist in orienting the playing pieces. Playing pieces may contain no mirror, one mirror, or two mirrors (oriented back-to-back to produce separate surfaces reflecting in opposite directions). Playing pieces are placed in a predetermined "starting" configuration on the squares of the gridded surface piece. Depending on whether a playing piece contains a mirror or not, said piece may reflect an incident laser beam from a row to a column or from a column to a row. A laser is placed in a predetermined position, in front of each player. The players alternate in moving pieces from square to square or rotating pieces in place, on the gridded surface, with the object of either directing their laser beam toward the opponent's "key" piece or preventing their opponent's laser beam from reaching their own "key" piece.

**54 Claims, 16 Drawing Sheets**



EXHIBIT
1

INNOV000238



FIG 1

INNOV000239



FIG 2

INNOV000240



FIG 3



INNOV000242



FIG 5

INNOV000243



INNOV000244



INNOV000245



FIG 12

FIG 11

FIG 10

INNOV000246



FIG. 14



FIG. 13

INNOV000247



INNOV000248



INNOV000249



INNOV000250



FIG 18

INNOV000251



INNOV000252



FIG 20

INNOV000253



INNOV000254

US 7,264,242 B2

1

# LIGHT-REFLECTING BOARD GAME

## CROSS REFERENCES TO RELATED APPLICATIONS

U.S. Provisional Patent Application No. 60/652,533, filed 14 Feb. 2005, and U.S. Provisional Patent Application No. 60/679,821, filed 11 May 2005, are incorporated herein by reference. Priority of those applications is hereby claimed.

## STATEMENT REGARDING FEDERALLY SPONSORED RESEARCH OR DEVELOPMENT

Not Applicable.

## REFERENCE TO A "MICROFICHE APPENDIX"

Not Applicable.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to board type games played on a game board or surface, preferably a substantially orthogonally gridded, planar surface, and more particularly to a game which selectively diverts a beam (e.g. laser beam) by user-placed mirrored game pieces that are moved laterally or rotated during play.

2. Description of the Related Art

Many board games have been provided which use paths across their surface as part of the game. An example of such a game is chess. In addition, games exist that depend on the deflection or reflection of objects off of other objects to "score" points.

The following US Patents are examples of board games, each hereby incorporated herein by reference: U.S. Pat. Nos. 3,516,671; 5,145,182; and 6,702,286.

U.S. Pat. No. 3,516,671 (the '671 patent) describes a board game that combines the features of the players creating paths and deflection of the paths. The '671 patent shows a board game, having a matrix comprised of rows and columns, and an energy source, which is electricity in the preferred embodiment, that can be selectively positioned to direct energy along a selected column, thereby creating an energy path. The energy path may be diverted to a row and then back to a column by deflecting pieces. The deflecting pieces may be small mirrors. However, the '671 patent does not contemplate a plurality of styles for pieces, directing energy toward a mobile game piece of an opponent, nor the unique elements and rules of the instant invention.

U.S. Pat. No. 5,145,182 (the '182 patent) describes a board game that combines the features of the players creating paths with laser beams and deflection of the laser beam paths. The '182 patent shows a board game, having a matrix comprised of rows and columns, multiple laser beams that can be selectively directed along a selected row or column, thereby creating a laser beam path. The energy path may be diverted to a row and then back to a column by selectively-placed deflecting pieces. The deflecting pieces may be small mirrors. The object of each player is to direct their laser beams toward the opponent's light-detecting scoring module while preventing the opponent's laser beams from reaching their own scoring module. The '182 patent does not contemplate providing a separate single beam for each player, instead of multiple lasers per player. The '182 patent also does not contemplate a game played without a light-detecting scoring module. Importantly, the '182 patent does not

2

describe a game wherein players begin the game with playing pieces placed in a predetermined "starting" configuration on the playing surface, or wherein players take turns moving said pieces on the surface to change their position or orientation; instead, the '182 patent contemplates turn-by-turn addition of playing pieces to the game board.

U.S. Pat. No. 6,702,286 (the '286 patent) describes a war strategy board game that combines the features of player-initiated playing piece movement with illumination of the playing grid. The '286 patent describes illumination of radial and latitudinal paths adjacent to playing pieces, said illumination provided by electric circuitry and lights. The stated purpose for illumination is to help players know when two pieces are flanking (thus surrounding, and capturing) an opposing piece. The '286 patent does not contemplate using a beam to illuminate playing pieces or mirrors to deflect light and thereby illuminate playing pieces. The '286 patent contemplates a game in which the object is to maneuver one's pieces to flank (or surround) those of the opposing player.

Strategy games may differ in a variety of ways. For example, the boards may contain different layouts or fields of positions. Each player may have the same or a different number of playing pieces. Each player may have the same or different kinds of playing pieces with superior strengths or capabilities. Playing pieces may be placed on the board at the start of the game or throughout the game. The playing pieces may move in a wide variety of ways on their respective boards. Players may capture the opposing pieces by moving their pieces to jump, surround, occupy the same position as, or otherwise affect the opposing pieces. Some games are limited to two players, while others allow two or more players. Each of these variations affects the strategy of play and the degree of skill required to play the game against a knowledgeable opponent.

Game designs should produce a balance between opposing players or sides. Neither player should have a significant advantage over the other simply based on which side or set of pieces they are playing, or who moves first. The combination of board size and geometry, the types and number of playing pieces, the layout of the interconnecting playable positions, the manner each piece moves on the board, the manner of capture and the number of allowable players should all be taken into consideration when designing a strategy game.

Game designs should involve a desired degree of skill and variation of possible moves and outcomes. They should reward strategy and thought. If the board layout, types and number of pieces, rules of movements, rules of capture and criterion for completion are overly simplistic, the game is too easy, will usually end in a draw or a predictable manner, and quickly become uninteresting for the average player. An example is "tic-tac-toe," which (although often played with pen and paper, could also be played on a board) usually ends in a draw. Conversely, if the board size and layout, number and kinds of pieces, and rules of movement and capture are overly complicated, the game takes too long to learn is frustrating and uninteresting for the average player.

## BRIEF SUMMARY OF THE INVENTION

The present invention is a game that employs a game board or playing surface, over which beams (e.g. laser beams) are directed in one embodiment down symbolic rows and columns that constitute a matrix of squares (each square

INNOV000255

US 7,264,242 B2

3

being formed at the intersections of said rows and columns), and game playing pieces, some possessing surfaces which reflect the said laser beams.

The present invention combines the strategy of traditional board games with modern technology, for an engaging experience. The rules are simple enough to be learned in minutes, but the options during play are plentiful enough so as to be neither dull nor predictable.

The game of the present invention has the universal and enduring appeal of classic games, such as chess, checkers and go, in an embodiment which incorporates lasers.

The game of the present invention generates a "beam" for each player, which can be a low-powered laser diodes to emit a beam of colored light. These beams are reflected and deflected around the playing field by mirrored surfaces of pieces, or stopped by non-mirrored surfaces of pieces.

The game is won by a player who strategically maneuvers pieces to reflect a laser beam so as to illuminate a key piece belonging to his opponent, e.g., a "Pharaoh" or "King" piece.

With each turn, a player may move one of his pieces to one of the potentially eight, unoccupied adjacent squares (front, back, left, right or diagonal) or may rotate (re-orient) one of his pieces.

After moving or rotating a piece, that player presses a fire button that triggers the emission of a beam above and parallel to the playing surface. If the beam hits a non-mirrored surface of a playing piece, that piece is removed from the board and eliminated from further play, unless it is the key piece, e.g., "King" or "Pharaoh" piece, in which case the game ends.

The pieces can vary in design and setup, with mirrors being located on multiple (e.g. one, two or more) sides or no sides.

## BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWINGS

For a further understanding of the nature, objects, and advantages of the present invention, reference should be had to the following detailed description, read in conjunction with the following representative drawings, wherein like reference numerals denote like elements and wherein:

FIG. 1 is a perspective view of the preferred embodiment of the apparatus of the present invention;

FIG. 2 is a plan view of the preferred embodiment of the apparatus of the present invention;

FIG. 3 is a partial perspective view of the preferred embodiment of the apparatus of the present invention showing the game board with game pieces removed;

FIG. 4 is a partial perspective view of the preferred embodiment of the apparatus of the present invention showing the game board with no playing pieces and illustrating hidden electrical components and wiring;

FIG. 5 is a bottom perspective view of the preferred embodiment of the apparatus of the present invention showing electrical game board components;

FIG. 6 is a perspective view of one of the game pieces, a "key" game piece in the form of a Pharaoh playing piece having no mirrored surfaces;

FIG. 7 is a top view of the game piece of FIG. 6;

FIG. 8 is a perspective view of one of the game pieces in the form of an Obelisk playing piece having no mirrored surfaces;

4

FIG. 9 is a top view of the game piece of FIG. 8;

FIG. 10 is a perspective view of one of the game pieces in the form of a Pyramid playing piece having one mirrored surface;

FIG. 11 is a perspective view of the game piece of FIG. 10 in the form of a Pyramid playing piece having one mirrored surface;

FIG. 12 is a top view of the game piece of FIGS. 10-11;

FIG. 13 is a perspective view of one of the game pieces in the form of a Djed Column playing piece having multiple mirrored surfaces;

FIG. 14 is a top view of the game piece of FIG. 13;

FIG. 15 is a partial perspective view of the preferred embodiment of the apparatus of the present invention illustrating a lateral movement of one of the game pieces to an adjoining or adjacent square;

FIG. 16 is a partial perspective view of the preferred embodiment of the apparatus of the present invention illustrating a rotating move of one of the game pieces;

FIG. 17 is a partial perspective view of the preferred embodiment of the apparatus of the present invention illustrating a mirrored game piece reflecting a laser transmission;

FIG. 18 is a partial perspective view of the preferred embodiment of the apparatus of the present invention illustrating a mirrored game piece receiving the laser beam on a non-mirrored surface;

FIG. 19 is a partial plan view of the preferred embodiment of the apparatus of the present invention illustrating a transmission of the laser beam to multiple mirrored game pieces and then to a non-mirrored surface of a game piece resulting in removal of that game piece; and

FIG. 20 is a plan view of the preferred embodiment of the apparatus of the present invention illustrating transmission of the laser to multiple mirrored game pieces and to the non-mirrored key game piece ending the game;

FIG. 21 is a schematic plan view of the game board portion of the preferred embodiment of the apparatus of the present invention and illustrating each square using a column and row number.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

FIGS. 1-4 show the laser game board apparatus of the present invention, designated generally by the numeral 10. Laser game board apparatus 10 provides a game board 11 having an upper playing surface 12 and a lower surface 13. Board 11 has a periphery 14. Raised border 15 is positioned at periphery 14.

The raised border 15 includes a plurality of sections or flanges that can be flat or planar as shown. The raised sections includes horizontal section 16, outer vertical section 17, and inner vertical section 18. A playing area 23 is defined by a plurality of smaller areas or squares that can be recessed areas 23A, each preferably being square in shape.

There are a pair of laser activating buttons 19, 20 positioned at opposing sides of game board 11 as shown in FIGS. 1-2. Each of the laser activating buttons 19, 20 activates a laser. Each of two players has control of a button 19 or 20 during a game. The laser activating button 19 activates laser 21 for a first player. The laser activating button 20 operates laser 22 for a second player.

Each of the recessed square areas 23A is surrounded by a raised border 25 that can be square in shape as shown. The raised border 25 can be comprised of a plurality of raised elements 24.

INNOV000256

US 7,264,242 B2

5

In the bottom peripheral view of FIG. 5, lower section 13 of game board 11 reveals cavity 26 that is defined by the sections 16, 17, 18 of raised border 15. Cavity 26 provides one or more battery compartments 27. The cavity 26 can be used for containing wiring 28 that interconnects a battery (or batteries) and lasers 21, 22 so that power supplied by a battery that occupies battery compartment 27 can be used to power the lasers 21, 22.

During play, a beam 29 is selectively emitted by each laser 21, 22 when activated by a player's control button 19 or 20. The laser beam 29 that is emitted by a laser 21 or 22 provides a visible indication of whether or not a particular game piece 30, 35, 40, 50 has been hit by the beam 29. An illumination appears on the particular game piece 30, 35, 40, 50 such as for example a red or orange circular illumination or dot. However, some of the game pieces (40, 50) provide mirrored surfaces so that while the beam strikes the mirrored surface 45 or 55 or 56 of that particular game piece, it is also reflected toward another game piece 30, 35, 40, 50.

In FIGS. 6 and 7, the game piece 30 is the key game piece, namely that game piece that ends the game when it is hit with beam 29. Game piece 30 provides a base 31 having a periphery 32. Vertically extending portion 33 of game piece 30 extends upwardly from base 34. In the embodiment shown in FIGS. 6 and 7, the game piece 30 is in the form of a Pharaoh. However, other forms can be used for key game piece 30 (e.g. King, Queen, etc.).

In FIGS. 8 and 9, another game piece 30 is shown, in the form of an Obelisk. Game piece 35 has a base 36 with a periphery 37. Vertically extending portion 38 extends upwardly from base 36. Game piece 35 also provides a generally flat or planar underside 39. Each of the game pieces 35, 40 is non-mirrored so that if either is struck by a laser beam 29, it is removed from the game board playing area 23.

The game piece 40 shown in FIGS. 10-12 has a base 41 with a periphery 42. The base 41 provides a flat or planar underside 43. A vertically extending portion 44 extends upwardly from base 41. The vertically extending portion 44 provides a mirrored surface 45. As shown in FIG. 12, the mirrored surface 45 forms an angle 46 of about 45 degrees with the sides of base 41 at periphery 42. Thus, the mirrored surface 45 falls upon a reference line 49 that extends from corner 47 to corner 48. When a laser beam 29 strikes mirrored surface 45, it will turn 90 degrees as will be illustrated more fully hereinafter.

The game piece 50 is also a mirrored game piece. Game piece 50 provides a base 51 having an underside 52 and a periphery 53. The underside 52 is preferably flat or planar. A vertically extended portion 54 of game piece 50 provides a pair of mirrored surfaces 55, 56 as shown in FIGS. 13 and 14. Each of the mirrored surfaces 55, 56 forms an angle of about 45 degrees with any side of periphery 53.

FIGS. 15 and 16 illustrate the moves that are available to a particular game piece 30, 40, 45, 50. In FIG. 15, the game piece 50 is shown occupying one of the recessed areas 23A. Arrows 57 illustrate that game piece 50 can more to an adjacent square in an orthogonal direction while arrows 58 indicate that game piece 50 can be moved diagonally as well to an adjacent space.

In FIG. 16, curved arrows 59 illustrate that game piece 50 can be rotated. A rotational move is important for one of the mirrored game pieces 40, 50 in that it changes the position of the mirror 45, 55, 56 relative to the beam 29 that is emitted by either of the lasers 21, 22 (see FIG. 17).

FIGS. 1 and 2 show the game board, containing laser fire buttons 19, 20 and lasers 21, 22 having apertures. Two sets

6

of playing pieces are shown, one can be of a dark color (e.g. gold) and one can be light in color (e.g. silver). FIGS. 1 and 2 shown one possible configuration to start a game. The particular configuration and combination of pieces, i.e., Pharaohs 30, Obelisks 35, Pyramids 40, and Djed columns 50, shown works very well for beginners and seasoned players, creating a challenging scenario at the onset.

The rules for moving and taking turns work well for a wide variety of starting configurations, and it is anticipated that players may begin with any starting configuration for which there is mutual agreement.

Game board 11 can consist of a playing surface 23, with a recessed grid of rows and columns, and a bounding frame or border 15. Each of the squares 23A at the intersections of the rows and columns on the board surface are recessed so as to ensure proper alignment of playing pieces. Correspondingly, the bases 31, 36, 41, 51 of the pieces 30, 35, 40, 50, which fit into the recessed squares 23A have the same shape so as to ensure proper alignment.

The raised border or frame 15 houses two laser diodes 21, 22, or any other collimated light source(s). If diodes 21, 22 are used, they will be of low power, being either class I, class II or class III lasers 21, 22. The light sources are oriented such that the beams 29 are parallel to the playing surface 23 or the floor of the game board 11 and are aligned with column 1 and column 10, as shown in FIG. 21. The raised border frame 15 acts as a bounding surface to prevent the laser light beams 29 from extending beyond the boundaries of the game board, i.e., the beam 29 doesn't leave the confines of the playing surface 23.

In the preferred embodiment, the lasers 21, 22 are powered by a battery or batteries which are housed in a compartment(s) 27 in the frame cavity 26. Also contained in frame cavity 26 are the wires which make two parallel electrical connections, each making serial links between the batteries, a laser fire switch button 19, 20 and a laser diode 21, 22. The laser fire buttons switch can each be a normally open switch which activates the laser 21, 22 closest to it, for the duration the button 19, 20 is depressed. Once a button 19 or 20 is released, the laser is deactivated.

The game pieces 30, 35, 40, 50 can be made of translucent plastic so as to glow when stuck by the laser beam on any non-mirrored surface.

The game piece 30 (i.e. Pharaoh or key piece), have no mirrored surfaces. The loser of the game is the first to have his or her key game piece 30 (e.g. Pharaoh) illuminated by a light beam 29, which signifies the end of a game.

The game piece 40 possesses one surface which is a mirror 45 that reflects impinging laser light. Other surfaces of the piece 40 are non-mirrored. The mirror or mirrored surface 45 is oriented perpendicular to the base 41, and along a diagonal line which passes through opposite corners 47, 48 of the base 41. This mirror 45 orientation, coupled with the square base 41 seating into a recessed square 23A of the game board 11, ensures that when the piece 40 is in any space 23A that puts the mirrored surface in the path of a laser beam 29, the beam reflects at a right angle. This results in a change of the beam path in one of two ways, either (1) beams 29 traveling parallel to columns on the game board are reflected to be parallel to rows on the game board 11, or (2) beams 29 traveling parallel to rows are reflected to be parallel to columns. If the piece 40 is in any space that puts one of its non-mirrored surfaces in the path of a laser beam 29, the piece 40 is illuminated and removed from play at the end of a player's turn.

The double-mirrored piece 50 can be shaped as an Egyptian Djed column. The piece 50 has two surfaces 55, 56

A239

7

which are mirrors to reflect impinging laser light. These mirrored surfaces 55, 56 may be totally reflective mirrors mounted back-to-back and oriented perpendicular to the base 51, and along a diagonal line which passes through opposite corners 60, 61 of the base 51 (see FIG. 14). The mirrored surfaces 55, 56 may be opposite sides of a single beam-splitting, partial mirror (also known as a "one-way mirror", "two-way mirror", or "beam-splitter".) This mirror surface orientation, coupled with the square base 51 seating into the recessed squares 23A of the game board 11, ensures that when the piece 50 is in any space 23A that puts it in the path of a laser beam 29, that all or part of the beam 29 reflects at a right angle. This results in a change of the beam path in one of two ways, either (1) beams 29 traveling parallel to columns are reflected to be parallel to rows, or (2) beams 29 traveling parallel to rows are reflected to be parallel to columns. When partial mirrors are used, a portion of the impinging beam will continue along its original path and will not be diverted, leading to the creation of two beams from a single light source. Since laser beams 29 impinging upon a double-mirrored Djed piece 50 will always strike a mirrored surface, these pieces are never illuminated and therefore never removed from play.

A turn can consist of a player moving one of his or her pieces 30, 35, 40, 50 to an adjacent, unoccupied square (see FIG. 15). One variation permits Djed Column pieces to move into adjacent squares which are occupied by either Obelisks 35 or Pyramids 40 belonging to either player. If this is done, the displaced piece is moved, retaining its rotational orientation, to the square which the Djed Column piece 50 vacates.

FIG. 16 illustrates that a player may rotate one of his or her pieces (such as game piece 50 shown) one-quarter turn (i.e., 90 degrees) either clockwise or counter-clockwise (see arrows 57).

FIG. 17 shows a laser beam 29 reflecting off surface 45 of game piece 40 (e.g. a Pyramid in this case).

8

50, 40, 50, 40, 50 before terminating on the non-mirrored surface of the key game piece 40 (e.g. a Pyramid), which would be removed from the game board at the end of this turn.

FIG. 20 shows a top view of the game board 11 with a possible configuration of pieces to represent a game in-progress. The heavy line represents a laser beam 29 which reflects from four mirrored surfaces on four pieces 50, 40, 50, 40 before terminating on the non-mirrored surface of key game piece 30 (e.g. a Pharaoh). Such a situation would mark the end of the game. The player whose key game piece 30 (e.g. Pharaoh) was hit by the beam is the loser.

FIG. 21 shows a numbering scheme for the rows and columns of the game board 11, for the purpose of aiding the description of play. While a specific composition of pieces comprising each set, along with a specific starting configuration, is discussed below, it is important to note that the pieces composing each set at the beginning of the game can be any number and combination of types agreed upon by the two contestants, as long as there is one Pharaoh (key piece) each. Likewise, at the start of a game, the pieces can be arranged in any agreed upon configuration, as long as the placements of pieces in each player's set has the same arrangement when viewed from one side of the board as the arrangement of the opponent's pieces has when viewed from the opposite side of the board. (This arrangement holds true in traditional chess, with the exception of the placement of the king and queen, which are symmetric about the chess board's midline running between the two starting positions, i.e., white has the king on the right of the queen, while black has the queen on the left of the king.)

Assuming the two colors used to differentiate the players' sets of pieces are gold and silver, the following table provides a guide to the starting positions for those players' pieces. This configuration is shown in a perspective view in FIG. 1 and in a top view in FIG. 2. The square designations for column and rows are given in FIG. 21. For this specified arrangement, the gold-player's laser fire button is the one closest to the C10R1 square, while the silver-player's button is closest to the C1R8 square.

| Player | Piece type | Quantity | Starting location specified in FIG. 10 by column and row numbers. When applicable, mirror surface is toward corner designated by A, B, C or D. | | | | | | |
|--------|-----------|----------|-----|-----|-----|-----|-----|-----|-----|
| gold | Pharaoh | 1 | C5R1 | | | | | | |
| gold | Obelisk | 2 | C4R1 | C6R1 | | | | | |
| gold | Pyramid | 7 | C3R1 D | C8R2 C | C3R4 D | C10R 4 A | C3R5 A | C10R 5 D | C4R 6 D |
| gold | Djed Column | 2 | C5R4 D | C6R4 C | | | | | |
| silver | Pharaoh | 1 | C6R8 | | | | | | |
| silver | Obelisk | 2 | C5R8 | C7R8 | | | | | |
| silver | Pyramid | 7 | C7R3 B | C1R4 B | C8R4 C | C1R5 B | C8R5 C | C3R7 A | C8R 8 B |
| silver | Djed Column | 2 | C5R5 C | C6R5 D | | | | | |

FIG. 18 shows a laser beam 29 terminating on a non-mirrored surface of a typical piece 40 (a Pyramid in this case). This game piece 40 would be removed from play in this illustration of FIG. 18.

FIG. 19 shows a top view of the game board 11 with a possible configuration of pieces 30, 35, 40, 50 to represent a game in-progress. A heavy line represents a laser beam 29 which reflects from multiple mirrored surfaces on five pieces

Players alternate turns. A turn consists of a player moving one of his pieces (all the pieces move in the same way, unlike in chess where each piece type is governed by a different rule for moving) either: (1) to one of the potentially eight squares which are contiguous to the presently occupied square, rearward, forward, backward, left, right, or diagonally, as long as the new square is unoccupied, while preserving the orientation of the piece, or (2) by a clockwise or counter-

INNOV000258

US 7,264,242 B2

9

clockwise quarter turn (i.e., ±90 degrees about the vertical centerline of the piece) while remaining in the presently occupied space. (There will be fewer than eight spaces available to pieces located at the periphery of the playing board.) The pieces may not, however, occupy a space in the column which corresponds to the opponent's laser location, e.g., for the starting configuration of FIGS. **1**, **2** and using the space and corner designations of FIG. **21** with the silver player operating the laser button **19** and the gold player operating the laser button **20**. Silver pieces are not permitted to occupy any space in column **10** and gold pieces are not permitted to occupy any space in column **1**.

After a player moves a piece, he presses his laser fire button **19** or **20**. Any piece **30**, **35**, **40**, **50** which is illuminated on a non-mirrored surface is removed from the board, no matter to which player the piece belongs, and the turn shifts to the other player (opponent).

PARTS LIST

The following is a list of parts and materials suitable for use in the present invention:

| Parts Number | Description |
|---|---|
| 10 | laser game board apparatus |
| 11 | game board |
| 12 | upper surface |
| 13 | lower surface |
| 14 | periphery |
| 15 | raised border |
| 16 | horizontal section |
| 17 | outer vertical section |
| 18 | inner vertical section |
| 19 | laser activating button |
| 21 | laser activating button |
| 22 | laser |
| 23 | playing area |
| 23A | recessed square surface area |
| 24 | raised element |
| 25 | raised square border |
| 26 | cavity |
| 27 | battery compartment |
| 28 | wiring |
| 29 | laser beam |
| 30 | key game piece |
| 31 | base |
| 32 | periphery |
| 33 | vertically extending portion |
| 34 | underside |
| 35 | game piece |
| 36 | base |
| 37 | periphery |
| 38 | vertically extending portion |
| 39 | underside |
| 40 | game piece |
| 41 | base |
| 42 | periphery |
| 43 | underside |
| 44 | vertically extending portion |
| 45 | mirrored surface |
| 46 | angle |
| 47 | corner |
| 48 | corner |
| 49 | reference line |
| 50 | game piece |
| 51 | base |
| 52 | underside |
| 53 | periphery |
| 54 | vertically extended portion |
| 55 | mirrored surface |
| 56 | mirrored surface |
| 57 | orthogonal arrow |
| 58 | diagonal arrow |

10

-continued

| Parts Number | Description |
|---|---|
| 59 | curved arrow |
| 60 | corner |
| 61 | corner |
| 62 | corner |

It will be understood that each of the elements described above, or two or more together may also find a useful application in other types of methods differing from the type described above. Without further analysis, the foregoing will so fully reveal the gist of the present invention that others can, by applying current knowledge, readily adapt it for various applications without omitting features that, from the standpoint of prior art, fairly constitute essential characteristics of the generic or specific aspects of this invention set forth in the appended claims. The foregoing embodiments are presented by way of example only; the scope of the present invention is to be limited only by the following claims.

The invention claimed is:

**1**. A board game, comprising:
a game board having a playing surface and a cavity for holding electronic components;
a plurality of game pieces, each having a base with a periphery and an under surface;
the playing surface being segmented into a plurality of spaces, each defining a location that can be occupied by one of the game pieces;
a first beam emitting device mounted to the game board;
a second beam emitting device mounted to the game board;
a first control button that enables a first player to activate and deactivate the first beam emitting device;
a second control button that enables a second and opposing player to activate and deactivate the second beam emitting device;
mirrored surfaces being provided upon multiple of the game pieces, some of the pieces having more than one mirrored surface; and
the game pieces, spaces and beam emitting devices being so configured that when a beam emitted by the beam emitting device strikes a mirrored surface on a game piece that occupies a space, the beam reflects along a line that traverses one or more other spaces.

**2**. The board game of claim **1** wherein the beam emitting devices are each laser diodes.

**3**. The board game of claim **1** wherein one of the game pieces is a key game piece that enables a game to be ended when a beam strikes the key piece of one of the players.

**4**. The board game of claim **3** wherein the key game piece is non-mirrored.

**5**. The board game of claim **1** wherein there are two key game pieces, enabling a key game piece to be associated with each of two opposing game players.

**6**. The board game of claim **5** wherein the key game pieces are non-mirrored.

**7**. The board game of claim **1** wherein each of the spaces is recessed.

**8**. The board game of claim **7** wherein each game piece has a base that is sized and shaped to fit a recessed space.

**9**. The board game of claim **1** wherein each of the spaces is surrounded by a raised border.

INNOV000259

US 7,264,242 B2

<table>
<tr><td>11</td><td>12</td></tr>
</table>

**10**. The board game of claim **9** wherein each game piece has a base that is sized and shaped to fit inside the raised border of a space.

**11**. The board game of claim **1** wherein some of the mirrored pieces have a mirror that forms an angle of about 45 degrees with the beam emitted by a beam emitting device.

**12**. The board game of claim **1** wherein at least one mirror has a surface that reflects a beam emitted by the beam emitting device an angle of about 90 degrees when the game piece occupies a space traversed by a beam emitted by a beam emitting device.

**13**. The board game of claim **1** wherein the beam control buttons are positioned on opposite sides of the game board.

**14**. The board game of claim **1** wherein the game board has a raised periphery that disallows transmission of a beam beyond the periphery of the game board.

**15**. A game comprising:

a game board having a playing surface and one or more receptacles for holding electronic components;

a plurality of game pieces, each having a base with a periphery and an under surface, some of the game pieces being mirrored and some of the game pieces being non-mirrored;

the playing surface being segmented into a plurality of spaces, each defining a location that can be occupied by one of the game pieces;

one of the electronic components being a first beam emitting device mounted to the game board;

another electronic component being a second beam emitting device mounted to the game board;

a first control button that activates and deactivates the first beam emitting device;

a second control button that activates and deactivates the second beam emitting device;

the game pieces, spaces and beam emitting devices being so configured that when a beam emitted by the beam emitting device strikes a mirrored surface on a game piece that occupies a space, the beam reflects along a line that traverses one or more other spaces.

**16**. The game of claim **15** wherein the beam emitting devices are each laser diodes.

**17**. The game of claim **16** wherein the spaces are arranged in a matrix of rows and columns.

**18**. The game of claim **15** wherein there are two key game pieces, enabling a key game piece to be associated with each of two opposing game players.

**19**. The game of claim **15** each of the spaces is surrounded by a raised border.

**20**. The game of claim **15** wherein some of the mirrored pieces have a mirror that forms an angle of about 45 degrees with the beam emitted by a beam emitting device.

**21**. The game of claim **15** wherein at least one mirror has a surface that reflects a beam emitted by the beam emitting device an angle of about 90 degrees when the game piece occupies a space traversed by a beam emitted by a beam emitting device.

**22**. The game of claim **15** wherein each space is recessed and each game piece has a base that is sized and shaped to fit inside the recessed space.

**23**. The game of claim **15** wherein the game has a raised periphery that disallows transmission of a beam beyond the periphery of the game board.

**24**. The game of claim **15** wherein the spaces are arranged in a matrix.

**25**. A laser game comprising:

a game having a playing surface and a cavity for holding electronic components;

a plurality of game pieces, each having a base with a periphery and an under surface, some of the game pieces being mirrored and some of the game pieces being non-mirrored;

the playing surface being segmented into a plurality of rows and columns defining spaces at the intersection of each row and column, each space defining a location that can be occupied by one of the game pieces;

a first beam emitting device mounted to the game board;

a second beam emitting device mounted to the game board;

a first control button that activates and deactivates the first beam emitting device;

a second control button that activates and deactivates the second beam emitting device;

the beam emitting devices being mounted to emit a beam along a column and the spaces being positioned so that when a beam emitted by the beam emitting device strikes a mirrored surface on a game piece that occupies a space, the beam reflects along a line that traverses one or more of the space of a row.

**26**. The laser game apparatus of claim **25** wherein each space provides a recess that is receptive of a game piece.

**27**. The laser game of claim **26** wherein some of the game pieces have multiple surfaces that are mirrored.

**28**. The laser game of claim **25** wherein there are two sets of game pieces.

**29**. The laser game of claim **25** wherein some of the game pieces have multiple surfaces that are mirrored.

**30**. The laser game of claim **25** further comprising a raised peripheral border and wherein each beam emitting device is positioned to emit a beam along a line that extends between the beam emitting device and the border.

**31**. A board game for two opposing players or teams of players comprising:

a game board, movable playing pieces having at least one mirrored surface, movable key playing pieces having no mirrored surfaces, and a laser source,

wherein alternate turns are taken to move playing pieces for the purpose of deflecting laser beams, so as to illuminate the key playing piece of the opponent.

**32**. The board game of claim **31**, wherein pieces can be positioned to prevent the opponent from illuminating the key playing piece.

**33**. The board game of claim **31**, wherein the pieces can be positioned in recesses on the board to ensure reflection of the laser beam.

**34**. The board game of claim **31**, comprising:

a checkerboard-style game board having first and second ends, a pair of opposed sides, and a playing surface comprising a plurality of spaces to form a checkerboard pattern, said spaces forming a plurality of columns extending between said sides, and a plurality of rows extending between said ends;

two sets of game pieces, comprising at least one piece without a mirrored surface, and at least one piece possessing at least a single mirror surface;

said game pieces having initial locations in respective spaces on said game board; and

a board which houses two or more laser diodes.

**35**. The board game of claim **31**, comprising:

a checkerboard-style game having first and second ends, a pair of opposed sides, and a playing surface comprising a plurality of spaces to form a checkerboard

INNOV000260

US 7,264,242 B2

13

14

pattern, said spaces forming a plurality of rows extending between said sides, and a plurality of columns extending between said ends;

two sets of game pieces comprising one Pharaoh, two Obelisks, seven Pyramids, and two Djeds; 5 and

two laser diodes.

**36.** The board game of claim **35**, wherein the game includes eight rows.

**37.** The board game of claim **35**, wherein the game 10 includes ten columns.

**38.** The board game of claim **35**, wherein the game includes eighty squares.

**39.** A method of playing a game by opposed players; said game comprising two sets of distinguishable playing pieces, 15 each set having movable pieces with no mirrored surfaces, of which one is a key piece, and pieces with at least one mirrored surface, a game board consisting of a first end, a second end, and a plurality of rows and columns, intersecting to form a plurality of spaces, the method comprising the 20 steps of:

placing each player's set of playing pieces on the game in a pre-determined starting configuration; and

alternating turns, each turn comprising moving, either a translation or a rotation, a piece followed by activation 25 of a laser, said alternating moves continuing until one player illuminates the opposing player's key piece;

wherein moving a piece consists of a movement one space in a horizontal, vertical, or diagonal direction to an unoccupied adjacent space. 30

**40.** A method of playing a game by opposed players, said game comprising two sets of distinguishable playing pieces, each set having movable pieces with no mirrored surfaces, of which one is a key piece, and pieces with at least one mirrored surface; and a game board consisting of a first end, 35 a second end, and a plurality of rows and columns intersecting to form a plurality of spaces, the method comprising the steps of:

placing each player's set of playing pieces on the game in a pre-determined starting configuration; and 40

alternating turns, each turn comprising moving, either a translation or a rotation, a piece followed by activation of a laser, said alternating moves continuing until one player illuminates the opposing player's key piece;

wherein moving a piece consists of a movement one space 45 in a horizontal, vertical, or diagonal direction to an

available adjacent square, or of remaining in the same space and rotating the piece.

**41.** A board game for multiple opposing players or teams of players, comprising:

a game board, movable playing pieces having at least one mirrored surface, movable key playing pieces having no mirrored surfaces, and a laser source,

wherein alternate turns are taken to move playing pieces for the purpose of deflecting laser beams, so as to illuminate the key playing piece of the opponent.

**42.** The board game of claim **41**, wherein multiple, horizontal playing surfaces are parallel and arranged in a vertically-stacked arrangement.

**43.** The board game of claim **41**, wherein pieces reflect the light at a 90 degree angle while keeping the laser beam parallel to the playing surface.

**44.** The board game of claim **41**, wherein pieces reflect the laser beam at an arbitrary and/or adjustable angle while keeping the laser beam parallel to the playing surface.

**45.** The board game of claim **43**, wherein pieces reflect the laser beam at an angle to reflect the laser beam from one game board level to another.

**46.** The board game of claim **41**, wherein pieces can split an incident laser beam into multiple laser beams.

**47.** The board game of claim **41**, wherein pieces allow an incident laser beam to pass through from one direction while reflecting a laser beam from another.

**48.** The board game of claim **41**, wherein pieces illuminate when in the path of a laser beam.

**49.** The board game of claim **41**, wherein pieces are moveable and emit laser beams.

**50.** The board game of claim **41**, wherein pieces have multiple component parts.

**51.** The board game of claim **41** further comprising means for visually revealing the path of the laser beams.

**52.** The board game of claim **41**, wherein the and pieces magnetically attract.

**53.** The board game of claim **41**, wherein switches control the illumination of the laser beam sources.

**54.** The board game of claim **41**, wherein a sound is generated when the key playing piece is illuminated.

\* \* \* \* \*

INNOV000261

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing BRIEF FOR DEFENDANTS-

APPELLANTS MGA ENTERTAINMENT, INC., WAL-MART STORES, INC.,

AND TOYS "R" US, INC.were served upon registered counsel by operation of the

Court's CM/ECF system on this 21st day of October, 2014.

> James C. Otteson, Esq.
> AGILITY IP LAW, LLP
> 149 Commonwealth Drive
> Menlo Park, CA 94025
> e-mail: jim@agilityiplaw.com

> _____/s/Kay Wylie_____

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 13,798 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

Date: October 21, 2014        /s/  Allen M. Sokal
                              Allen M. Sokal
                              Finnegan, Henderson, Farabow,
                                Garrett & Dunner, L.L.P.
                              Attorney for Appellants